**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

              v.

SERGEY SHESTAKOV,

              Defendant.

Case No. 23 Cr. 16 (JHR)

 

**MEMORANDUM OF LAW IN SUPPORT OF**
**SERGEY SHESTAKOV'S MOTION TO COMPEL**
**THE GOVERNMENT TO PRODUCE DISCOVERY**

**GLAVIN PLLC**
Rita M. Glavin
Katherine E. Petrino
Leo S. Korman
156 W. 56th Street, Ste. 2004
New York, NY 10019
rglavin@glavinpllc.com

*Counsel for Sergey Shestakov*

## <u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ................................................................................................... ii

I.      BACKGROUND ......................................................................................................... 7

      A.      The 2018 U.S. Sanctions on Deripaska and USAO's Investigations of Deripaska's Efforts to Evade those U.S. Sanctions ............................... 7

            1.      *United States v. Graham Bonham-Carter*, 22 Cr. 503 (PAE) ................... 9

            2.      *United States v. Deripaska et al.*, 22 Cr. 518 (PKC) .............................. 12

            3.      *United States v. Charles McGonigal et al.*, 23 Cr. 16 (JHR) ................... 14

II.     APPLICABLE LAW ............................................................................................... 18

III.    ARGUMENT ............................................................................................................ 19

      A.      Rule 16 Requires Production of the Requested Materials .................................. 21

            1.      The USAO Has Possession, Custody, or Control over the *Deripaska* and *Bonham-Carter* Discovery ............................... 21

            2.      Evidence from *Deripaska* and *Bonham-Carter* Demonstrates that Shestakov Was Not in a Conspiracy with Deripaska and Doing Business with Him ............................... 22

      B.      *Brady* Requires Disclosure of the Requested Materials ....................................... 24

      C.      The USAO's Recent Discovery Violations Require Much Greater Scrutiny by the Court of USAO Representations about Compliance with Their Discovery Obligations ............................... 25

IV.    CONCLUSION ....................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. 18, 24

*Giglio v. United States*, 405 U.S. 150 (1972) ................................................................. 18

*Kyles v. Whitley*, 514 U.S. 419 (1995) .......................................................... 18, 19, 24

*Murray v. U.S. Dep't of Just.*, 821 F. Supp. 94 (E.D.N.Y. 1993) ................................ 24

*Nnodimele v. Derienzo*, No. 13 Cv. 3461 (ARR) (RLM), 2016 WL 3561708 (E.D.N.Y. June 27, 2016) ................................................................................................................. 25

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) ....................................... 25

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) ............................................... 19

*United States v. Bagley*, 473 U.S. 667 (1985) ............................................................. 24

*United States v. Gallo*, 654 F. Supp. 463 (E.D.N.Y. 1987) ......................................... 19

*United States v. Martinez*, 844 F. Supp. 975 (S.D.N.Y. 1994) .................................... 19

*United States v. Messina*, No. 11 Cr. 31 (KAM), 2011 WL 3471511 (EDNY Aug. 8, 2011) ........................................................................................................................ 22, 23

*United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020) ........................ 25, 26, 27

*United States v. Niket Jain*, 19 Cr. 59 (PKC), 2020 WL 6047812 (S.D.N.Y. Oct. 13, 2020) ............................................................................................................................... 27

*United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005) ............................................ 24

*United States v. Seabrook*, No. 16 Cr. 467 (AKH), 2021 WL 2709360 (S.D.N.Y. July 1, 2021) ............................................................................................................................... 24

*United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) ................................ 19, 22

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017) ................................................. 18

*Wearry v. Cain*, 577 U.S. 385 (2016) .......................................................................... 24

**Rules**

Federal Rule of Criminal Procedure 16 ................................................................... 18, 25

**Other Authorities**

En+ Group, *Annual Report 2018* at 2 (Apr. 26, 2018),
https://enplusgroup.com/upload/iblock/bb8/EN_AR2018_ENG_ FINAL.pdf ..................... 14

*Evgeny Fokin Business Leaders Biography*, MARKETSCREENER (last visited Oct. 19,
2023) https://www.marketscreener.com/business-leaders/Evgeny-Fokin-0CNHF6-
E/biography/ ................................................................................................................. 14

Exec. Order No. 13660, 79 Fed. Reg. 13493–95 (Mar. 6, 2014) ................................................. 7

Haroon Siddique, *UK Businessman's Accounts Frozen Over Suspected Links to Oleg
Deripaska*, THE GUARDIAN (Mar. 4, 2022),
https://www.theguardian.com/world/2022/mar/04/uk-businessman-graham-bonham-
carter-accounts-frozen-over-links-oleg-deripaska ................................................. 10

Henry Vaughan, *US Drops Bid to Extradite British Businessman Linked to Russian
Oligarch*, THE INDEPENDENT (Mar. 3, 2023, 10:45 AM GMT),
https://www.independent.co.uk/news/uk/crime/oleg-deripaska-national-crime-
agency-vladimir-putin-british-home-office-b2293490.html ................................. 11

Jack Queen, *'Bury It': Inside a Hidden Evidence Scandal That Rocked SDNY*, LAW360
(Mar. 15, 2021), https://www.law360.com/articles/1364454 ................................. 27

Press Release, Dep't of Justice, *Retired FBI Executive Charged with Concealing
$225,000 in Cash Received From an Outside Source* (Jan. 23, 2023),
https://www.justice.gov/usao-dc/pr/retired-fbi-executive-charged-concealing-225000-
cash-received-outside-source ................................................................................. 16

Press Release, Dep't of Justice, *U.K. Businessman Graham Bonham-Carter Indicted for
Sanctions Evasion Benefitting Russian Oligarch Oleg Vladimirovich Deripaska* (Oct.
11, 2022), https://www.justice.gov/opa/pr/uk-businessman-graham-bonham-carter-
indicted-sanctions-evasion-benefitting-russian-oligarch ....................................... 10

Press Release, U.S. Dep't of the Treasury, *Treasury Designates Russian Oligarchs,
Officials, and Entities in Response to Worldwide Malign Activity* (Apr. 6, 2018),
https://home.treasury.gov/news/press-releases/sm0338 ......................................... 7

Press Release, United States Dep't of Justice, *Attorney General Merrick B. Garland
Announces Launch of Task Force KleptoCapture* (Mar. 2, 2022),
https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-
launch-task-force-kleptocapture ................................................................................. 8

Robert Kim, *Bonham Carter Stars in Real Estate Blockbusters of Russian Oligarch Oleg
Deripaska*, KHARON (May 10, 2022), https://www.kharon.com/updates/bonham-
carter-stars-in-real-estate-blockbusters-of-russian-oligarch-oleg-deripaska ......................... 11

Shane Harris, et al., *Former FBI Agent's Side Work Puts Bureau Under New Scrutiny*,
 WASHINGTON POST (Feb. 13, 2023), https://www.washingtonpost.com/national-
 security/2023/02/13/mcgonigal-albania-deripaska-indictment-fbi/........................................ 15

U.S. Customs and Border Protection, *TECS-Secondary Inspection Report Evgeny Fokin*
 (Aug. 16, 2021) (on file with counsel)................................................................................... 14

United States Dep't of Justice, *Fact Sheet: Justice Department Efforts in Response to
 Russia's February 2022 Invasion of Ukraine* (Feb. 24, 2023),
 https://www.justice.gov/d9/press-
 releases/attachments/2023/02/24/2023.02.23_doj_ukr_fact_sheet_final_1.pdf...................... 8

**Court Filings**

*United States v. Deripaska et al.*, 22 Cr. 518 (PKC) (S.D.N.Y.).................................................... 12

*United States v. Graham Bonham-Carter*, No. 22 Cr. 503 (PAE) (S.D.N.Y.)............................... 9

Defendant Sergey Shestakov respectfully moves to compel the government to produce records that are both material to preparing his defense and exculpatory that were derived, in whole or in part, in connection with two related sanctions indictments brought by the U.S. Attorney's Office for the Southern District of New York ("USAO") in September 2022, which, like the instant case brought by the USAO in January 2023, charge alleged conspiracies by Russian oligarch Oleg Deripaska to evade U.S. sanctions imposed on him in 2018 through the use of shell companies, foreign bank accounts, and foreign nationals who have worked closely with Deripaska. Specifically, the defense seeks the following materials, most if not all of which were collected by the USAO during the Deripaska investigations that resulted in the indictments *United States v. Oleg Deripaska et al.*, 22 Cr. 518 (PKC) and *United States v. Graham Bonham-Carter*, 22 Cr. 503 (PAE):

- Images of or records from seized electronic devices related to or associated with Deripaska, or parties associated with Deripaska, including Gracetown Inc., En+, GBCM Limited, Global Consulting Services LLC, Graham Bonham-Carter, Terra Services, Turcos Limited, Ocean Studios LLC, Pavel Ezubov, Evgeny Fokin, Olga Shriki, Natalia Bardakova, Ekaterina Voronina, and defendants and unindicted co-conspirators in this matter (*e.g.*, Evgeny Fokin);

- Financial records related to or associated with Deripaska, or parties associated with Deripaska including Gracetown Inc., En+, GBCM Limited, Global Consulting Services LLC, Turcos Limited, Ocean Studios LLC, Graham Bonham-Carter, Terra Services, Pavel Ezubov, Olga Shriki, Natalia Bardakova, Ekaterina Voronina, and defendants and other unindicted co-conspirators in this matter;

5

- Records of corporate entities related to or associated with Deripaska, or parties associated with Deripaska, including Gracetown Inc., GBCM Limited, En+, Global Consulting Services LLC, Turcos Limited, Ocean Studios LLC, Graham Bonham-Carter, Terra Services, Pavel Ezubov, Olga Shriki, Natalia Bardakova, Ekaterina Voronina, and defendants and unindicted co-conspirators in this matter;

- Intercepted and/or electronic communications related to Deripaska, or parties associated with Deripaska, including electronic communications of Graham Bonham-Carter, Pavel Ezubov, Olga Shriki, Natalia Bardakova, Ekaterina Voronina, and defendants and unindicted co-conspirators in this matter;

- Search warrant returns and seized items pursuant to search warrants executed at Mr. Deripaska's properties; and

- Surveillance records, phone records, and communications of Mr. Deripaska and parties associated with Deripaska, including Graham Bonham-Carter, Olga Shriki, Natalia Bardakova, Ekaterina Voronina, and defendants and unindicted co-conspirators in this matter.

These records (the "Discovery Materials") are material to preparing Mr. Shestakov's defense that there was no conspiracy with Deripaska (or anyone else) to violate U.S. sanctions laws as charged in the Indictment, and/or Mr. Shestakov was not knowingly involved in any such conspiracy. Mr. Shestakov is innocent. These materials are required to be produced by the USAO under Rule 16 and *Brady v. Maryland.*

I.     **BACKGROUND**

A.  **The 2018 U.S. Sanctions on Deripaska and USAO's Investigations of Deripaska's Efforts to Evade those U.S. Sanctions**

On April 6, 2018, the U.S. government subjected Russian oligarch Oleg Deripaska to economic sanctions prohibiting him from transferring, paying for, exporting, and withdrawing "all property and interest in property that are in the United States, that [thereafter] come within the United States, or that are [thereafter] come within possession or control of any United States person." Exec. Order No. 13660, 79 Fed. Reg. 13493–95 (Mar. 6, 2014); *see* Press Release, U.S. Dep't of the Treasury, *Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity* (Apr. 6, 2018), https://home.treasury.gov/news/press-releases/sm0338. Those sanctions further prohibited individuals from providing money, goods, or services to or for the benefit of Mr. Deripaska, or receiving money, goods, or services from him. *See* Exec. Order No. 13660. Specifically, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Mr. Deripaska as a "Specially Designated National" ("SDN"), in connection with OFAC's finding that (a) the actions of the Russian government and Vladimir Putin regarding Ukraine constituted an extraordinary threat to the national security and foreign policy of the United States, and (b) Mr. Deripaska had acted or purported to act on behalf of a senior Russian government official, *i.e.*, Vladimir Putin. *See id.* Those sanctions sought to prevent Mr. Deripaska from accessing U.S. commercial and financial markets to put pressure on Russia and Vladimir Putin. Soon thereafter, the USAO and the Federal Bureau of Investigation ("FBI") began investigating Mr. Deripaska and his efforts to evade those sanctions through shell corporations and with the assistance of others. Of note, OFAC also imposed economic sanctions on En+, a Russian company in which Mr. Deripaska had a controlling interest.

Days after Russia's invasion of Ukraine on February 24, 2022, United States Attorney General Merrick B. Garland announced the Department of Justice's ("DOJ") creation of Task Force KleptoCapture, "an interagency law enforcement task force dedicated to enforcing the sweeping sanctions, export restrictions, and economic countermeasures that the United States has imposed . . . in response to Russia's unprovoked military invasion of Ukraine." Press Release, United States Dep't of Justice, *Attorney General Merrick B. Garland Announces Launch of Task Force KleptoCapture* (Mar. 2, 2022), https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-launch-task-force-kleptocapture. In the press release, United States Deputy Attorney General Lisa O. Monaco stated: "Oligarchs be warned: we will use every tool to freeze and seize your criminal proceeds." *Id.* Until in or about August 2023, an Assistant United States Attorney ("AUSA") from the USAO was detailed as the head of the task force.

In the year following Russia's invasion, DOJ touted its success in forfeiting, freezing, or otherwise restraining over $500 million in assets belonging to individuals linked to the Russian regime. United States Dep't of Justice, *Fact Sheet: Justice Department Efforts in Response to Russia's February 2022 Invasion of Ukraine* (Feb. 24, 2023), https://www.justice.gov/d9/press-releases/attachments/2023/02/24/2023.02.23_doj_ukr_fact_sheet_final_1.pdf. DOJ also reported that its efforts led to the indictments of over 30 individuals and two corporate entities "accused of sanctions evasion, export control violations, money laundering, and other crimes—and arrested defendants in over a half-dozen countries in 2022." *Id.* DOJ specifically lauded the indictments of Oleg Deripaska and British businessman Graham Bonham-Carter, and noted the launch of the Task Force aimed at enforcing "sweeping sanctions" through investigations and prosecutions. *Id.*

Though Mr. Deripaska was in the USAO's sights long before the Russian invasion of Ukraine in 2022, Russia's aggression increased pressure to bring criminal charges against Russian

oligarchs and those allegedly close to them. Consequently, the USAO's investigations into Mr. Deripaska culminated in three indictments for sanctions violations involving Mr. Deripaska in close succession in the fall of 2022 and early 2023: *United States v. Graham-Carter*, *United States v. Deripaska*, and *United States v. McGonigal*.

### 1.    *United States v. Graham Bonham-Carter*, 22 Cr. 503 (PAE)

On September 21, 2022, the USAO charged British businessman Graham Bonham-Carter in a three-count indictment alleging he was in a conspiracy with Mr. Deripaska from at least 2020 thought at least 2021 to violate the International Emergency Economic Powers Act ("IEEPA"), a substantive violation of IEEPA, and one count of wire fraud. *See* Ex. A to Declaration of Rita M. Glavin dated October 19, 2023 ("Glavin Decl.")[1] (*Bonham-Carter* Indictment); *see generally United States v. Graham Bonham-Carter*, No. 22 Cr. 503 (PAE) (S.D.N.Y.). Mr. Bonham-Carter, a close associate and employee of Deripaksa for approximately 20 years, had worked for entities controlled by Mr. Deripaska and managed Mr. Deripaska's residential properties located in the United Kingdom and the United States. *See* Ex. A ¶ 10. These properties included multi-million dollar properties located in Washington, D.C. and Manhattan. *Id.* ¶ 14. The USAO charged that even after OFAC designated Mr. Deripaska an SDN in April 2018, Mr. Bonham-Carter continued to work for Mr. Deripaska and conducted international financial transactions for him. *Id.* ¶¶ 11, 15. The USAO and FBI seized Bonham-Carter's email communications and the indictment specifically includes paragraphs citing Bonham-Carter emails discussing Mr. Deripaska, his work for him, the banks he conducted business with, and the Deripaska sanctions. *See id.* ¶¶ 11–12. For example, in an email dated on or about June 18, 2018, Mr. Bonham-Carter wrote: "Times a bit tough for my boss as sanctions have hit him from the USA so not an ideal time." *Id.* ¶ 11(a). In an

---

[1]    Exhibits to the Declaration of Rita M. Glavin dated October 19, 2023 filed herewith are cited herein as "Ex. __."

email dated on or about October 13, 2021, Mr. Bonham-Carter wrote: "It[']s all good apart from banks keep shutting me down because of my affiliation to my boss Oleg Deripaska . . . I have even been advised not to go to the USA where Oleg still has personal sanctions as the authorities will undoubtedly pull me to one side and the questioning could be hours or even days!!" *Id.* ¶ 11(d). The FBI searched Deripaska's properties located in Washington, D.C. and New York in October 2021. A few months later, in March 2022, the United Kingdom's National Crime Agency ("U.K. NCA") froze bank accounts linked to Mr. Bonham-Carter. *See* Haroon Siddique, *UK Businessman's Accounts Frozen Over Suspected Links to Oleg Deripaska*, THE GUARDIAN (Mar. 4, 2022), https://www.theguardian.com/world/2022/mar/04/uk-businessman-graham-bonham-carter-accounts-frozen-over-links-oleg-deripaska. The USAO worked with the U.K. NCA in investigating this case and acknowledged the U.K. NCA's substantial assistance in the investigation. *See* Press Release, Dep't of Justice, *U.K. Businessman Graham Bonham-Carter Indicted for Sanctions Evasion Benefitting Russian Oligarch Oleg Vladimirovich Deripaska* (Oct. 11, 2022), https://www.justice.gov/opa/pr/uk-businessman-graham-bonham-carter-indicted-sanctions-evasion-benefitting-russian-oligarch ("The National Crime Agency of the United Kingdom provided substantial assistance.").

According to the indictment, Mr. Bonham-Carter engaged in over $1 million of illicit financial transactions to fund real estate properties in the United States for Mr. Deripaska's benefit despite the economic sanctions. *See* Ex. A ¶ 16. The properties were managed by a company called Gracetown, Inc., a New York company that Mr. Bonham-Carter ran. *Id.* Mr. Deripaska also purchased properties in Manhattan through a British Virgin Islands trust. In addition to his work for Gracetown, Mr. Bonham-Carter also worked with Terra Services, a U.K. company formerly owned by Mr. Deripaska. *See* Robert Kim, *Bonham Carter Stars in Real Estate Blockbusters of*

*Russian       Oligarch       Oleg       Deripaska*,  Kharon       (May       10,       2022),
https://www.kharon.com/updates/bonham-carter-stars-in-real-estate-blockbusters-of-russian-
oligarch-oleg-deripaska. Mr. Deripaska also held real estate in the United Kingdom and France
through legal entities associated with Mr. Bonham-Carter and Mr. Deripaska's cousin, Pavel
Ezubov. *See id.* After Mr. Deripaska's SDN designation, Mr. Bonham-Carter allegedly set up his
own company to run the properties: GBCM Limited. *See* Ex. A ¶ 16. Thereafter, Mr. Deripaska
allegedly wired funds from a bank account in Russia held in the name of Mr. Bonham-Carter's
company, GBCM Limited, to bank accounts held by Gracetown Inc. in New York. *See id.*
Gracetown Inc. then used the GBCM Limited funds to pay for various expenses associated with
Deripaska's properties located in the United States, including staff salaries, property taxes, and
other services. *See id.* Mr. Bonham-Carter allegedly also attempted to unlawfully transfer artwork
purchased by Mr. Deripaska from an auction house in New York to London and thereby conceal
Mr. Deripaska's ownership of the artwork. *See id.* ¶¶ 17–22. In other words, Mr. Bonham-Carter
was in regular communication with Mr. Deripaska, served as his right-hand person in moving Mr.
Deripaska's money and assets from 2005 through 2022, and assisted him in evading U.S.
sanctions.

After the USAO announced that it would seek extradition of Bonham-Carter from the U.K.
to face the charges, in or about March 2023, the USAO reversed course and suddenly dropped its
efforts to extradite Mr. Bonham-Carter. *See* Henry Vaughan, *US Drops Bid to Extradite British
Businessman Linked to Russian Oligarch*, The Independent (Mar. 3, 2023, 10:45 AM GMT),
https://www.independent.co.uk/news/uk/crime/oleg-deripaska-national-crime-agency-vladimir-
putin-british-home-office-b2293490.html. Thus, the *Bonham-Carter* case has not otherwise
progressed since September 2022.

2.      *United States v. Deripaska et al.*, 22 Cr. 518 (PKC)

On September 29, 2022, eight days after the *Bonham-Carter* indictment, the USAO indicted Russian oligarch Oleg Deripaska—the unindicted co-conspirator in this case and the *Bonham-Carter* case—along with Natalia Bardakova, Ekaterina Voronina, and Olga Shriki for conspiring from at least 2019 through 2022 to violate sanctions imposed on Mr. Deripaska and one of his corporate entities. *See* Ex. B (*Deripaska* Indictment); *see generally United States v. Deripaska et al.*, 22 Cr. 518 (PKC) (S.D.N.Y.). This investigation went on for at least two years before the indictment, because the USAO served a grand jury subpoena on Ms. Shriki, a U.S. citizen, on September 23, 2020 for records relating to the investigation of Mr. Deripaska. The indictment reveals numerous investigative steps taken, including border stops, the apparent seizure of electronic devices of Ms. Voronina and Ms. Bardakova in or about 2022, and the seizure of electronic communications with and involving Mr. Deripaska between 2020 and 2022. *See* Ex. B ¶¶ 5, 18, 19(b)–(m).

The *Deripaska* indictment alleges that Mr. Deripaska used a corporate entity and employed Ms. Shriki and Ms. Bardakova to engage in illegal transactions in the United States on his behalf in violation of sanctions imposed on Mr. Deripaska. *See id.* ¶ 19. Before being sanctioned, Mr. Deripaska purchased properties in the United States worth tens of millions of dollars, and managed them through Gracetown, Inc. *See id.* ¶ 6. Following Mr. Deripaska's designation on the SDN list, Ms. Shriki, a long-time employee at the New York office of Mr. Deripaska's company, Basic Element (which was also sanctioned), was tasked with closing that office. *See id.* ¶ 15. Once closed, Ms. Shriki, a U.S. citizen, continued to work for Mr. Deripaska. *Id.* She and Ms. Bardakova, who is a Russian national living in Russia and close associate of Deripaska, worked together to carry out tasks for Mr. Deripaska's benefit and the benefit of companies owned or controlled by Mr. Deripaska. *See id.* ¶ 19. According to the indictment, Mr. Deripaska's co-

defendants carried out consequential and personal tasks for him, including: handling the proceeds of a $3 million sale of a music studio; providing gifts to Ekaterina Voronina, Mr. Deripaska's girlfriend who gave birth to Mr. Deripaska's child in the United States in 2020; purchasing mobile devices and clothing for delivery to Mr. Deripaska; and making arrangements—involving $300,000 in financial transactions—to assist Ms. Voronina in obtaining a U.S. visa and to stay in the United States to give birth to Mr. Deripaska's child. *See id.* Mr. Deripaska and Ms. Voronina, with the assistance of Mr. Deripaska's long-time associates, Ms. Shriki and Ms. Bardakova, allegedly expended $400,000 in the effort to have Ms. Voronina give birth in the U.S. *See id.* ¶ 19(i)–(m). At Mr. Deripaska's direction, Ms. Shriki created a consulting business called Global Consulting Services LLC, through which she coordinated with Ms. Bardakova to receive funds from Mr. Deripaska for her work in assisting him with U.S. financial transactions. *See id.* ¶ 16.

The *Deripaska* case is currently pending before Judge P. Kevin Castel. Although counsel has appeared for Mr. Deripaska, Ms. Shriki is the only co-defendant who has been arraigned since the case was unsealed last fall. At her arraignment, the USAO stated that the discovery was "voluminous" and that "[i]n addition to thousands of pages of subpoena returns, the discovery also consists of raw electronic data from multiple electronic devices that were seized and searched pursuant to search warrants." Transcript of Conference held before Judge P. Kevin Castel on November 15, 2022 at 3:4–8, *United States v. Deripaska, et al.*, No. 22 Cr. 518 (S.D.N.Y. Dec. 15, 2022), ECF 23. The indictment makes clear that the USAO possesses records of Deripaska-associated corporate entities, as well as financial records relating to Mr. Deripaska and parties working closely with him to conduct his financial transactions in the United States from at least 2019 through 2022—covering the same period in which the USAO charges Mr. Shestakov with

conspiring with Mr. Deripaska to evade sanctions. A control date in the *Deripaska* case was set for October 15, 2023 and subsequently adjourned. No trial date has been set.

### 3. *United States v. Charles McGonigal et al.*, 23 Cr. 16 (JHR)

On January 12, 2023, four months after the *Bonham-Carter* and *Deripaska* indictments, a grand jury in the Southern District of New York returned a sealed indictment, No. 23 Cr. 16, against Charles McGonigal and Mr. Shestakov, charging Mr. Shestakov with: (i) conspiracy to violate IEEPA; (ii) violation of IEEPA; (iii) conspiracy to commit money laundering; (iv) money laundering; and (v) false statements. *See* ECF 2, *Shestakov* Indictment. The indictment alleges that Mr. Shestakov conspired with co-defendant Mr. McGonigal and unindicted co-conspirators Oleg Deripaska and Evgeny Fokin to violate the sanctions imposed on Mr. Deripaska. Specifically, it alleges that beginning in the spring of 2021, Mr. Deripaska's "agent" Evgeny Fokin hired Mr. McGonigal and Mr. Shestakov to investigate a rival Russian oligarch, Vladimir Potanin, on behalf of Mr. Deripaska. Mr. Potanin, who had not been placed on the U.S. sanctions list until 2022, had a controlling stake in Norilsk Nickel, which was a competitor of En+. Notably, unindicted co-conspirator Evgeny Fokin was employed by En+ as its director of international cooperation at all relevant times, and, though previously under sanctions, En+ was no longer under any U.S. sanctions. *See* En+ Group, *Annual Report 2018* at 2 (Apr. 26, 2018), https://enplusgroup.com/upload/iblock/bb8/EN_AR2018_ENG__FINAL.pdf; *Evgeny Fokin Business Leaders Biography*, MARKETSCREENER (last visited Oct. 19, 2023) https://www.marketscreener.com/business-leaders/Evgeny-Fokin-0CNHF6-E/biography/; U.S. Customs and Border Protection, *TECS-Secondary Inspection Report Evgeny Fokin* (Aug. 16, 2021) (on file with counsel) ("[S]ubject stated that he has been working for En+ for about the past 10 years. Subject stated that he is the Director for international government relations."). According to the USAO, Mr. Deripaska, through Mr. Fokin**,** contracted with a New Jersey-based corporation

associated with Mr. McGonigal, Spectrum Risk, for "business intelligence services, analysis, and research relevant to [the Russian Corporation], its business operations, and shareholders." Ex. B ¶¶ 18–19. Mr. Deripaska then purportedly caused money to be sent from a Russian bank through a Cyprus corporation, Pandean Ltd., to Spectrum Risk. Spectrum Risk then paid Mr. McGonigal and Mr. Shestakov. *Id.* ¶ 19.

In February 2023, the USAO produced discovery that includes financial records such as Mr. Shestakov's mortgage documents from the United Nations Credit Union, SWIFT wire transfer records between Spectrum Risk and Mr. Shestakov's company Eastlink Translations, and six years of Webster Bank records for Eastlink Translations. None of the materials produced reflect any transactions directed by or from Mr. Deripaska. Moreover, the discovery and Indictment make clear that the sanctions case against Mr. Shestakov is entirely circumstantial. Notably, Mr. Deripaska has publicly stated that he was unfamiliar with Mr. McGonigal or Mr. Shestakov.[2] As far as we are aware, the USAO did not produce records relating to the various individuals and corporate entities associated with Mr. Deripaska referenced in the *Bonham-Carter* and *Deripaska* cases, which also charge criminal conspiracies with Mr. Deripaska—during the same time period charged in this case—through long-running sophisticated financial and corporate schemes by long-time close and trusted associates of Mr. Deripaska to conduct his business and related financial transactions around the world, including the United States.

At the March 8, 2023, status conference, AUSA Hagan Scotten stated that the USAO would produce discovery material to Mr. Shestakov from the separate indictment in the District of

---

[2]     *See also* Shane Harris, et al., *Former FBI Agent's Side Work Puts Bureau Under New Scrutiny*, WASHINGTON POST (Feb. 13, 2023), https://www.washingtonpost.com/national-security/2023/02/13/mcgonigal-albania-deripaska-indictment-fbi/ ("A spokeswoman for Deripaska, Larisa Belyaeva, said . . . Deripaska had 'zero knowledge' of McGonigal's interactions with the firm or Shestakov.")

Columbia of Mr. Shestakov's co-defendant Mr. McGonigal. However, AUSA Scotten further stated that, as to Mr. Shestakov: "I doubt very much any of that [discovery from the D.C. case] is going to be Rule 16 material since it is part of a second investigation. So I don't think the Court needs to account for that in terms of timing [for setting a trial date], I just wanted to flag it as potentially coming out in the future." March 8, 2023 Tr. at 4:2–6. Moreover, at the May 10, 2023 status conference, AUSA Scotten further represented his view that the D.C. case discovery "as to Mr. Shestakov, to be clear, **it's sort of definitionally not rule 16**. It's another case . . . it's not something that should get lumped in as Rule 16 in this case." May 10, 2023 Tr. at 11:15–24 (emphasis added). Mr. Shestakov was not charged in that McGonigal D.C. indictment, nor is he alleged to be an unindicted co-conspirator. Contrary to AUSA Scotten's position on what was Rule 16 material, however, it is evident from our review of that discovery from the D.C. investigation that it is absolutely Rule 16(1)(E)(i) material (*i.e.*, items "material to preparing the defense") as to Mr. Shestakov. The D.C. case discovery included many materials that would be consistent with a defense by Mr. Shestakov that he was not in an illegal conspiracy with Mr. McGonigal (or anyone else), and those materials are evidence that Mr. McGonigal was not telling Mr. Shestakov about all his relevant activities and kept him siloed. *See* Press Release, Dep't of Justice, *Retired FBI Executive Charged with Concealing $225,000 in Cash Received From an Outside Source* (Jan. 23, 2023), https://www.justice.gov/usao-dc/pr/retired-fbi-executive-charged-concealing-225000-cash-received-outside-source. Further, in the D.C. case, the same case agent in this case, FBI Agent Evan Schlessinger, used D.C. grand jury subpoenas to obtain records relating to Mr. Shestakov and his company, Eastlink Translations. The fact that the USAO did not understand this to be core Rule 16 material as to Mr. Shestakov preparing his defense in this case is simply startling and cause for grave concern.

At the May 10, 2023 status conference, defense counsel brought the *Deripaska* case to the Court's attention. The Court then inquired of the USAO about the relevance of the *Deripaska* case in the present matter. The USAO informed the Court that the *Deripaska* case was a "complex" case and relates to Mr. Deripaska violating sanctions by "secreting assets through third parties in various places." May 10, 2023 Tr. at 27:18–20. As set forth *supra*, the USAO representation about the *Deripaska* case was way off-base: the *Deripaska* case involves Mr. Deripaska using long-time trusted employees and associates to transfer money and conduct business transactions for him to get around the U.S. sanctions.

At that May 10 conference, Mr. Shestakov thereafter requested the USAO to produce the materials in *Deripaska*, *id.* at 29:2–8, and only after that request did AUSA Scotten inform the Court that in fact, he had "never seen the discovery in [*Deripaska*]. [And knew] the subject of the case from which [he] inferre[d] the nature of the discovery." *Id.* at 30:14–16. Mr. Scotten then informed the Court he would "take a look" and then respond to Mr. Shestakov's counsel's request. *Id.* at 30:16–17.

On May 18, 2023, the USAO wrote to the defense, stating: "The prosecution team in this case does not possess the evidence gathered in [*Deripaska*], nor are [they] aware of any evidence in that case that constitutes *Brady* or *Giglio* or is material to the defense in this case." Ex. C (Letter from Rebecca T. Dell dated May 18, 2023). Notably, the USAO inaccurately stated what they are required to produce under Rule 16(a)(1)(E)(i): the USAO must produce items "material to *preparing* the defense," as opposed to "material to the defense." In conversations subsequent to that letter, the USAO not only reiterated its obstinate refusal to produce materials from the *Deripaska* case, but also refused to offer any insight as to how they fulfilled their professional and

ethical obligations to review the *Deripaska* materials for items that the USAO would be statutorily and constitutionally required to produce.

At the September 19, 2023, court conference, the Court set a briefing schedule for Mr. Shestakov to file the instant motion to compel. In working on this motion, defense counsel for Mr. Shestakov then became aware of the *Bonham-Carter* case and inquired of the USAO about producing those materials. The USAO responded that it takes the same position in *Bonham-Carter* as in *Deripaska* and therefore would not produce those materials to Mr. Shestakov.

## II.   <u>APPLICABLE LAW</u>

The USAO's discovery obligations are governed largely by Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). Rule 16 requires the government to produce certain enumerated categories of information, including records "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Evidence is material if it "could be used to counter the government's case or to bolster a defense." *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017) (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)). Similarly, under *Brady* and its progeny, the government must disclose evidence favorable to an accused when such evidence is material to guilt or punishment because it is exculpatory or impeaching. *Brady*, 373 U.S. at 87–88; *Kyles v. Whitley*, 514 U.S. 419, 432–440 (1995); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972).

The government's obligations under Rule 16 apply to any information "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). The scope of the obligation has been described as follows: "Legal ownership of the requested documents or things is not determinative, nor is actual possession necessary if the party has control of the items. Control has been defined to include 'the legal right to obtain the documents requested upon demand.' The

term 'control' is broadly construed." *United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y.

2007) (citation omitted). The government's *Brady* obligation is similar; it has a duty to "learn of

any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*,

514 U.S. at 437; *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

## III.   <u>ARGUMENT</u>

The USAO has taken an impermissibly narrow view of its discovery and *Brady* obligations

in this case. *See United States v. Martinez*, 844 F. Supp. 975, 982 (S.D.N.Y. 1994) **(**Rule 16 must

be interpreted broadly to ensure fairness to defendants). The USAO has refused to produce what

is self-evidently core Rule 16 material. Mr. Shestakov respectfully requests that this Court order

the government to produce the Discovery Materials. *See United States v. Gallo*, 654 F. Supp. 463,

471 (E.D.N.Y. 1987) ("The rules are intended, and must be construed, to enhance a just

determination, not to inhibit it.").

Mr. Shestakov maintains his innocence and the Discovery Materials are critical to

preparing his defense in a number of ways.

As a preliminary matter, the Indictment's narrative of a criminal conspiracy between Mr.

Shestakov, Mr. McGonigal, Mr. Deripaska, and Mr. Fokin is wrong because it simply is not true.

The *Bonham-Carter* and *Deripaska* sanctions conspiracy cases demonstrate that Mr. Deripaska

had (1) established means and methods of evading sanctions from 2019 through 2022, involving

close, longtime personal confidantes/employees and particular entities associated with him and

those close confidantes/employees (*e.g.*, Gracetown Inc., Terra Services, GCBM Limited, Global

Consulting Services Inc.), and (2) specific ways of setting up new companies and bank accounts

for the purpose of continuing business in the United States and evading sanctions. Mr. Deripaska

utilized none of his established entities, accounts, or associates in the sanctions conspiracy charged

against Mr. Shestakov *because there was no conspiracy for Mr. Deripaska to engage Mr. McGonigal and Mr. Shestakov and pay them for their services to him.* Thus, the Discovery Materials are absolutely material to preparing Mr. Shestakov's defense that there was no conspiracy to assist Deripaska in doing business in the U.S. with Mr. Shestakov and Mr. McGonigal and for Deripaska to pay them for services rendered to him. Mr. Shestakov was working for and always understood he was working for En+ and its representatives. Evgeny Fokin, the En+ Director of International Cooperation, is the "Agent-1" in the Indictment who purportedly acted as the middleman between Mr. Shestakov, Mr. McGonigal, and Mr. Deripaska. In fact, Mr. Fokin was working on behalf of En+, and the Cyprus entity that contracted with and paid Mr. McGonigal and Mr. Shestakov is not a Deripaska-associated entity. Further, the bank account utilized to make payment to Spectrum was not a Deripaska-associated account. And it was perfectly legal for Mr. Shestakov to do business with En+ and Mr. Fokin. Indeed, the government stopped and questioned Mr. Fokin when he entered the United States on August 27, 2021 and Mr. Fokin confirmed that he worked for En+ and that his company had a contract with Spectrum. *See* Ex. D (materials received in discovery). The evidence at trial will be that En+ most certainly had an interest in the Russian oligarch, Vladimir Potanin, who was CEO of competitor Norilsk Nickel, and it made perfect sense to seek corporate intelligence about him.

Moreover, the Discovery Materials are necessary to preparing Mr. Shestakov's defense that there was no conspiracy with Deripaska because those corporate and financial records will establish no Deripaska ties to the entities and accounts utilized on the transaction between the Cyprus company and Spectrum. This is not only Rule 16 material, but *Brady.* To the extent that Mr. Deripaska's corporate entities and related bank accounts that he used to continue U.S. business, as alleged in *Bonham-Carter* and *Deripaska,* have zero ties to the entities in this very

circumstantial indictment against Mr. Shestakov, that is exculpatory material that must be produced. Moreover, the seized communications of Mr. Bonham-Carter, as well as the seized communications and devices of Ms. Bardakova, Ms. Shriki, and Ms. Voronina, are also material to preparing the defense as to how Mr. Deripaska worked and did business, and the fact that those communications and devices have no reference to Spectrum, Mr. McGonigal, or Mr. Shestakov—because Deripaska and his network were not working with them.

Finally, Mr. Shestakov reasonably believed that the corporate intelligence work he and McGonigal were asked to do was on behalf on behalf of En+ and its chairman Lord Barker.  That fact that the Discovery Materials will include records to demonstrate that none of Deripaska's longtime business associates who conducted his business and took care of his financial transactions were associated with, or even knew about Spectrum, the Cyprus entity or Mr. McGonigal and Mr. Shestakov is critical to preparing the defense.

### A.  Rule 16 Requires Production of the Requested Materials

#### 1.  The USAO Has Possession, Custody, or Control over the *Deripaska* and *Bonham-Carter* Discovery

The USAO must produce information in its possession, custody, or control. Fed. R. Crim. P. 16 (a)(1)(E). In its May 18, 2023 letter, the USAO took the startling position that records gathered in the *Bonham-Carter* and *Deripaska* cases were not in its "possession." *See* Ex. C. Aside from being impossible to credit in its own right, the fact that USAO takes the view that it can carve up their AUSAs who are investigating the same target—Deripaska—with the same office of the FBI, for the same crimes over the same time period, to avoid their statutory and constitutional obligations to the defense is disturbing.

*McGonigal*, *Shriki*, and *Graham Bonham-Carter* were being investigated by the same offices (the USAO and the FBI's New York Field Office), in the same time period, in the same

criminal division, for the same crime, and targeting the same person and co-conspirator in all three cases: Oleg Deripaska. *See e.g.*, *Avellino*, 136 F.3d at 255 ("An individual prosecutor is presumed, however, to have knowledge of all information gathered in connection with his office's investigation of the case."). Of course that material is in the USAO's possession, custody, and control, as well as the FBI's New York Field Office's Counterintelligence Division that investigated all three cases with the USAO.

2.    **Evidence from *Deripaska* and *Bonham-Carter* Demonstrates that Shestakov Was Not in a Conspiracy with Deripaska and Doing Business with Him**

The Discovery Materials are material to preparing Mr. Shestakov's defense in this case for the reasons set forth *supra*, at pages 14–18 and 19–21. Further, data from seized electronic devices in *Bonham-Carter* and *Deripaska* directly relate to the conduct charged in this Indictment, which alleges a conspiracy with Deripaska. To the extent there are communications with Mr. Deripaska himself or communications that detail the manner in which he conducts his U.S. business and works around the U.S. sanctions—*i.e.*, via corporate entities, financial accounts, and the associates who handle that business acting as his agents—that is critical to preparing Mr. Shestakov's defense that there was no conspiracy with Mr. Deripaska and to benefit Mr. Deripaska, and "bears more than an abstract logical relationship to the issues in this case." *See United States v. Messina*, No. 11 Cr. 31 (KAM), 2011 WL 3471511, at *2 (E.D.N.Y. Aug. 8, 2011). Moreover, this evidence would play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal. *See id.*; *see also Stein*, 488 F. Supp. 2d at 358 (finding that correspondence related to conspiracy was Rule 16 material). Indeed, the defense understands that in 2022, the USAO seized electronic devices from Mr. Deripaska's close business associate, Ms. Bardakova, and Mr. Deripaska's girlfriend, Ms. Voronina, and those devices would not only have their communications with and about Deripaska, but Ms. Bardakova's

device would also have contact information about the key associates who worked with Mr. Deripaska to execute his financial transactions. We expect those devices will have exculpatory evidence establishing that the entities, accounts, and individuals in this case are not part of Mr. Deripaska's established network to conduct business and make payments.

Financial records—including those related to purported transactions—bank accounts, and corporate records similarly would go to Mr. Deripaska's manner and methods of carrying out alleged sanctions crimes. As the USAO has represented that evidence of the "simple" transactions at issue here will be evidence in their case-in-chief, evidence that would tend to rebut that theory and show that the transactions are what Mr. Shestakov believes them to be (*i.e.*, permissible payments for services on behalf of En+), the records are critical to preparing his defenses. Where evidence would corroborate Mr. Shestakov's defense and defense witness testimony to refute the government's case, it is without question core Rule 16 material. *See, e.g.*, *Messina*, 2011 WL 3471511, at *2–*3.

Further, seized items pursuant to search warrants executed at Mr. Deripaska's properties similarly relate to preparing Mr. Shestakov's defenses regarding his lack of involvement with Mr. Deripaska. Presumably business records and electronic data were seized and would establish that the entities and accounts in this case are not linked to Deripaska. The defense has a reasonable basis for believing that these items would bear directly on issues in our case, play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal. *See also Stein*, 488 F. Supp. 2d at 358–59. For instance, they may shed further light on Mr. Deripaska's alleged illicit transactions in the companion cases, and why the manner in which Mr. Deripaska handled those transactions shows why Mr. Deripaska was not involved in this case.

### B. *Brady* Requires Disclosure of the Requested Materials

The USAO's suppression of the Discovery Materials violates Mr. Shestakov's due process rights. *Brady*, 373 U.S. at 87–88 ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."). Evidence is material "when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016). A defendant only needs to show that the new evidence "is sufficient to 'undermine confidence' in the verdict." *Id.*; *see also United States v. Bagley*, 473 U.S. 667, 678 (1985) ("[E]vidence is material in the sense that its suppression undermines confidence in the outcome of the trial."); *Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); *United States v. Seabrook*, No. 16 Cr. 467 (AKH), 2021 WL 2709360, at *2 (S.D.N.Y. July 1, 2021) ("A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial.") (citations omitted). Material that tends to impeach the government's case must also be disclosed under *Brady*. *See Murray v. U.S. Dep't of Just.*, 821 F. Supp. 94, 106 (E.D.N.Y. 1993), *aff'd*, 14 F.3d 591 (2d Cir. 1993) (*Brady* requires the government to disclose material impeachment evidence as it "can make the difference between acquittal and conviction" especially in a case "where credibility is the central issue in the case and the evidence presented at trial consists of opposing stories presented by the defendant and government agents."); *see also United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("The prosecutor cannot be permitted to look at the case pretrial through the ends of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence

without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of trial.")

Pre-trial disclosure under *Brady* "is not conditioned on [a defendant's] ability to demonstrate that he would or even probably would prevail at trial" with the disclosed evidence. *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014); *see Nnodimele v. Derienzo*, No. 13 Cv. 3461 (ARR) (RLM), 2016 WL 3561708, at *10 (E.D.N.Y. June 27, 2016) ("[P]laintiff's actual innocence is irrelevant to his fair trial claims. Neither his claim for fabricating evidence nor his claim for withholding evidence requires plaintiff to show that he was actually innocent or that he would have been acquitted" but for the suppressed evidence). The evidence in *Deripaska* and *Bonham-Carter* will demonstrate how Mr. Deripaska had a modus operandi for doing business before and after the sanctions were imposed, and how he relied on long-known acquaintances and entities to carry out his personally directed orders. That Mr. Deripaska did no such thing in this case is because Mr. McGonigal and Mr. Shestakov were not working for him or being paid by him or an entity or account associated with him. That is exculpatory to Mr. Shestakov's defense that there was no conspiracy and there was no sanctions violation.

## C. The USAO's Recent Discovery Violations Require Much Greater Scrutiny by the Court of USAO Representations about Compliance with Their Discovery Obligations

The Court must analyze the USAO's obstinacy in taking a narrow view of *Brady* and Rule 16(a)(1)(E)(i), with the USAO's very recent and serious discovery violations that demonstrate, for example, failures to adequately respond to defense's and the Court's inquiries, a breakdown in communications between AUSAs and the FBI, and the FBI's lack of understanding of disclosure obligations when investigations overlap. In *United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020) (attached herein as Ex. E), Judge Alison Nathan dismissed the indictment and vacated Mr.

Nejad's guilty verdict because of the USAO's repeated disclosure failures and misstatements to the court. *Nejad*, 487 F. Supp. 3d at 208.

Specifically, the Judge Nathan identified numerous belated disclosures of exculpatory information, including after Mr. Nejad was convicted. *Id.* at 212. Indeed, the USAO produced to Mr. Nejad recordings of him being interviewed by law enforcement *two weeks after trial ended*. *Id.* During the trial the USAO disclosed, for the first time, exculpatory material critical to the defense case. *Id.* Instead of immediately producing the exculpatory, the USAO spent almost 20 hours "strategizing how best to turn it over." *Id* at 208. Indeed, "[o]ne prosecutor suggested to another that they 'bury' the evidence along with other, already-disclosed documents." *Id.* Nor were these the only discovery violations Judge Nathan was especially appalled by the USAO producing two recording after trial that the USAO had previously claimed twice that FBI was attempting to obtain, when in fact the FBI had had them in their possession since before the trial started. *Id.* at 212 The Court attributed this egregious error to "communication breakdowns between the prosecutors and the FBI." *Id.*

Judge Nathan also questioned the "Government's complete failure to produce certain classified material at any point—either before, during, or after trial." *Id.* at 213. In the post-trial review of the discovery violations, the Court determined that "classified material subject to Rule 16 disclosure . . . was never declassified and disclosed to Mr. Sadr." *Id.* Judge Nathan found that the "suppression and disclosure-related issues that plagued the prosecution" were precipitated by some of the following factors: failure to communicate with outside agencies; "[b]reakdowns in communication between the FBI and line prosecutors, including the FBI's investigation of this case;" "insufficient training for all participating AUSAs on disclosure obligations;" "insufficient policies in place that ensure timely and complete compliance with disclosure obligations;" and

"insufficient supervision of disclosure obligations by the USAO's Unit Chiefs." *Id.* at 213–14. Judge Nathan continued, "[i]t is possible that the issues articulated above, as well as the precipitating factors the Court identifies, are not unique to this case. Indeed, in the last criminal case tried before [Judge Nathan], the Government also seriously breached its *Brady* obligations." *Id.* at 214; *see* Jack Queen, *'Bury It': Inside a Hidden Evidence Scandal That Rocked SDNY*, Law360 (Mar. 15, 2021), https://www.law360.com/articles/1364454.

But Judge Nathan was not alone in her conclusions.  In *United States v. Niket Jain*, 19 Cr. 59 (PKC), 2020 WL 6047812, (S.D.N.Y. Oct. 13, 2020) (attached hereto as Ex. F), the USAO informed Judge P. Kevin Castel, two weeks before trial began and despite previously assuring the Judge Castel that discovery was complete and they were in compliance with their Rule 16 obligations, that for the last year and a half they were in possession of approximately 5 terabytes of unproduced data from a cooperator's phone.  *See Jain*, 2020 WL 6047812, at *1, *5.

Judge Castel found that the material was not produced, in part, because the FBI believed (wrongly) that this material related to a different investigation and therefore had no exculpatory value to Mr. Jain. *Id.* at *4. The last-minute production resulted in delaying the trial by seven months. *Id.* at *9. In his opinion, Judge Castle admonished the USAO's stating "the failure to timely produce this data was the result of a pattern of inattentiveness" and carelessness, and that "[t]hese inexcusable failures bespeak of negligence." *Id.* at *1.

In the most recent case highlighting the discovery problems with the USAO—*United States v. Ahuja, et al.*, 18 Cr. 328 (KPF) (S.D.N.Y.)— Judge Katherine Polk Failla, a longtime former AUSA with the USAO,  found that she would grant defendants a new trial after "issues in [the] case transcended mere hiccups" and noting that "it turn[ed] out that this Court made decisions on incorrect information." Ex. G (Transcript of Conference held before Judge Failla on Dec. 17, 2021

at 8:3–4, 11–12, *United States v. Ahuja*, 18 Cr. 328 (S.D.N.Y.), ECF 457). In that case, Former Premium Point Investments CEO Anilesh Ahuja was convicted in 2019 following a jury trial, along with co-defendant and ex-bond trader Jeremy Shor. The jury heard testimony from several cooperators, including Amin Majidi. At the time, the government assured Judge Failla that the government had not sought to shape or modify the guilty plea. *Id.* at 11:14-21. Nevertheless, following an order to produce documents related to the plea, over a year later—and following a defense Freedom of Information Act request weeks after the trial concluded—the defendants uncovered documents that directly refuted the USAO's representations about discovery. Specifically, emails showed that—contrary to the USAO's specific representations to the defense and the Court—one AUSA was, in fact, involved in the cooperator's plea, going so far as to revise the allocution to add a defendant's name, expand the time frame, and delete references to the cooperator's involvement in meeting trading targets. *Id.* at 13:24–14:18.

Judge Failla advised the parties that if the case were remanded back to her, she would grant defendants' request for a new trial, concluding that they had been deprived a fair trial by the USAO's repeated withholding of evidence and misleading and erroneous statements to the Court. *Id.* at 33:9–10, 19, 24. The USAO offered several explanations for the failures to disclose, including typographical errors, misfilings, failures to retain or memorialize information, and "certain restrictions that were read into [the court's] questions and [] orders that were simply not there." *Id.* at 8:18–19. Nonetheless, Judge Failla determined "the participants in [this] system assume that the government will comply with its disclosure obligations and thus ensure a fair trial. **If the government is going to respond categorically that it is aware of its disclosure obligations and has complied with them, such statements have to be correct. In this case, they were not.**" *Id.* at 9:11–20 (emphasis added). Accordingly, Judge Failla found that the government

"repeatedly failed to identify, locate, and produce material information in accordance with its *Brady* obligations and in response to defense's requests and [the court's] own inquiries." *Id.* at 9:3–7. Part of the USAO's failure was that it "did not search its file as [the court] directed, but in this case stopped looking[.]" *Id.* at 26:2-3. Disclosure failures deprived the defense of "potentially powerful cross-examination opportunities" and had the court been aware of the nature and scope of the USAO's involvement in the cooperator's plea allocution, the court would "very likely have decided the issue differently, and provided the cross-examination sought by the defense." *Id.* at 28: 15-25.

With respect to the government's representations that it complied with its disclosure obligations, Judge Failla expressed frustration:

> The government asseverated -- categorically, repeatedly, and incorrectly -- that it knew of its disclosure obligations and had complied with them. But that wasn't quite accurate, because the prosecution team produced key information immediately prior to and during trial. I repeatedly asked the government to review its files. The prosecution team told me it had, and that everything that should have been produced had been produced. But that also wasn't quite accurate, because things were produced in June and July of 2020. And it continues to trouble me that defense counsel had to employ extraordinary means in the form of Rule 7(c) subpoenas, FOIA requests, and court-ordered productions of material in order to force the government to comply with its disclosure obligations. . . . I do not accept the justifications proffered by the government for these errors, and I cannot understand why the prosecution team didn't conduct a simple e-mail search during the remaining weeks of the trial to confirm or refute the representations made to me, particularly since I had made clear that my in limine decisions were predicated on those representations.

*Id.* at 31:16-25, 32:1-3, 7-13.

"Ultimately," Judge Failla reasoned, "these failures to disclose" that were "partly the product of government misconduct…. are best described as *Brady* violations or disclosure violations" and the court "no longer [has] confidence in [the trial's] fairness." *Id.* 24:16–19, 33:4–

29

5. Judge Failla continued: "the government conduct that precipitated these motions is unacceptable, and, as I stated earlier, consistent with production failures that have plagued the government in at least two other cases recently in this district," citing *United States v. Jain* and *United States v. Nejad*. *Id.* at 19:23–20:3. To resolve this unacceptable conduct, Judge Failla instructed that "the government must take appropriate steps to ensure that it meets its disclosure obligations and its duty to this and all other courts. *Id.* at 22:22–24.

When considering the USAO's recent glaring discovery violations and systemic discovery issues, the USAO's refusal to produce the Discovery Materials is even more egregious in light of the USAO's practice of cross-producing discovery in other cases. The USAO inaccurately represented that in gang cases or those with overlapping conspiracies, that "they do not cross-produce" in such cases, alluding to the undersigned's apparent lack of familiarity. May 17, 2023 Tr. at 30:21–23 ("And if she [Ms. Glavin] was more familiar in an extensively litigated criminal network in this district with Cosa Nostra, they do not cross-produce"). There are recent cases in this District where the USAO cross-produced among different cases because there are overlapping conspiracies or co-conspirators. *See, e.g.*, *United States v. Carwell, et al.*, 20 Cr. 293 (LJL) (in a MacBallers indictment, a March 3, 2023 discovery cover letter noted the inclusion of "a reproduction of materials from *United States v. Lawrence et al.*, 19 Cr. 761 (JPO) in a folder entitled "Lawrence Case Record[,]" another MacBallers case in this District); *U.S. v. Navarro, et al.*, 20 Cr. 160 (September 2020 production cross-produced materials from other cases with different defendants involved in similar misbranding scheme, *United States v. Grasso*, 20 Cr. 163, and *United States v. Robinson*, 20 Cr. 162). There simply is no reason not to cross-produce discovery here, and the USAO's obstinance is startling.

## IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, we ask the Court to compel additional disclosure or, in the

alternative, conduct an *in-camera* review of the requested materials.


Dated: New York, New York                          Respectfully submitted,
            October 19, 2023

                                                                      <u>   */s/ Rita M. Glavin*            </u>

                                                                      Rita M. Glavin
                                                                      Katherine E. Petrino
                                                                      Leo S. Korman
                                                                      Glavin PLLC
                                                                      156 West 56th Street, Ste. 2004
                                                                      New York, NY 10019
                                                                      Tel: (646) 693-5505
                                                                      rglavin@glavinpllc.com

                                                                      *Counsel for Sergey Shestakov*