# EXHIBIT G

LCH3AHUD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

           v.                          18 Cr. 328 (KPF)

ANILESH AHUJA and JEREMY SHOR,

            Defendants.              Decision
------------------------------x

                           New York, N.Y.
                           December 17, 2021
                           9:40 a.m.

Before:

               HON. KATHERINE POLK FAILLA,
                               District Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ANDREA M. GRISWOLD
     JOSHUA A. NAFTALIS
     Assistant United States Attorneys

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     Attorneys for Defendant Anilesh Ahuja
BY:  RICHARD TARLOWE
     ROBERTO FINZI
     DAVID P. FRIEDMAN

KIRKLAND & ELLIS LLP
     Attorneys for Defendant Anilesh Ahuja
BY:  JOHN P. DEL MONACO

WEDDLE LAW PLLC
     Attorneys for Defendant Jeremy Shor
BY:  JUSTIN S. WEDDLE
     JULIA I. CATANIA

LCH3AHUD

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name.

3          MS. GRISWOLD:  Good morning.  Andrea Griswold and Josh

4   Naftalis for the government, and we are joined by Special Agent

5   Matthew Mahaffey with the FBI.

6          MR. TARLOWE:  Good morning, your Honor.  Richard

7   Tarlowe on behalf of Mr. Ahuja.  With me is Roberto Finzi, John

8   Del Monaco, David Friedman, and Mr. Ahuja is present as well.

9          THE COURT:  Good morning to each of you and thank you,

10  all.

11         MR. FINZI:  I'm so sorry I was late.  I didn't realize

12  people were waiting for me.

13         THE COURT:  Sir, it's okay.  I didn't ask the followup

14  question that I should have.  I understood you to be in the

15  security line.

16         MR. WEDDLE:  Justin Weddle from Weddle Law PLLC.  I am

17  here with my client Jeremy Shor, and my colleague Julia

18  Catania.

19         THE COURT:  Good morning to each of you.  And I see

20  others who are familiar to me from this case.

21         As I mentioned in the robing room, I have in recent

22  months been in need of eyeglasses, so when I read the decision,

23  I will take off my mask so I don't fog them up.

24         Let me offer just a few thoughts at the outset,

25  recognizing what I imagine is some tense moments for everyone.

LCH3AHUD

1      At times in this case, we have had -- I am not sure if there

2      are moments of levity, but at least moments of civility.

3      Because I am reading this decision, I'm not afterwards going to

4      exchange pleasantries with you all.  So let me do it at the

5      outset.

6              It's been a while since we've seen each other.  There

7      has been a pandemic intervening.  There's been a lot of things

8      happening.  My hope for each of you and for your families is

9      that you have weathered this pandemic and continue to do so;

10     that you and your families are well; and that you are finding

11     some happiness and peace during this holiday season.

12             Let me also say that I am going to read this decision,

13     and I appreciate your patience as I read it.  I am asking you

14     to have no expressions until you leave this courtroom.  Someone

15     will be happy or sad or something, but not here.  Let me get

16     through this, and then you can have whatever expressions you

17     wish to have.

18             I also want to ask the parties this question.  A chunk

19     of this decision comprises legal standards that you all know,

20     because you gave them to me.  There is a section, for example,

21     on the standards for dismissal of the indictment.  There is a

22     section also for standards for a new trial.  I'd like to know

23     from counsel the degree of detail in which I have to go.  I can

24     read you all of the quotes that I have in here, although I

25     believe you're familiar with them.  I can tell you the cases

LCH3AHUD

1    that I was looking at and give you the pinpoint cites, I can

2    just give you the names of the case, or I can not give any

3    legal standards at all.  It didn't make sense to me to read

4    word for word quotes from cases that you know, but I will do

5    what you want me to do.

6            So please tell me what degree of detail you would like

7    for the legal standards.

8            Mr. Finzi.

9            MR. FINZI:  As little as your Honor thinks is

10   appropriate.  We don't require anything, anything more than

11   that.  So we are not asking for cases or standards or anything

12   your Honor feels, if your Honor feels anything can be cut out,

13   you absolutely should proceed that way.

14           THE COURT:  All right.  Thank you.

15           Ms. Griswold.

16           MS. GRISWOLD:  That's fine, your Honor.  We don't need

17   any legal standards.

18           THE COURT:  I assumed, I didn't want to presume, but I

19   thought it was something with which we could dispense.

20           MR. WEDDLE:  I guess I am just not totally clear.  If

21   your Honor has written down a more fulsome description of the

22   legal standard, and then you are not going to read it, what's

23   going to happen to it?

24           THE COURT:  It remains in my oral decision.  It was

25   for me guideposts as I was writing the analysis, sir.  If you'd

1   like, I can tell you the cases that I was consulting and

2   looking at as I give you the analysis I then give you.

3          MR. WEDDLE:  I think it would be helpful at least to

4   get the case name, even in a short form.

5          THE COURT:  Of course, that's why --

6          MR. WEDDLE:  Would your Honor consider just taking the

7   legal standard portion and filing it as a document?

8          THE COURT:  No, I wouldn't do that.  But I'll give you

9   the names, of course.  All right.  We begin.

10          As I do sometimes with the jury charge, I will ask you

11   to take no offense if I don't look at you.  I wrote this

12   myself, and I've been writing this over a period of months, and

13   it to me is more important that I read what I've written here,

14   than that I make eye contact with you.  So take no offense if I

15   don't look at you.

16          I want to begin by recognizing the amount of time that

17   has passed since the verdict, since the disclosure of

18   information received from the FOIA request and succeeding court

19   orders, and since briefing was concluded on this motion.  I

20   truly needed the time to give these issues the thought and the

21   attention that they merit.

22          In this regard, I'd also like to speak directly to

23   Mr. Ahuja and to Mr. Shor.  I want you to understand that I did

24   not intend or mean to cause you any needless anxiety with any

25   delay in issuing this decision.  Had this been an easy

LCH3AHUD

motion -- more to the point, had this been an easy denial --
you would have heard from me sooner.  My feelings on this
motion have evolved over the months, and only when I revisited
more of the trial record did I have the requisite confidence in
my decision.

As the parties are aware, this case is currently on
appeal to the Second Circuit.  Federal Rule of Criminal
Procedure 37 provides in these instances that the Court can
defer considering the motion, deny the motion, or "state either
that it would grant the motion if the court of appeals remands
for that purpose or that the motion raises a substantial
issue."  I am quoting here from the case *United States v.
Fernandez*, a summary order issued this year from the Second
Circuit at 853 F.App'x 730.

For the reasons I will explain, I am denying the
motion for dismissal of the indictment, but I am providing an
indicative ruling that I would grant the motion for a new trial
as to both defendants if the case were remanded back to me.

I find myself saying not infrequently that this motion
did not need to happen, that these problems with the trial did
not need to occur.  And after every trial, I perform my own
postmortem, and that's often with the assistance of the jury,
and I consider what I could have done better as the presiding
judge, what issues I could have foreseen or addressed earlier,
what room, if any, there was to make the trial fairer.

LCH3AHUD

1          What has been frustrating for me in this process is

2     that because of the quality of counsel, the issues that bring

3     us here this morning were raised, and I made pointed inquiries

4     precisely to find out the information that was later revealed

5     by the FOIA requests.  I really don't know what other questions

6     I could have asked, or what other motions defense counsel could

7     have made, to get to the truth of the matter during the trial.

8          Turning now to the facts.  The parties generally don't

9     dispute what happened in the months leading up to the trial and

10    at trial.  For this reason, and because the portions that

11    discuss interactions with the Court accord largely with my own

12    recollection and review of the record, I am largely adopting

13    the timelines set forth by the defense at pages 5 through 42 of

14    their opening brief concerning both government interactions

15    with defense counsel or the Court and internal government

16    communications.  To be clear, however, I'm not necessarily

17    accepting the defense's spin on these facts.

18         My decision today springs from two disclosure issues,

19    one macro and one micro.  Beginning with the macro, the defense

20    suggests that the government's disclosure problems were

21    systemic, and it's hard for me to disagree with that

22    characterization.  However well-intentioned, the processes that

23    were put in place by the government to gather, organize, and

24    produce discoverable material did not work as they should have

25    in this case.

LCH3AHUD

1          To be clear, I don't think the prosecution team set

2     out to bury discoverable information, and I do understand that

3     hiccups in production can arise.  But the issues in this case

4     transcended mere hiccups.  As detailed in the defense's opening

5     brief, problems with disclosure were identified and discussed

6     with the Court in January 2019, March 2019, May 2019, the

7     weekend prior to the commencement of the trial, and at various

8     points during the trial.  The Court issued decisions on defense

9     motions in limine based on the government's representations

10    about the completeness of its file reviews for disclosable

11    information, and it now turns out that this Court made

12    decisions based on incorrect information.

13          The government has offered several benign explanations

14    for the failures to disclose, including typographical errors

15    and misfilings.  But there are certain arguably less benign

16    reasons as well, including the government's failure to retain

17    or memorialize certain information, as well as certain

18    restrictions that it read into my questions and my orders that

19    simply were not there.

20          I also accept the defense's position that, even

21    including adding in the materials obtained as a result of the

22    FOIA request and the materials obtained as a result of the

23    post-conviction motion, post-FOIA motion practice in 2020, the

24    government's production is necessarily incomplete, because

25    certain text messages cannot now be retrieved.

1          Ultimately, however, I do not find that the government

2   systematically failed to memorialize or preserve evidence in

3   this case.  Rather, what I believe the record demonstrates is

4   that the government repeatedly failed to identify, locate, and

5   produce material information in accordance with its *Brady*

6   obligations and in response to both the defense's requests and

7   my own inquiries.

8          I pause here to discuss the involvement of defense

9   counsel in ferreting out discoverable information that should

10   have been produced in the ordinary course.

11          Here I'm telling you what you all already know.  The

12   criminal justice system does not presuppose that defendants

13   will have counsel with the wherewithal and the creativity of

14   Mr. Shor's and Mr. Ahuja's attorneys.  Instead, the

15   participants in that system assume that the government will

16   comply with its disclosure obligations and thus ensure a fair

17   trial.  If the government is going to respond categorically

18   that it is aware of its disclosure obligations and has complied

19   with them, such statements have to be correct.  In this case,

20   they were not.

21          Relatedly, while I thought that I was able during the

22   trial to address the material disclosed as a result of the Rule

23   7(c) subpoenas, the information disclosed as a result of the

24   FOIA request calls my earlier measures into question.

25          To put it more bluntly:  When I dismissed the jury

LCH3AHUD

1    with my thanks in July of 2019, I was confident that I had

2    provided all sides with a fair trial.  I no longer have that

3    confidence, and it troubles me that had the defense not filed

4    the FOIA request, I might have persisted in a misapprehension

5    of the trial's fairness.

6           I'll now turn to the more specific defense argument

7    concerning the government's disclosures to the Court.  I want

8    to be clear here that there are two separate issues addressed

9    by the parties in their submissions.  The first is whether it

10   is appropriate for the government to be involved in the plea

11   allocutions of its cooperating witnesses, and the second is

12   what was said to me about the government's involvement.

13          I disagree with the defense to the extent they are

14   suggesting that the government's arguments concerning the

15   propriety of their involvement are post hoc, fallback

16   positions.  My review of the record, and this includes both the

17   government's contemporaneous internal communications and their

18   submissions to me, indicates that the government consistently

19   took the position that participation in the plea allocutions of

20   cooperating witnesses was not improper, was not that big a

21   deal, and was not as probative as other evidence in the case.

22   You'll learn more about my views on this subject later on.  In

23   the continuum of impeachment evidence, I don't know that it

24   matches Mr. Majidi's money transfers or Mr. Dinucci's

25   looting -- for lack of a better term -- of his mother's trust

LCH3AHUD

1    account.  But I find that government involvement in the plea

2    allocutions here was important to the prosecution team, and

3    probative to the defense, both because of the involvement the

4    prosecution team had, and because of the substance of what it

5    failed to disclose, despite repeated opportunities to do so.

6         A key issue here is the accuracy of what was conveyed

7    to me, and I'm going to focus for the moment on what

8    Mr. Naftalis said to me, although it bears noting there were

9    instances in which his trial partners could and should have

10   spoken up.

11        I begin with Mr. Naftalis' statements during the

12   June 10, 2019, mid-trial conference, and if you look back on

13   the transcript of this day, you will see that I asked specific

14   questions of each of the prosecutors.  In the course of my

15   discussions with Mr. Naftalis, I asked -- and I am strangely

16   quoting myself -- "You're telling me, you're representing to me

17   as an officer of the court that in no way did you seek to shape

18   or modify the allocution."

19        Mr. Naftalis responded:  "Correct.  I don't remember

20   exactly what I said, but I would never suggest to a defense

21   lawyer, this is what he should say or not say."

22        After consulting with Mr. Nicholas and Ms. Griswold,

23   Mr. Naftalis clarified that he understood the verb "shape" to

24   mean doing something improper, and precisely for this reason I

25   asked different questions, after explicitly remarking, "Let's

LCH3AHUD

not use the term 'shape,'" and thus moving the conversation
away from any normative judgments.  To these questions
Mr. Naftalis responded that he might encourage defense counsel
to have their clients hit the elements, and that he might offer
corrections to information that was factually wrong, that he
did not ask Mr. Majidi's counsel to change the names of anyone
in the allocution, including in particular Mr. Shor, who did
not appear in the draft allocution; that there was no change in
date between the two versions; and that he did not discuss
Mr. Majidi's allocution with his counsel on the day of the plea
proceeding.

        The Court renewed these discussions on June 19, 2019,
when it discussed Mr. Majidi's allocution with his counsel Seth
Rosenberg.  Mr. Rosenberg recalled sending a draft allocution
to the government and having a conversation with Mr. Naftalis
regarding the allocution, though he could not recall the
specifics of that consideration.  Mr. Rosenberg acknowledged a
difference between the draft allocution submitted to the
government and the allocution notes from which his client read
during the plea proceeding.  He could not recall specifically
how the allocution came to be modified, though he believed the
changes to be "the product of his discussions with the
government." Mr. Rosenberg did not recall himself or his
colleagues editing the Majidi allocution document, and his
firm's records included no receipt of an e-mail from the

government with a revised allocation.  He also did not recall
receiving a revised allocation from the government by means
other than e-mail.

Mr. Naftalis and Mr. Nicholas both stated that the
government sent nothing to Mr. Rosenberg.  In speaking with
Mr. Nicholas, who again argued that there was nothing "improper
about discussing with a defense lawyer an allocation," the
Court made plain the purposes of its questioning, and again I
quote myself.  "Mr. Rosenberg suggested that maybe there was a
possibility that the government handled the edits.  So I'm
allowed to ask whether they handled the edits, and I'm being
told that they didn't."  No one on the prosecution team
corrected me.  And based on the evidence now before me, someone
should have.

In light of the evidence unearthed as a result of the
FOIA request, I now understand that certain of the government's
statements to me were misleading, and some were flat-out
incorrect.

The timeline, as revised, indicates that upon
receiving a draft Majidi allocation from Mr. Rosenberg on
October 29, 2018, the prosecutors began discussing the draft by
e-mail, and then scheduled a team meeting for 3 p.m. the
following day.

In advance of the internal meeting, Mr. Naftalis
circulated an edited version of the allocation in redline form.

The edits go beyond a mere directive to hit the elements.  They
include the replacement of a statement that the "scheme
accelerated in the second half of 2015" with a statement that
the scheme occurred "between 2014 and 2016"; the replacement of
a statement that certain conduct was undertaken "at the
direction of Neil Ahuja" with a statement that Mr. Majidi
participated in the scheme with others including Messrs. Ahuja
and Shor; the deletion of Mr. Majidi's acknowledgment that he
pressured his traders to achieve targets; the inclusion of a
reference to "funds" in the plural; and the removal of numerous
details regarding the process of obtaining marks.

        After the October 30 team meeting, Mr. Naftalis
participated in an approximately 10-minute call with
Mr. Rosenberg.  The following day, Mr. Naftalis suggested a
meeting with Mr. Rosenberg 10 minutes before the plea, which
suggestion Mr. Rosenberg accepted.  The plea allocution
ultimately given by Mr. Majidi is virtually identical to
Mr. Naftalis' revised allocution.

        In a declaration dated February 12, 2021, Mr. Naftalis
states that his recollection is not entirely refreshed by his
review of the record, but believes that he may have suggested
edits to Mr. Rosenberg during the October 30 telephone
conference, and that when he met with Mr. Majidi and his
counsel the next day, it was to discuss and sign the
cooperation agreement.

LCH3AHUD

1      On the record currently before the Court, I believe

2  that Mr. Naftalis' statements are incorrect, and while he may

3  have discussed the allocution with Mr. Rosenberg on October 30,

4  he in fact provided the revised plea allocution to the defense

5  immediately prior to Mr. Majidi's plea.  It is the government's

6  version of the allocution, and not the original draft or a

7  draft edited by someone at the Clayman & Rosenberg firm, from

8  which Mr. Majidi read.

9      And that leads me to the 800-pound gorilla in the

10 room.  Mr. Naftalis was asked specific questions regarding his

11 practices with respect to plea allocutions, generally and in

12 this case, and he gave me answers that I now know to be

13 incorrect.  The hardest thing for me to wrap my head around is

14 why.  I understand that trials can be stressful and that

15 memories can differ.  The fact remains that on June 10 or 19,

16 or at any point over the ensuing several weeks, Mr. Naftalis or

17 other members of the prosecution team could easily have checked

18 their files and realized the inaccuracies of their

19 representations to the Court and the defense.

20     In his February 2021 declaration, which is notably

21 short on contrition, Mr. Naftalis seeks to explain himself.  He

22 acknowledges that he should have reviewed certain files, and

23 that such review would have led him to additional disclosures

24 and more accurate answers to the Court.

25     Separately, Mr. Naftalis suggests that he

misapprehended certain of my questions, such that he was
responding to defense counsel's allegations of misconduct,
rather than my actual questions.  I do not understand how that
can be the case.

My initial questions about allocutions did not bespeak
agreement with defense counsel's arguments, and indeed they
followed Mr. Nicholas' proffer of the government's view that
there was nothing improper in such conduct.  Furthermore, after
answering several of my questions, Mr. Naftalis took a break,
conferred with his colleagues, and offered his concerns about
the use of the term "shape."  I then told Mr. Naftalis, "then
let's not use the term 'shape'" and proceeded to ask new,
different questions about his practices, as to which there
should have been no confusion.

Even if Mr. Naftalis were confused on June 10, that is
no excuse for the erroneous statements made to me on June 19,
nor for the prosecution team's failure to review the files and
to correct these earlier statements at any point thereafter --
particularly in light of my continued reliance on these
statements.

Because I don't find Mr. Naftalis' answers to be
satisfying, I sketched out in a prior draft of this opinion
several working theories as to why the government's answers to
me were incorrect, ranging from inattention to deliberate
falsity.  Let me just focus on the latter, because on that

LCH3AHUD

1    point, I have a number of hesitations.

2              To begin, in the scheme of all of the issues at trial,

3    and indeed, even in the more circumcised scheme of the

4    government's disclosure issues before and during the trial,

5    there isn't an obvious benefit to lying about this information.

6    And as I've noted, the government's contemporaneous e-mails

7    suggest that they would not have been troubled by the

8    disclosure of their participation in the allocution process.

9    More fundamentally, I have difficulty believing that an officer

10   of the court would lie to me, not me, qua me, but me as a

11   federal judge, and I just don't want to believe that that

12   happened here.

13             We are all shaped by our experiences.  Mr. Weddle and

14   I were, in different ways, shaped by a judicial finding of

15   prosecutorial misconduct that we will each go to our graves

16   thinking was unsupported by the record.  A finding that

17   Mr. Naftalis lied to a federal judge in a criminal prosecution

18   would -- and should -- follow him throughout his professional

19   career.  On this record, I am reluctant to make that finding.

20   Given my resolution of these motions, I don't believe that I

21   need to.  At the same time, I do not accept the reasons that

22   have been proffered to me to date about why Mr. Naftalis said

23   what he did.

24             Let me note as well there are issues with the Dinucci

25   and Dole allocutions.  I will discuss them later in this

LCH3AHUD

1    opinion, but I don't know -- in fact, I don't believe -- that I

2    would be granting the motion for a new trial or offering an

3    indicative ruling in that regard on those issues alone.

4            Let me return to the general issue of the government's

5    disclosures in connection with the trial.  There were

6    disclosure issues in the run-up to the trial, and certain of

7    those issues recurred during the trial.  At that time, I

8    believed that the fairest way to approach them was to inquire

9    as to what was being produced late and why, and then to direct

10   the government to go back to its files, rereview everything,

11   and certify to me that the files had been reviewed and

12   disclosures made.  With the information I have now, I question

13   whether my efforts were fair to the defense.

14           Putting this in metaphorical terms, I view myself as

15   plugging up holes in a leaking roof as each hole became

16   apparent.  And the problem I now have is I question whether

17   there weren't more structural problems with that roof that

18   foreclosed a piecemeal approach.

19           My concerns that exist today are also borne out in

20   other cases in this district addressing problems with the

21   government's compliance with its disclosure obligations,

22   including Judge Castel's problems with the *Jain* case, and Judge

23   Nathan's problems in the *Nejad* case.

24           The defense is correct to identify the issue as to

25   whether these deficiencies, in the aggregate, interfered with

1   their right to a fair trial.  Ultimately I conclude that they

2   did.

3          I am now going to speak to the issue of the motion to

4   dismiss the indictments, and I'll give you some of the cases

5   that I looked at.  Again, now that you understand the

6   introduction to this, you have a sense of what I was focusing

7   on.

8          Cases include:  *United States v. Walters*, 910 F.3d 11

9   (2d Cir. 2018); *United States v. Brown*, 602 F.2d, 1073 (2d Cir.

10  1979); *United States v. Broward*, 594 F.2d 345 (2d Cir. 1979);

11  *United States v. Percoco*, 13 F.4th 158 (2d Cir. 2021); *United

12  States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989); *United

13  States v. Brito*, 907 F.2d 392 (2d Cir. 1990); *United States v.

14  Jain*, 2020 WL 6047812, a decision from Judge Castel from

15  October of 2020, and the cases cited therein; and United States

16  v. *Nejad*, 487 F.Supp.3d 206, decision from Judge Nathan from

17  2020.

18          Mr. Weddle, is that sufficient?

19          MR. WEDDLE:  Yes, thank you, your Honor.  More than

20  sufficient.  I just need the names.  I can find the cites and

21  probably already have them.

22          THE COURT:  Thank you.

23          The government conduct that precipitated these motions

24  is unacceptable, and, as I stated earlier, consistent with

25  production failures that have plagued the government in at

LCH3AHUD

| | |
|---|---|
| 1 | least two other cases recently in this district.  That said, |
| 2 | the conduct is neither sufficiently severe nor prejudicial to |
| 3 | warrant dismissal of the indictment. |
| 4 | Defendants begin by noting that the government's |
| 5 | disclosure failures were persistent, reckless (if not |
| 6 | intentional), and the product of a lack of "functioning process |
| 7 | for recording, preserving and disclosing substantive |
| 8 | communications with counsel for cooperating witnesses."  I am |
| 9 | citing here to the defense brief at page 72.  There is similar |
| 10 | language at page 76. |
| 11 | As noted earlier in this opinion, I agree that there |
| 12 | were repeated failures to disclose on the part of the |
| 13 | government, though I do not conclude that they were the product |
| 14 | of a concerted effort to avoid disclosure obligations, such as |
| 15 | the suggestion that the government deliberately refrained from |
| 16 | generating written communications. |
| 17 | I acknowledge than these failures took place over a |
| 18 | period of months, and it is significant to me that, despite |
| 19 | repeated questioning from defense counsel and the Court, |
| 20 | certain materials were only revealed as a result of heroic |
| 21 | defense efforts, here the Rule 7(c) subpoenas and the FOIA |
| 22 | request.  Having the government quantify for me the information |
| 23 | that has been produced is irrelevant if material information |
| 24 | has been simultaneously withheld.  That all said, I believe |
| 25 | that the unfairness to the defense can be addressed through a |

LCH3AHUD

1    new trial, rather than the extraordinary remedy of dismissal of
2    the indictment.

3            On this point, I do not accept the defense's arguments
4    that the problems occasioned by the government's conduct or
5    misconduct cannot be cured by a new trial.  The defense
6    suggests in this regard that a new trial would give the
7    government an opportunity to refine its case after viewing the
8    defense's arguments.  Moreover, they add the government's
9    deficiencies in memorializing discussions with witnesses and
10   defense counsel suggests that no further documents will be
11   forthcoming.  Those points have merit.  But they overlook the
12   countervailing challenges for the government, which minimize
13   the prejudice identified by the defense.  To begin, the second
14   trial will take place years after the first, and even more
15   years from the 2014-2016 period of events at issue.  Witnesses'
16   memories have almost certainly faded.  One member of the trial
17   team has left the office.  The defense has also seen the
18   government's arguments and its evidence.  And while I am
19   deciding nothing now, I imagine that the defense would be able
20   to make use of the evidence it has gathered post-trial, and
21   would be able to ask me to reconsider certain of my prior in
22   limine rulings regarding the scope of cross-examination.

23           Another argument for dismissal concerns the
24   completeness and accuracy of the prosecution team's disclosures
25   to the Court.  Here, too, I am troubled, but given the fact

LCH3AHUD

1    that I have not found actual lies to the Court, I think it is

2    preferable to proceed by way of a new trial.  My review of the

3    government's most recent, court-ordered productions gives me

4    comfort that all relevant material in the government's

5    possession, custody, or control has been now been produced.

6    And with respect to that material that no longer exists, I

7    believe that includes certain text messages and voicemails, or

8    that was never memorialized, I believe those issues are better

9    addressed by further motions in limine, and as appropriate,

10   curative instructions from the Court.

11        Finally, I recognize that these events took place in

12   the shadow of other cases in this district involving

13   allegations of prosecutorial misconduct including the *Jain* and

14   *Nejad* cases I cited a few moments ago.  However, the conduct in

15   those cases postdates this one, and thus I cannot say that the

16   government should have learned from Judge Castel's or Judge

17   Nathan's admonishments, nor do I believe that the cases, even

18   considered in the aggregate, reflects, as *Broward* called it, "a

19   pattern of demonstrated and longstanding widespread or

20   continuous official misconduct."  But let me be clear:  The

21   government's conduct in these three cases is unacceptable and

22   cannot continue.  The government must take appropriate steps to

23   ensure that it meets its disclosure obligations and its duty of

24   candor to this and all other courts.  I trust that the

25   government will do so, and that it recognizes the tools

1    available to courts if it does not.

2          Let me turn now to the motion for a new trial.  There

3    are many cases in this regard.  I'll give a sampling.

4          Judge McMahon in *United States v. Connolly*, 2019 WL

5    2120022 (S.D.N.Y. May 2, 2019) contains a precis of that law.

6    It includes such cases as *United States v. Sanchez*, 969 F.2d

7    1409 (2d Cir. 1992); *United States v. McCourty*, 562 F.3d. 458

8    (2d Cir. 2009); *United States v. Parkes*, 497 F.3d 220 (2d Cir.

9    2007); *United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001).

10         I don't believe there is a question here, no one seems

11   to be challenging the timing of this motions, so I will skip

12   the section of my analysis that talks about the timing of the

13   motion.

14         There are certain cases that have focused on new trial

15   motions predicated on prosecutorial misconduct.  Another

16   decision of Judge McMahon's in which these cases are summarized

17   is *United States v. Santiago*, 2014 WL 4827883 (S.D.N.Y. Sept.

18   26, 2014).  As for cases involving new trial on the grounds of

19   newly discovered evidence, they are summarized in *United States

20   v. Jones*, 965 F.3d 149 (2d Cir. 2020).

21         With respect to newly discovered evidence, there are

22   certain cases summarized in a decision of Judge Preska's,

23   *Pizzuti v. United States*, 2019 WL 10371606 (S.D.N.Y. Sept. 30,

24   2019); and as well, *United States v. Martinez*, 388 F.Supp.3d

25   225 (E.D.N.Y. 2019), which speaks about new trial motions, and,

LCH3AHUD

1    as well, new trial motions predicated on violations of the

2    government's disclosure obligations in cases like *Brady*.

3            So, again, Mr. Weddle, are you satisfied?

4            MR. WEDDLE:  Yes, thank you, your Honor.

5            THE COURT:  Let me please proceed to the analysis

6    because I do believe that is more important here.

7            I want to begin by recognizing that these standards

8    are difficult to meet.  And I had struggles similar to I

9    believe the defense had in categorizing the basis for a new

10   trial.  The conduct that I've identified, which includes

11   repeated disclosure violations coupled with misleading and

12   erroneous statements to the Court, exists at the intersection

13   of several of these constructs.  It is more than newly

14   discovered evidence; it is more than mere impeachment; the

15   delays in production discussed in this opinion were partly the

16   product of government misconduct.  Ultimately, given the

17   standards I've just outlined, I think these failures to

18   disclose and to provide accurate information to the Court are

19   best described as *Brady* violations or disclosure violations.

20           What does that evidence include?  My principal focus

21   has been on the government's conduct and disclosures with

22   respect to the Majidi allocution, as evidenced by the amount of

23   detail with which I described that conduct in this opinion.

24   I'm not going to repeat that information here.  I would remind

25   you of it.

LCH3AHUD

1       As I suggested to you a little while ago, if I were

2   only dealing with the challenges to the Dinucci and Dole

3   allocutions, I would not be inclined to grant the motion for a

4   new trial.  But I do have some concerns about the Dinucci

5   allocution, and I will include them here for completeness.

6       During trial, the government produced a previously

7   undisclosed draft plea allocution sent to it by Mr. Dinucci's

8   counsel, which allocution focused on the 2015-2016 time period

9   and did not mention misconduct at PPI in 2014.  During a

10  conference outside of the presence of the jury, Ms. Griswold

11  acknowledged advising Mr. Dinucci's counsel that she thought

12  the accurate starting point was 2014, but recalled no other

13  changes.

14      One year later, in July of 2020, the government

15  produced an April 2017 e-mail in which one of the prosecutors

16  requested an opportunity to speak with the cooperator's

17  counsel, as well as a hard copy of the allocution to review.

18  The government also produced, for the first time, a revised

19  draft allocution that referred to mismarking beginning in 2015.

20  At the actual plea before Judge Hellerstein, Mr. Dinucci stated

21  that the criminal conduct occurred in or about mid-2014.

22      The defense argues, again with some force, that

23  because of the government's failure to memorialize

24  conversations with Mr. Dinucci's counsel, and the loss of

25  certain voicemails, the truth about those edits remains

LCH3AHUD

1    unknown.  For my part, I am more troubled by the fact that the

2    government did not search its files as I directed, but in this

3    case stopped looking after finding the first allocution.

4         I am less concerned about Mr. Dole's allocution, and

5    the record of communications regarding it doesn't inform my

6    decision.  In particular, I don't accept the defense's

7    suggestion that something untoward or even something worthy of

8    disclosure to the defense may have happened in brief meetings

9    between the then-unit chiefs and Mr. Dole's counsel after

10   Mr. Dole's guilty plea, or surrounding Mr. Dole's guilty plea.

11        At base, I agree with most of the defense arguments as

12   to why these communications were material to the defense, and

13   relatedly, why my mid-trial resolution of the defense's

14   cross-examination requests was incorrect.  Both the fact and

15   the content of these communications with cooperators and their

16   counsel were significant.  As to the former, I think it

17   significant that when the cooperating witnesses were thinking

18   about the precise criminal conduct in which they had engaged,

19   they drafted allocutions that accorded with certain defense

20   theories and undermined portions of their trial testimony and

21   the government's theory of the case.  As to the latter, the

22   malleability of the cooperating witnesses, plus the fact that

23   the government had a hand in drafting at least two, if not all

24   three allocutions, while not dispositive of any issue at trial,

25   were proper subjects of cross-examination that I curtailed

LCH3AHUD

1   based on incomplete and improper information.

2           Now, stepping back for a moment, I agree with the

3   government that there is nothing per se improper in the

4   involvement of prosecutors in drafting, editing, shaping the

5   plea allocutions of its cooperating witnesses.  An allocution

6   can be inadvertently incorrect as to a date or a place or it

7   can omit an element, like a tie to interstate commerce.

8           However, as with many things, allocutions and

9   prosecutors' involvement therewith exist on a continuum, and I

10  can think of circumstances in which either the fact of the

11  prosecutor's involvement, or the comparison of the before and

12  after allocutions, can constitute appropriate impeachment

13  evidence for the jury.  These circumstances include instances

14  in which the prosecutor scripts the allocution in its entirety,

15  or where the cooperator's initial allocution minimizes the

16  cooperator's conduct or suggests that the cooperator does not

17  truly believe himself to be guilty of the offense to which he

18  is pleading, or where the initial allocution contains flat-out

19  false statements.  And after considering what has happened in

20  this case, I think it also includes instances in which the

21  prosecutor edits the substance of the allocution in order to

22  preempt arguments that the government knows are at the heart of

23  the trial defendants' defense.

24          My resolution of this issue during trial focused on

25  Federal Rule of Evidence 403 issues, specifically, my concerns

LCH3AHUD

that the introduction of plea allocutions could invade the
cooperator's attorney-client privilege, or that I would have to
provide a companion disquisition on the requirements of Rule
11.  To be clear, I still have those concerns, and in many
cases, the probative value of the government's involvement in
the allocution won't overcome those concerns.  But the facts of
this case are different.  The prosecutors, contrary to their
representations to me, substantially edited Mr. Majidi's
allocution to bolster the prosecution theory while
simultaneously undermining the defense theory; they discussed
the redline of that allocution internally; they met with
counsel for the cooperator immediately prior to the plea to
communicate the revisions.  They then made analogous, though
less dramatic, edit to Mr. Dinucci's allocution.

        Again, to be clear, I recognize there is a difference
between a plea allocution that isn't read into the record at
trial, and the actual trial testimony of a cooperator.  That
said, shaping the allocutions in this manner deprived the
defense of potentially powerful cross-examination
opportunities.

        Not only was the defense deprived, but so was the
Court.  Had I been made aware of the nature and scope of the
government's involvement in Mr. Majidi's plea allocution, I
would very likely have decided the issue differently, and
provided the cross-examination sought by the defense.

LCH3AHUD

1        On this point, in thinking about this, I analogize the

2    probative value of differences between draft allocutions to

3    statements made in proffer sessions with the government.  It is

4    sometimes the case that a proffering witness's recollection

5    evolves, as when a putative co-conspirator's name is not

6    mentioned in the first proffer, but is mentioned later on.

7    That omission may be attributable to imprecise questioning by

8    the government, or to fear, or to a genuine failure to

9    recollect.  Or, of greater concern, it could reflect the

10   witness's desire to please the prosecutors by saying what the

11   witness believes they want to hear.  In other words, there are

12   benign and less benign reasons why cooperating witnesses

13   proffer as they do, but counsel for a trial defendant may be

14   permitted to probe these issues in cross-examination, and to

15   make credibility arguments in jury addresses.  Given the Rule

16   403 issues just outlined, trial courts should not require

17   cooperators to produce all drafts of their allocutions.  But

18   where the government is involved in the allocution, and the

19   changes that result are sufficiently substantive, the defense

20   should be permitted to probe the fact and the substance of

21   those changes.

22        And that leads logically to the next issue, which is

23   that of impeachment evidence.

24        I recognize, as the cases to which I referred a few

25   moments ago make clear, that the belated disclosure of evidence

LCH3AHUD

1   that amounts to additional impeachment material is generally

2   not an adequate basis for a new trial.  But what was withheld

3   here was more than that.  And to me, this case is closer

4   analytically to cases like *Triumph Capital*, where disclosure

5   was warranted.

6          The government often argues in this context that there

7   was plenty of cross-examination material as to the cooperating

8   witnesses, and that the newly disclosed information would only

9   have been cumulative.  The cooperating witnesses here had ample

10  impeachment material on which they could be cross-examined, and

11  defense counsel made effective use of this material at trial.

12  There was also limited cross-examination concerning each

13  cooperator's plea allocutions.  However, the information that

14  was withheld by the government until recently, and the

15  information that was available at trial but as to which I

16  precluded cross-examination, presented a qualitatively

17  different basis of questioning.

18         This was a cooperator-driven case, particularly as to

19  Mr. Ahuja.  I'll concede that the government had more evidence

20  against Mr. Shor, but I am unable to say that the evidence

21  against him was so overwhelming that he is not entitled to a

22  new trial here.  At least two of the cooperating witnesses

23  prepared allocutions with their respective attorneys that

24  accorded with key defense arguments at trial.  And, to repeat,

25  while those allocutions would not have been admissible as

LCH3AHUD

direct evidence at trial, it would have been reasonable for
defense counsel to expect those cooperators to testify in
accordance with their allocutions, and to be prepared to
cross-examine the cooperators if they did not.  The record,
however, reflects that the government substantially redrafted
Mr. Majidi's allocution, and less substantially, redrafted
Mr. Dinucci's allocution, all with a view to cutting off
defense arguments at trial, without the defense knowing that
such arguments could have been made.  The content of these
changes, and the fact that the cooperators acceded to them,
were fair subjects for cross-examination.

          I want to return to something I said at the beginning
of this opinion:  These motions didn't need to happen.  The
disclosure issues generally, and the allocution issues in
particular, were fleshed out by defense counsel before trial.
The government asseverated -- categorically, repeatedly, and
incorrectly -- that it knew of its disclosure obligations and
had complied with them.  But that wasn't quite accurate,
because the prosecution team produced key information
immediately prior to and during trial.  I repeatedly asked the
government to review its files.  The prosecution team told me
it had, and that everything that should have been produced had
been produced.  But that also wasn't quite accurate, because
things were produced in June and July of 2020.  And it
continues to trouble me that defense counsel had to employ

 1  extraordinary means in the form of Rule 7(c) subpoenas, FOIA

 2  requests, and court-ordered productions of material in order to

 3  force the government to comply with its disclosure obligations.

 4      There remains the separate issue of the government's

 5  involvement in the Majidi and Dinucci allocutions.  With

 6  particular respect to the former, I asked direct questions, and

 7  I received incorrect answers.  I do not accept the

 8  justifications proffered by the government for these errors,

 9  and I cannot understand why the prosecution team didn't conduct

10  a simple e-mail search during the remaining weeks of the trial

11  to confirm or refute the representations made to me,

12  particularly since I had made clear that my in limine decisions

13  were predicated on those representations.

14      The content of these allocutions was sufficiently

15  important, to the government at least, that at different times,

16  prosecutors sought out allocutions from cooperator counsel,

17  discussed them internally, conducted internal meetings

18  regarding their contents, redlined at least one allocution, and

19  provided edits to cooperator counsel.  How they could do all of

20  that and not disclose all of the relevant documents to the

21  Court or defense counsel until a year after the verdict, not

22  memorialize communications with cooperator counsel concerning

23  these efforts, and forget that all of these happened when a

24  district judge specifically questions them about it perplexes

25  me to no end.

LCH3AHUD

1        I tried my hardest to conduct a fair trial, and based

2   on the history of disclosure problems by the government, and

3   the incomplete and inaccurate information it provided to the

4   defense counsel and to me during the trial, I no longer have

5   confidence in its fairness.

6        Since I currently lack jurisdiction to grant a new

7   trial, I instead advise the parties of my indicative ruling

8   that I would grant such a motion if the case were remanded back

9   to me.

10       I believe the appropriate protocol here is for the

11  defense to promptly notify the circuit clerk of the U.S. Court

12  of Appeals for the Second Circuit of an order that will come

13  out later today.  I'm looking at Federal Rules of Appellate

14  Procedure 12.1 and Federal Rule of Civil Procedure 62.1.  I

15  will separately direct the clerk of court to deliver a copy of

16  my order and of the transcript of this decision, which I

17  presume someone is going to have transcribed, to the clerk of

18  the United States Court of Appeals for the Second Circuit.

19       Relatedly, there is an open motion from Mr. Shor's

20  counsel, it is an April 2, 2021, letter motion, to preserve for

21  appellate review a request for monetary sanctions.  That letter

22  notes that counsel believes the record before the Court does

23  not permit a finding that the prosecutors' actions were taken

24  for reasons of harassment or delay under cases such as *United*

25  *States v. Seltzer*, and thus the Court may not award attorneys'

LCH3AHUD

1   fees under 28 U.S.C. Section 1927.

2          Independent of *Seltzer*, I don't believe that

3   attorneys' fees are warranted in this case, but I understand

4   the defense's desire to preserve the issue and they have done

5   so.

6          I also know that there is an open motion filed by

7   counsel for Mr. Ahuja, a pre-surrender motion for compassionate

8   release pursuant to Section 3582(c)(1)(A) of Title 18.  That

9   motion is denied as moot.

10          That is the end of my opinion, and I recognize that

11   all of you have a lot to process.  The government, I imagine,

12   will want to consider its appellate options.  The defense has

13   been directed to address certain issues to the Second Circuit.

14   It may be the case that you would like to discuss with each

15   other these issues before advising me of what the parties

16   believe are appropriate next steps.  I will wait to hear from

17   you.

18          I am getting a bit ahead of myself, but I want to put

19   something on your radar screens.  I want you to be aware that

20   because of a series of rollovers of trials occasioned by this

21   district's centralized jury system, I do not have six

22   sequential trial weeks in the entirety of 2022.  So if we get

23   to the point of a new trial, it will have to be some time in

24   2023.  I can show you my trial calendar, but there are criminal

25   cases and civil cases.  Our criminal cases, they have the same

LCH3AHUD

1    priority as yours.  The civil are cases that have been

2    repeatedly rolled over and they have to be tried.  So, I wanted

3    you to keep that in mind as you thought about scheduling a new

4    trial in this case.  Again, I'm ahead of myself by several

5    steps here.

6          I thought about the possibility that you may decide

7    that you would want another judge to try this case because of

8    my schedule.  And if that is something that everybody wants,

9    you'll let me know.  My sense, and it's just anecdotal from

10   talking to my colleagues, is we all have very, very jammed up

11   schedules for 2022 because we can only pick one jury a day in

12   this district.

13         From my perspective, I've addressed everything that I

14   want to address today.  If there is anything anyone wants to

15   bring to my attention, please do so.

16         Ms. Griswold, anything from the government?

17         MS. GRISWOLD:  No, your Honor.

18         THE COURT:  Mr. Finzi, anything from Mr. Ahuja?

19         MR. FINZI:  No, your Honor.

20         THE COURT:  Mr. Weddle, anything from Mr. Shor?

21         MR. WEDDLE:  No, your Honor.

22         THE COURT:  Thank you.  We are adjourned.

23         (Adjourned)

24

25