UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   - v. -                                          :        23 Cr. 16 (JHR)

SERGEY SHESTAKOV                            :

                Defendant.         :

--------------------------------------------------------------x


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
SHESTAKOV'S MOTION TO COMPEL DISCOVERY**



DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America



Hagan Scotten
Rebecca T. Dell
Derek Wikstrom
Assistant United States Attorneys
Of Counsel

1

The Government respectfully submits this memorandum in response to the motion of defendant Sergey Shestakov to compel the Government to disclose the evidence gathered in two other cases in this District, *United States v. Olga Shriki*, 22 Cr. 518 (PKC), and *United States v. Graham Bonham-Carter*, 22 Cr. 502 (PAE).[1]  For the reasons set forth below, the motion should be denied.

## I.      Factual Background

### A.  The Instant Indictment

This Court is already familiar with the allegations in this case, which have been admitted in a detailed guilty plea by Shestakov's co-defendant, Charles McGonigal.  (*See* Dkt. 59 at 32-40).  Nonetheless, because Shestakov's memorandum of law refers to several relevant entities by their proper names, rather than the anonymized versions used in the Indictment, the Government briefly summarizes the facts of this case using the same proper names.

In the late summer of 2021, Shestakov and McGonigal agreed to perform services for Oleg Deripaska, a sanctioned Russian oligarch.  Specifically, Deripaska's agent, Evgeny Fokin—referred to as "Agent-1" in the Indictment—contracted the defendants to investigate a rival oligarch.  The defendants were paid from an account at a Russian bank, which wired money from a Cyprus corporation called Pandean—"the Cyprus Corporation" in the Indictment.  That money was wired to Spectrum Risk Solutions—the "New Jersey Corporation" in the Indictment.

---

[1]     Shestakov states that "most if not all" of the material he seeks was gathered in *Shriki* and *Bonham-Carter*.  (Mem. 5).  This opposition addresses only material gathered in those cases.  To the extent Shestakov seeks material that exists elsewhere, he should separately move, because the factual issues and legal analysis may be different.

McGonigal then directed payments from Spectrum's account, including to pay for expenses in performing the investigation, and to pay Shestakov and himself.

This scheme ended in November 2021, when the FBI seized McGonigal's and Shestakov's cellphones pursuant to search warrants.  In a conversation with FBI agents before the seizure, Shestakov falsely denied having any business relationship with Fokin.  (*See* Ex. 1 at 13).[2]  Eight days later, however, Shestakov filed a post-hoc registration under the Foreign Agents Registration Act.  (*See* Ex. 2).  In his registration, Shestakov acknowledged performing paid work for Fokin, and that Fokin was "presumably" directed by Deripaska.  (Ex. 2 at 2).  Shestakov also claimed, however, that Fokin communicated with him "on behalf of himself and/or his company," with the latter referring to EN+.  (Ex. 2 at 6).  EN+ is a multinational corporation that was under sanctions until 2018, when Deripaska divested himself his majority stake in the company.  *See* https://home.treasury.gov/news/press-releases/sm592#.[3]  EN+ has no record of doing business with Shestakov, McGonigal, or Spectrum.  (Ex. 3).

_____

[2]    Exhibits with letter labels were attached to Shestakov's memorandum of law.  Exhibits with number labels are attached to this opposition.  The exhibits to this opposition are respectfully requested to be filed under seal, because they are drawn from the discovery in this case and were produced pursuant to a protective order, and contain the names and in some cases identifying information of uncharged third parties.  The interview transcribed in Exhibit 1 was recorded, and the Government expects to offer portions of that recording at trial.

[3]    Shestakov argues that in a 2021 interview with United States Customs and Border Protection, Fokin claimed that he dealt with McGonigal, Shestakov, and Spectrum on behalf of EN+.  (*See* Mem. 20 (citing Ex. D)).  But that lie hardly helps Shestakov.  Fokin stated that he met McGonigal through a law firm with which EN+ was working.  (Ex. D at 3).  As Shestakov has admitted, that law firm in fact entered a contract with Deripaska, not EN+.  (*See* Ex. 4 at 2).  Indeed, that fact is beyond dispute, given that Deripaska personally signed the engagement letter.  (*See* Ex. 5 at 1, 7).  That one of Shestakov's co-conspirators gave a provably false exculpatory statement is affirmative evidence of the charged conspiracy.  *See, e.g.*, *United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2005) (finding no error in admission of third parties' false alibi statements as evidence the defendant was conspiring with them).

### B. *Shriki*

The *Shriki* case charges four defendants, including Deripaska himself. (*See* Ex. B at 1). As alleged in that indictment, Shriki and her co-defendant Natalia Bardakova violated the sanctions against Deripaska by: facilitating the sale of a California music studio owned by Deripaska; purchasing and delivering small gifts—such as flowers—from Deripaska to people in the United States; buying personal items, such as shirts, for Deripaska; and arranging the logistics for their co-defendant Ekaterina Voronina to give birth to two of Deripaska's children in the United States. (Ex. B at 13-21). The indictment also includes charges based on three defendants' destruction of records and false statements to law enforcement. (Ex. B at 21-24).

### C. *Bonham-Carter*

Bonham-Carter is the sole defendant in the case bearing his name. (Ex. A at 1). As alleged in that indictment, Bonham-Carter violated the sanctions against Deripaska by helping him to manage and maintain three residential properties in the United States which Deripaska had purchased before the sanctions, and attempting to ship out of the United States artwork which Deripaska had purchased before imposition of the sanctions. (Ex. A at 7-11).

## II.   Applicable Law

### A. Motions to Compel Under Federal Rule of Criminal Procedure 16(a)(1)(E)(i)

Federal Rule of Criminal Procedure Rule 16(a)(1)(E)(i) requires the Government to produce, upon defense request, items "within the government's possession, custody, or control" that are "material to preparing the defense." An item is "material to preparing the defense" under Rule 16 "if it could be used to counter the Government's case or bolster a defense." *United States v. Stevens*, 985 F.2d 1175, 1180-81 (2d Cir. 1993). In other words, Rule 16(a)(1)(E)(i) authorizes production only of items that tend to "refute the Government's arguments that the defendant

committed the crime charged." *United States v. Armstrong*, 517 U.S. 456, 462 (1996); *see also United States v. Rigas*, 258 F. Supp. 2d 299, 306 (S.D.N.Y. 2003) ("Rule 16(a)(1)(E)(i) entitles a defendant to documents or other items that are material to preparing arguments in response to the prosecution's case-in-chief.").

The defendant must make a prima facie showing of materiality, *United States v. Finnerty*, 411 F. Supp. 2d 428, 431 (S.D.N.Y. 2006), and must "offer more than the conclusory allegation that the requested evidence is material," *Rigas*, 258 F. Supp. 2d at 307. *See also United States v. Abdalla*, 317 F. Supp. 3d 786, 790 (S.D.N.Y. 2018) (same).[4] The fact that an item may be "useful" to the defense does not render it "material" under Rule 16. *Rigas*, 258 F. Supp. 2d at 307. "There must be some indication that the pretrial disclosure of the disputed evidence would enable the defendant significantly to alter the quantum of proof in his favor." *United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013); *United States v. Hossain*, 16 Cr. 606 (SHS), 2020 WL 6874910, at *4 (S.D.N.Y. Nov. 23, 2020) (same).

### B.  *Brady v. Maryland*, 373 U.S. 83 (1963), and its Progeny

Under *Brady* and its progeny, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). This duty covers not only exculpatory material,

---

[4]     Shestakov criticizes the Government's correspondence for using the phrase "material to the defense" as opposed to "material to *preparing* the defense." (Mem. 17). But the Second Circuit, and courts in this District, often use the phrase "material to the defense" as shorthand to describe the obligation imposed by Rule 16. *See, e.g.*, *Stevens*, 985 F.3d at 1178; *United States v. Chalmers*, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006). Nor does Shestakov appear to argue that there is some relevant category of evidence here that is "material to preparing the defense" but not "material to the defense."

but also information that could be used to impeach a government witness. *Id.* (citing *Giglio v. United States,* 405 U.S. 150, 154 (1972)).

As relevant here, "the question of whether the Government has complied with its obligations under *Brady* and *Giglio* is not one to be decided by the Court in advance of trial." *United States v. Blondet*, 16 Cr. 387 (JMF), 2022 WL 507698, at *5 (S.D.N.Y. Feb. 18, 2022), *reconsideration denied,* 2022 WL 549707 (S.D.N.Y. Feb. 23, 2022). That is because "[a]lthough the government's obligations under *Brady* may be thought of as a constitutional duty arising before or during the trial of a defendant, the scope of the government's constitutional duty—and, concomitantly, the scope of a defendant's constitutional right—is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial." *Coppa*, 267 F.3d at 140. Thus, "to ask the Court to decide in advance of trial whether the government's non-production of specific documents or categories of evidence would violate its *Brady* obligations . . . is flatly contrary to the law in this Circuit." *United States v. Gatto*, 316 F. Supp. 3d 654, 658 (S.D.N.Y. 2018).

### III.      Discussion

Shestakov's motion to compel disclosure of the evidence gathered in *Shriki* and *Bonham-Carter* should be denied. He cannot compel pretrial disclosure under *Brady*, and he cannot make the showing required by Rule 16(a)(1)(E)(i), because he has not established that the evidence in those separate cases "could be used to counter the Government's case or bolster a defense." *Stevens*, 985 F.2d at 1180-81.

### A.  Rule 16(a)(1)(E)(i) Supplies the Applicable Standard

Although Shestakov moves under both *Brady* and Rule 16(a)(1)(E)(i), only the Rule is relevant here. That is because Shestakov's request for a pretrial ruling that *Brady* compels any

particular disclosure is "flatly contrary to the law in this Circuit." *Gatto*, 316 F. Supp. 3d at 358. To be clear, as discussed in its separate *ex parte* filing, the Government has undertaken extensive efforts to ensure that there is no evidence gathered in *Shriki* or *Bonham-Carter* which constitute *Brady* or *Giglio* in this case. But the Second Circuit has made crystal clear that the Government's *Brady* obligations can only be adjudicated after trial, because *Brady* requires a retrospective analysis. *See Coppa*, 267 F.3d at 142-46 (granting mandamus where district court improperly ordered pretrial disclosures under *Brady*). Thus, the sole question properly before this Court is whether Rule 16(a)(1)(E)(i) requires the immediate, pretrial disclosure that Shestakov seeks. *See also United States v. Chalmers*, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006) (stating that the " 'material to the defense' category" under Rule 16(a)(1)(E)(i) is arguably a broader scope of documents than exculpatory materials required by *Brady*").[5]

The Rule applies to evidence in the "possession, custody, or control," Fed. R. Crim. P. 16(a)(1)(E), of the prosecutors in this case. Shestakov claims that the Rule applies here solely because the prosecutors in this case and the prosecutors in *Shriki* and *Bonham-Carter* work in the same U.S. Attorney's Office. (Mem. 21-22). That is plainly wrong. *See, e.g., United States v.*

---

[5] For that reason, none of the cases from the Supreme Court or within the Second Circuit cited by Shestakov (Mem. 24-25) approve using *Brady* as the basis of a pretrial motion to compel. *See Wearry v. Cain*, 577 U.S. 385, 388-89 (2016) (exculpatory information disclosed after defendant pled guilty); *United States v. Bagley*, 473 U.S. 667, 670-71 &. n.4 (1985) (exculpatory information disclosed after defendant convicted at trial); *Kyles v. Whitley*, 514 U.S. 419, 431 (1995) (exculpatory information revealed during post-conviction collateral proceedings); *United States v. Seabrook*, 16 Cr. 467 (AKH), 2021 WL 2709360, at *2 (S.D.N.Y. July 1, 2021) (post-trial motion to discover allegedly exculpatory information); *Murray v. U.S. Dep't of Just.*, 821 F. Supp. 94, 106 (E.D.N.Y. 1993) (describing the *Brady* rule in resolving civil suit on other issue); *Poventud v. City of New York*, 750 F.3d 121, 126 (2d Cir. 2014) (exculpatory information disclosed after defendant's conviction at trial). Shestakov cites only an out-of-Circuit district court case which suggests that *Brady* can properly be evaluated pretrial. *See United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005). And whatever value *Safavian* has in the court from which it hales, in this Circuit its rule is squarely foreclosed by *Coppa*, 267 F.3d at 142-46.

*Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) (finding that two teams within the same U.S. Attorney's office were not part of the same prosecution team); *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation."), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015); *United States v. Attanasio*, 03 Cr. 1382 (NGG), 2005 WL 8153622, at *2 (E.D.N.Y. Sept. 9, 2005) ("Courts have been careful to impose the disclosure obligations created by Rule 16(a)(1) only on government attorneys and law enforcement officials actually involved in the prosecution or investigation of *a particular case*." (emphasis added)).[6]

That said, the Court need not decide that issue to resolve this motion. Because all three cases at issue here were investigated by the Counterintelligence Division of the FBI's New York Field Office, the analysis regarding the composition of the prosecution team in this case necessarily involves a detailed and cumbersome factual analysis. The Government's disclosure obligations extend to "information known to persons who are a part of the 'prosecution team' . . . who perform investigative duties or make strategic decisions about the prosecution of the case," including "police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (citation omitted). Whether any particular law enforcement officer belongs to the prosecution team can be a fact-

---

[6] Shestakov's sole citation on this point is not to the contrary. He quotes the Circuit stating that "[a]n individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation *of the case*." (Mem. 22 (quoting *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998) (emphasis added)). But Shestakov has made no showing that his case, *Shriki*, and *Bonham-Carter* can fairly be referred to as a singular "case." An overlap with respect to co-conspirators—as Shestakov posits with respect to Deripaska—does not establish that two different investigations should be treated as the same case. *See, e.g.*, *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (refusing to impute to the prosecution team knowledge of FBI reports concerning Gambino Family, of which defendants were members, prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants").

intensive inquiry.  *See generally United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (outlining factors used in prosecution team analysis). Although the Government believes that conducting such an inquiry would ultimately result in a holding that the FBI investigations here did not constitute a single team for disclosure purposes and thus that the *Shriki* and *Bonham-Carter* materials are not in the possession of the prosecution team in this case, the necessary fact-finding would be granular and time consuming, particularly as personnel within that division sometimes move between squads.  The Government thus believes Shestakov's motion can be more efficiently resolved solely by analyzing whether he has met the standard for compelling disclosure under Rule 16(a)(1)(E)(i).

### B.  Shestakov Has Failed to Satisfy Rule 16(a)(1)(E)(i)

Shestakov would not be entitled to the evidence from *Shriki* or *Bonham-Carter*, even if *Shestakov*, *Shriki* and *Bonham-Carter*, had been—as a matter of law, if not fact—investigated by the same prosecution team.  As explained in greater detail in the Government's *ex parte* filing, the prosecutors who are actually assigned to *Shriki* and *Bonham-Carter* have examined their files to ensure they do not contain information that would be discoverable in this case, even if its possession were imputed to the prosecution team here.  The Government can thus assure the Court that it is aware of and complying with its Rule 16 obligations, including the obligations it would have if it were deemed to constructively possess the evidence in *Shriki* and *Bonham-Carter*.  That alone typically suffices to defeat a motion to compel disclosure.  *See, e.g.*, *United States v. Garcia-Pena*, 17 Cr. 363 (GBD), 2018 WL 6985220, at *6 (S.D.N.Y. Dec. 19, 2018) ("[C]ourts in this circuit have repeatedly denied requests for discovery orders where the government represents that it has produced discovery to defendants pursuant to Rule 16 and has made a good faith representation to the defense that it recognizes and has complied with its obligations under *Brady*

and its progeny." (internal quotation marks, citation, and alterations omitted)); *United States v. Goode*, 16 Cr. 529, 2018 WL 919928 (NSR), at *18 (S.D.N.Y. Feb. 15, 2018) ("The Government represents that it has complied with Rule 16 obligations; the Rule 16 requests are therefore moot." (citation omitted)).[7]

Shestakov cannot meet the standard to compel production in the face of a Government representation that it is aware of, and complying with, its discovery obligations.   "If the Government represents that it 'has fully complied with [its Rule 16] obligations and will continue to do so,' the defendant must put forward some 'compelling demonstration to the contrary' by pointing to a 'specific failure by the Government to comply with its disclosure obligations' in order to justify a motion to compel." *United States v. Noel*, 19 Cr. 830 (AT), 2020 WL 12834537, at *2 (S.D.N.Y. June 9, 2020) (quoting *United States v. Minaya*, 395 F. Supp. 2d 28, 34 (S.D.N.Y. 2005)).[8]

---

[7]    The same rule applies to pretrial requests for orders to disclose *Brady* material, when courts consider such improperly timed requests.  *See, e.g.*, *United States v. Gonzalez*, 19 Cr. 123 (NRB), 2020 WL 1809293, at *5 (S.D.N.Y. Apr. 9, 2020) (denying a motion to compel because the government "represented that it had complied with and would continue to comply with its *Brady* and Rule 16 obligations); *United States v. Underwood*, 04 Cr. 424 (RWS), 2005 WL 927012, at *1 (S.D.N.Y. Apr. 21, 2005) ("The courts of this Circuit repeatedly have denied pretrial requests for discovery orders pursuant to *Brady* where the government has made such good faith representations."); *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (denying defendant's motion to compel production of *Brady* based on Government's representation that it was aware of and had complied with *Brady*).

[8]    The standard would be the same under *Brady*, if improperly considered pretrial.  *See Noel*, 2020 WL 12834537, at *2 ("As under Rule 16, if the Government has represented that it is aware of and has complied with its *Brady* and *Giglio* obligations, a defendant must make a 'particularized showing that materials exist requiring disclosure' in order to sustain a motion to compel." (quoting *United States v. Juliano*, No. 99 Cr. 1197, 2000 WL 640644, at *2 (S.D.N.Y. May 18, 2000)); *United States v. Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969) ("[T]he assurance by the [G]overnment that it has in its possession no undisclosed evidence that would tend to exculpate defendant justifies the denial of a motion for inspection that does not make some particularized showing of materiality and usefulness.").

Shestakov's core theory of materiality appears to be a sort of reverse modus operandi argument:  In *Shriki* and *Bonham-Carter*, Deripaska evaded sanctions using different people and entities than the people and entities in this case, so Deripaska must not have been using the people and entities in this case to evade sanctions.  (*See* Mem. 19-23).  Simply to state that theory is to refute it.  There is nothing unusual, or even slightly unlikely, about a criminal committing the same crime on multiple occasions, using different accomplices and methods each time.  Even the simplest thief committing the simplest crimes will often do that.  *E.g.*, *Herring v. Meachum*, 11 F.3d 374, 378 (2d Cir. 1993) (describing smalltime robber who committed two murders in different ways, with different accomplices).  And Deripaska is far from a simple thief:  He is one of Russia's most powerful oligarchs, sitting atop a sprawling empire of multinational businesses.  *See Deripaska v. Yellen*, 19 Civ. 727 (APM), 2021 WL 2417425, at *3, *6-*10 (D.D.C. June 13, 2021), *aff'd,* No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022), *cert. denied*, 143 S. Ct. 117 (2022).  That Deripaska would use different people, corporations, bank accounts, and the like to carry out different transactions is entirely consistent with the Government's case, and thus would not "enable the defendant significantly to alter the quantum of proof in his favor."  *Urena*, 989 F. Supp. 2d at 261.

That is particularly clear when examining the specific transactions at issue here.  Deripaska used Shriki—a former U.S. employee of his—to wind down a small business he owned, to purchase personal items, and to facilitate his girlfriend giving birth in America.  (*See* Ex. B at 13-21).  He used Bonham-Carter—a London real estate professional—to maintain three residential properties and to attempt to retrieve a collection of artwork.  (*See* Ex. A at 7-11).  And he used McGonigal and Shestakov—a former FBI intelligence professional and a former Russian diplomat—to investigate a rival.  Especially given the different nature of their different tasks, such

different assignments are in no sense exculpatory of Shestakov.  If Jeff Bezos hired a personal assistant to pick up his dry cleaning and a house cleaner to clean his house, that would not cast any doubt on whether he hired an accountant to balance his books.  To be sure, Deripaska's multifarious taskings each violated the sanctions against him.  That is not, however, due to any commonality among the entities or methods involved, but rather because the sanctions bar providing *any* services for Deripaska's benefit (*see* Dkt. 2 at 4-5; Ex. A at 2-3; Ex. B at 2-3).  *Cf. Boyle v. United States*, 556 U.S. 938, 948 (2009) (explaining that a racketeering enterprise need not have a "unique *modus operandi*").

Shestakov disagrees, claiming that *Bonham-Carter* and *Shriki* show that Deripaska had an "established network" involving "close confidantes/employees" and "specific ways of setting up new companies and bank accounts," so as to establish "a modus operandi" for his sanctions violations.  (Mem. 19, 23, 25).  Absent is any explanation for why the Court should believe that to be so.  Nothing about the *Bonham-Carter* indictment suggests that Bonham-Carter was part of an "established network," was a "close confidante" of Deripaska, or used any distinctive method to set up "new companies and bank accounts."  (*See* Ex. A).  Rather, Bonham-Carter managed certain real estate properties for Deripaska, which he did through the straightforward device of a company bearing his initials.  (*See* Ex. A at 5-8).  Bonham-Carter also made a rather ad hoc attempt to convince an auction house to ship out Deripaska's artwork based on a simple lie that Deripaska was not the owner or intended recipient.  (Ex. A at 8-11).  There is thus no support for Shestakov's assertion that Bonham-Carter was somehow Deripaska's "right-hand person" (Mem. 11) or that Deripaska has any distinctive M.O.

With respect to *Shriki*, it would be a stretch to call the informal exchanges between the defendants there an established network—among other things, Shriki casually declined a major

assignment from Deripaska because she was busy with her full-time job.  (*See* Ex. B at 19).  But to the extent such a network existed, it performed tasks such as buying shirts and arranging medical care, rather than constituting the sort of all-encompassing enterprise that would be expected to fold in the investigatory contract at issue in this case.  Nor does *Shriki* suggest that Deripaska only employed those close to him:  One of the defendants is the mother of his children (Ex. B at 5-6), but a scheme to facilitate the birth of Deripaska's children in the United States will necessarily involve the mother of those children, and so does not suggest that status as a confidante is a prerequisite for helping Deripaska evade sanctions.  Shriki herself lived in New York and often received direction only through her third co-defendant, Bardakova (Ex. B at 11, 14-17), suggesting no particular proximity to Deripaska.  Shriki set up a company in her name (Ex. B at 11), but there is nothing distinctive about it, meaning it is not materially like or unlike Bonham-Carter's company, Spectrum in this case, or any other cut-out that might be used in any sanctions violation scheme.[9]  Bardakova lived in Russia and so could communicate directly with Deripaska (Ex. B at 4, 20-21), but that merely makes her dissimilar from Bonham-Carter and Shriki—and similar to Fokin.  That further defeats any notion of significant commonality among Deripaska's minions— or at least any commonality that distinguishes this case from *Bonham-Carter* and *Shriki* in a way that could possibly be exculpatory.

---

[9]     The *Shriki* and *Bonham-Carter* indictments both discuss a company called Gracetown Inc., but that is not because it plays a unifying role in Deripaska's sanctions evasion.  Gracetown Inc. is the U.S corporation that maintains the three pieces of U.S. real estate which Bonham-Carter managed for Deripaska.  (*See* Ex. A at 7-8).  Gracetown did not play any role in the crimes committed by Shriki, Bardakova, or Voronina.  Rather, it appears in the *Shriki* indictment because that indictment names Deripaska as a defendant, meaning that forfeiture of the properties maintained by Gracetown is properly sought in *Shriki*.  (*See* Ex. B at 6, 28-29).

This same analysis defeats Shestakov's claims that the absence of communications with him, or about his crime, in *Shriki* and *Bonham-Carter* would be material to his defense. (*See* Mem. 21, 23). Because those cases do not concern the exclusive means or entities Deripaska uses to violate sanctions, the absence of communications about the means and entities in this case has no probative value. Indeed, it makes little sense to expect that in communicating with Shriki about purchasing flowers, or asking Bonham-Carter to retrieve artwork, Deripaska or one of his lieutenants would also chit chat about the subject matter of this case. Steve Jobs's messages with his hair stylist may have contained nothing about the design of iPhones, but that has no bearing on whether Jobs had other employees who designed iPhones. That reasoning has all the more force where the communications evince criminal activity, giving Deripaska an affirmative motive for secrecy. *Cf. United States v. Barret,* 848 F.3d 524, 535 (2d Cir. 2017) ("Indeed, leaders of drug conspiracies may intentionally compartmentalize their operations in an effort to ensure that individual members are unaware of other parts of the conspiracy as well as the full scope of the conspiracy's operations.").

Moreover, to the extent Shestakov wishes to argue that there is a lack of evidence he met or communicated directly with Deripaska, or that his conduct was integrated with a broader sanctions-evading network, he can already do so. The Government bears the burden of proof in this case. It does not anticipate presenting any evidence on those points. Thus, if the absence of evidence on those matters was otherwise probative,[10] Shestakov already has all the grounds he

---

[10]    It is not. Consistent with the law of this Circuit, "a standard formulation of the jury instruction for such crimes makes clear that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need he have been apprised of all of their activities." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 78 (2d Cir. 2023), *cert. denied*, No. 22-1117, 2023 WL 6377871 (U.S. Oct. 2, 2023). Shestakov need only know that his services were performed for Deripaska's ultimate benefit, making them a violation of the sanctions against him. Thus, that Shestakov has not met Deripaska, or forged any agreement

needs to so argue.  But to the extent Shestakov seeks to argue there is no evidence on those points despite the Government having also investigated Deripaska's sanctions-busting in *Shriki* and *Bonham-Carter*, that would add nothing, because there is nothing about those cases that suggests that they would or should contain evidence of Shestakov's crimes.  Shestakov therefore has not identified anything about the evidence he seeks that "could be used to counter the government's case or to bolster a defense."  *Stevens*, 985 F.2d at 1180-81.

The cases upon which Shestakov relies further illustrate his failure to make the required showing.  For example, Shestakov repeatedly cites *United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y. 2007).  (Mem. 19, 22, 23).  *Stein* concerned charges against former partners of the accounting firm KPMG for concealing fraudulent tax shelters from the IRS and Senate investigators.  *See Stein*, 488 F. Supp. 2d at 354-55, 358.  Judge Kaplan found that correspondence between KPMG and the IRS or the Senate on that very subject was obviously material to the preparation of the defense.  *Id.* at 358.  Judge Kaplan also found that portions of communications between KPMG and the Government that touched directly on the charged conduct were discoverable under Rule 16(a)(1)(E)(i).  *Id.* at 358-60.  In other words, *Stein* concerned evidence about the conduct in the case at hand—not evidence about conduct in different cases that a defendant wished to distinguish from his own conduct, as Shestakov does here.  Similarly, the court ordered disclosure of the police file for the murder with which the defendant was charged, and which contained evidence that tended to exculpate the defendant by identifying "possible alternative perpetrators, motives and other facts" regarding the very murder with which the

---

directly with him, no more exonerates him than someone shipping drugs for a cartel can create reasonable doubt because he has never met the cartel's boss and ships his drugs without involving himself in the cartel's other operations.

defendant was charged in his federal case, in *United States v. Messina*, 11 Cr. 31 (KAM), 2011 WL 3471511, at *2 (E.D.N.Y. Aug. 8, 2011).  (Cited at Mem. 22, 23).[11]  Shestakov cannot reasonably argue that he seeks anything analogous here.

Shestakov also briefly asserts that the evidence gathered in *Shriki* and *Bonham-Carter* would support a defense that he reasonably believed he had contracted to perform work for EN+, not Deripaska, because it will show that "none of Deripaska's longtime business associates who conducted his business and took care of his financial transactions were associated with, or even knew about Spectrum, the Cyprus entity or Mr. McGonigal and Mr. Shestakov." (Mem. 21).  This argument errs for at least three reasons:  *First*, Shestakov plainly knew that Fokin was Deripaska's "business associate who conducted his business" because—among other reasons—Shestakov attended meetings with Fokin and McGonigal to help Fokin secure legal representation for Deripaska, as Shestakov admitted in a proffer with the Government.  (Ex. 3 at 2).  *Second*, Shestakov does not claim that in 2021 he knew anything about the conduct at issue in *Shriki* and *Bonham-Carter*.  For that reason, any purported dissimilarity between those cases and his own could not possibly have affected Shestakov's beliefs at the time he engaged in the charged conduct. *Third*, even if Shestakov had possessed a complete understanding of the crimes in *Shriki* and *Bonham-Carter*, there is nothing about those cases that would have suggested to him that he was not entering a separate agreement to violate the sanctions against Deripaska, as discussed above. (*See supra* at 11-15).

---

[11]     Shestakov also errs in suggesting that under *Messina* he must show only " 'more than an abstract logical relationship to the issues in this case.' " (Mem. 22 (quoting *Messina*, 2011 WL 3471511 at *2)).  As *Messina* correctly states, "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case.  Rather, the requested information must enable the defendant significantly to alter the quantum of proof in his favor."  *Messina*, 2011 WL 3471511 at *1.

Finally, Shestakov twice repeats the stock phrase that the evidence he seeks "would play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." (Mem. 22, 23). Absent is any concrete explanation of how the *Shriki* or *Bonham-Carter* evidence would enable him to uncover admissible evidence, what witnesses—or even what general types of witnesses—this evidence might aid in preparing, what sort of testimony it could corroborate, or how it might impeach or rebut any expected Government evidence.[12] Shestakov's incantations thus offer the sort of "conclusory allegation" that courts in this District routinely reject. *Abdalla*, 317 F. Supp. 3d at 790. Nor can Shestakov buttress his assertions with claims that the evidence "may" or "[p]resumably" will support his defense, or even that he "expect[s]" it will. (Mem. 23). For the reasons just discussed, nothing about *Shriki* or *Bonham-Carter* suggests that they concern a comprehensive, or even representative, modus operandi or cast of characters for Deripaska's efforts to evade sanctions, and there is thus no reason to think that evidence of sanctions violations in those cases will be material to preparing his defense in this case. Shestakov "has not articulated a coherent and particular reason why" the evidence he seeks "could counter the government's case or bolster a defense." *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017). His claim that he nonetheless "may" or "presumably" will find such items in the *Shriki* and *Bonham-Carter* evidence thus seeks

---

[12]     Shestakov does briefly suggest that the purportedly complex activity in *Shriki* and *Bonham-Carter* stands in distinction to the "simple" transactions the Government expects to prove in this case. (Mem. 23). But a comparison of the sanctions-busting transactions charged in *Shriki* and *Bonham-Carter* with those in this case does not show those cases to concern markedly more complex schemes. (*Compare* Ex. A at 5-11 and Ex. B at 12-21 *with* Dkt. 2 at 7-13). Moreover, the Government's description of the simple transactions here was not an evidentiary characterization of the modus operandi employed, but rather a logistical explanation that the case would not require vast amounts of pretrial defense preparation. (*See* March 8, 2023 Tr. at 5 (Government responding to Court's question about discovery); *see also id.* at 9 (McGonigal's counsel stating that "in my view it may end up, in the end, being a rather simple case to try.")).

nothing more than a fishing expedition, and should be denied as such.  *Id.* (affirming district court's denial of Rule 16(a)(1)(E)(i) discovery requests and Rule 17(c) subpoenas as an "overall fishing expedition").

### C.  Practices in Other Cases Do Not Affect the Scope of Rule 16(a)(1)(E)(i) Here

In support of his motion, Shestakov offers descriptions of three unrelated cases from several years ago in which the Government made serious errors in fulfilling its discovery obligations.  His presentation is lengthy—considerably longer than his argument that he can satisfy Rule 16(a)(1)(E)(i).  (*Compare* Mem. 22-23 *with* Mem. 25-30).  It is also irrelevant to the question before this Court.  Shestakov offers neither argument nor citation to the effect that a party's previous errors in different litigation can alter its discovery obligations in the case at hand.  And to the extent Shestakov means to unsettle the rule that courts will accept the Government's statement that it is aware of and fulfilling its discovery obligations, the law is to the contrary. Judges in this District—including one of the judges that Shestakov cites as finding fault with the Government in an unrelated case—have continued to follow that rule in rejecting motions to compel, fully aware of the cases Shestakov describes.  *See, e.g.*, *United States v. Maxwell*, 534 F. Supp. 3d 299, 324 (S.D.N.Y. 2021) (Judge Nathan holding that "[t]he Court also will not issue an order requiring the immediate disclosure of *Brady* and *Giglio* material.  The Government has represented that it recognizes its obligations under *Brady* and that it has complied, and will continue to comply, with such obligations."); *United States v. Alexandre*, 22 Cr. 326 (JPC), 2023 WL 416405, at *12 (S.D.N.Y. Jan. 26, 2023) (relying on Government representations in denying motions to compel discovery); *United States v. Parnas*, 19 Cr. 725 (JPO), 2021 WL 2981567, at *9 (S.D.N.Y. July 14, 2021) (denying multiple discovery requests "based on the Government's representations").

18

Shestakov also notes that in other cases in this District, the Government has sometimes produced discovery from another case involving one or more overlapping participants.  (Mem. 30).  Those cases do not support Shestakov's motion, for at least two reasons:

*First*, Shestakov has made no showing that the facts of those cases are analogous to the circumstances here.  For example, in the two cases concerning the Mac Baller gang cited by Shestakov (Mem. 30), evidence in the first case included proof of at least two robberies that the Government intended to prove in the second case, meaning that the evidence was discoverable because "the Government intend[ed] to use the item in its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E)(ii).  Similarly, in the second set of cases Shestakov cites, the Government produced discovery from other cases that directly implicated the defendants in the case at hand, such as where the defendants in one case purchased drugs from the defendant in the other.  Moreover, in that latter set of cases the Government did not simply cross-produce *en masse*, but rather produced those portions of the other-case discovery that also fell under Rule 16 in the case at hand.

*Second*, the Government can voluntarily produce evidence without any reason to believe that Rule 16 requires its disclosure.  For example, in the Mac Baller cases just discussed, all the evidence in the original case was unlikely to be Rule 16 material in the case in which it was cross-produced, but reproducing the entire universe of discovery from the first case avoided any potential litigation about exactly what qualified as Rule 16 material in the second case.  Where doing so would not prejudice the Government, such voluntary disclosures avoid unnecessary litigation and thereby conserve judicial and prosecutorial resources.  But if those voluntary disclosures were taken to define the scope of the Government's obligations, then the Government would be forced to raise—and courts forced to resolve—countless otherwise unnecessary disputes, solely so that

voluntary disclosures which were efficient in most cases would not be deemed mandatory in others.

## <u>CONCLUSION</u>

For the reasons set forth above, Shestakov's motion should be denied.

Dated:  New York, New York
        October 27, 2023

<div style="margin-left:40%">

Respectfully submitted**,**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:     /s/                             
        Hagan Scotten
        Rebecca T. Dell
        Derek Wikstrom
        Assistant United States Attorneys
        Tel.: (212) 637-2410

</div>