N472BahS kjc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               21 Cr. 430 (RA)

NILOUFAR BAHADORIFAR,

                Defendant.

------------------------------x              Sentencing

                                             April 7, 2023
                                             10:05 a.m.


Before:

                    HON. RONNIE ABRAMS,

                                             District Judge



                        APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:  JACOB H. GUTWILLIG
        MATTHEW HELLMAN
        Assistant United States Attorneys


LAW OFFICES OF JEFFREY LICHTMAN
        Attorneys for Defendant
BY:  JEFFREY H. LICHTMAN
        JEFFREY B. EINHORN

N472BahS kjc

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name

3    for the record.

4              MR. GUTWILLIG:  Good morning, your Honor.  Jacob

5    Gutwillig for the government.  I'm joined at counsel table by

6    my colleague AUSA Matthew Hellman.

7              THE COURT:  Good morning to both of you.

8              MR. LICHTMAN:  Jeffrey Lichtman and Jeffrey Einhorn

9    for defendant Niloufar Bahadorifar.

10              THE COURT:  Good morning to all of you, as well.

11              So this matter is on for sentencing.  Ms. Bahadorifar

12    pled guilty in December to conspiring to violate International

13    Emergency Economic Powers Act, the IEEPA, as we call it, in

14    violation of 50 United States Code 1701 and structuring in

15    violation of 31 United States Code 5324.

16              So in connection with today's proceeding, I have

17    reviewed all of the numerous letters submitted by the parties,

18    some with attachments, all of which I have read as well,

19    together with a presentence investigation report dated March 7

20    of this year.

21              Why don't we begin by discussing the presentence

22    report prepared by the probation department.  Counsel, have you

23    reviewed the presentence report and discussed it with your

24    client?  Let me start with defense counsel, please.

25              MR. LICHTMAN:  I have, your Honor.

1          THE COURT:  And do you have any objections to it?

2          MR. LICHTMAN:  Judge, we have no objections but, you

3    know, there is the issue with regard to the sentencing

4    guidelines, and we would defer to the plea agreement.

5          THE COURT:  Okay.  All right.  Understood.  Thank you.

6    I was going ask if you wanted to be heard, but thank you for

7    that.

8          Ms. Bahadorifar, have you had enough time and

9    opportunity to review the presentence report and discuss it

10   with your attorneys?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Okay.  Does the government have any

13   objections to the presentence report?

14         MR. GUTWILLIG:  Not beyond those with respect to the

15   guidelines calculation, your Honor.

16         THE COURT:  Okay.  All right.  All right.  So the

17   Court adopts the factual findings in the report.  The

18   presentence report will be made a part of the record in this

19   matter and placed under seal.  If an appeal is taken, counsel

20   on appeal may have access to the sealed report without further

21   application to the Court.

22         So, Ms. Bahadorifar, when you pled guilty in

23   December, we discussed the federal sentencing guidelines.  And

24   for those who are here and are not aware, the guidelines are,

25   you know, in a book like this.  They are a set of rules.  They

N472BahS kjc

1     are published by the United States Sentencing Commission, and

2     they are designed to guide judges when they impose sentence.

3     At one time they were mandatory, meaning judges were required

4     to follow the guidelines, but they are no longer mandatory,

5     they are no longer binding on judges, but judges must

6     nonetheless consider them and calculate them properly.

7              So while the parties stipulated to a guidelines range

8     of 46 to 57 months, the probation department found that the

9     applicable range should instead be 37 to 46 months.  The

10    difference in the ranges turns on whether Counts Two and Five

11    should be grouped or not.  The probation department found that

12    they should be, stating that, pursuant to Section 3D1.2, they

13    involve the same victim, namely, society at large, and two or

14    more acts or transactions that are connected by a common

15    criminal objective constituting part of a common scheme or

16    plan.

17             It seems like defense counsel doesn't want to be heard

18    on this.  Would the government like to be heard on this issue

19    further?

20             MR. GUTWILLIG:  Your Honor, the government is happy

21    to rest on its papers unless there are any specific questions

22    we can address.

23             THE COURT:  I don't think so, thanks.

24             So Section 2M5.1, the guideline applicable to Count

25    Two, is not specifically listed as a guideline to be grouped

N472BahS kjc

1    under 3D1.2, nor is it listed as a guideline to be excluded

2    from the grouping analysis.

3           But 3D1.2 provides that for multiple counts of

4    offenses that are not listed, grouping under this subsection

5    may or may not be appropriate and that a case-by-case

6    determination must be made based on facts in the applicable

7    guidelines.

8           The application note 2 addresses the use of the term

9    "victim" in the guideline and reads, "For offenses in which

10    there are no identifiable victims, e.g., drug or immigration

11    offenses, where society at large is the victim, the 'victim'

12    for purposes of subsection (b) is the societal interest that's

13    harmed."

14           And the introductory commentary to part 3D of the

15    guidelines makes clear that it is specifically designed to

16    provide incremental punishment for significant additional

17    conduct while preventing multiple punishment for substantially

18    identical conduct.

19           So ultimately I agree with the government that the

20    societal harms caused by violations of IEEPA and the

21    structuring laws are different and the criminal conduct

22    involved is not substantially identical.  The language in

23    50 United States Code 1701(a) makes clear that IEEPA relates

24    to unusual and extraordinary threats which have their source in

25    whole or in part outside the United States to the national

N472BahS kjc

1    security, foreign policy, or economy of the United States.

2    You know, in *United States v. Hashimi*, 2009 WL 4042841,

3    Judge Preska collected a history of executive actions taken

4    under the authority of IEEPA, including President Clinton

5    adding Osama Bin Laden and al Qaeda to the list of specially

6    designated terrorists.  And as the Second Circuit observed in

7    the *Banki* case, pursuant to IEEPA, the Iranian transactions

8    and sanctions regulations were specifically adopted to target

9    the Iranian government's proliferation of weapons of mass

10   destruction, state-sponsored terrorist activity, and efforts

11   to frustrate Middle East diplomacy.

12           The structuring laws, by contrast, are principally

13   focused on transparency in the financial system and are

14   designed to fulfill multiple distinct goals.  And as far back

15   as 1979, for instance, the Second Circuit described the

16   structuring laws and noted that the reports or records

17   required by them will be useful not only for criminal purposes

18   but also in tax or regulatory investigations or proceedings

19   and that such nonprosecutorial interests accounted for by the

20   laws were substantial.  Indeed, Congress specifically codified

21   a declaration of purpose for passing reporting requirements in

22   the structuring laws at 31 United States Code 5311, and there

23   it noted that it enacted the structuring laws to require

24   records that could, among other things, prevent the laundering

25   of money, be used for regulatory investigations, and aid in

N472BahS kjc

1   combating tax evasion and fraud risks to American financial

2   institutions.

3          So for all of those reasons, I find that, given the

4   facts of these offenses and the distinct statutory purposes of

5   IEEPA and the structuring laws, that the parties are correct

6   in not grouping Counts Two and Five.

7          So I accept the guidelines calculation in the plea

8   agreement and I accept the guidelines calculation in the

9   presentence report except for the grouping analysis.  As a

10  result, Ms. Bahadorifar's offense level after, among other

11  things, factoring in acceptance points and a minor role

12  reduction, is 23, her criminal history category is I, and her

13  recommended guidelines sentence is 46 to 57 months.  So that's

14  consistent with the plea agreement.

15         As I said a moment ago, that range is only advisory,

16  so courts may impose a sentence outside of that range based on

17  one of two legal concepts——a departure or a variance.  A

18  departure allows for a sentence outside of the advisory range

19  based on some provision in the guidelines themselves.  I

20  understand that in the plea agreement the parties agreed that

21  neither party could seek a departure.  Is that correct?

22         MR. GUTWILLIG:  That's correct, your Honor.

23         MR. LICHTMAN:  Yes, your Honor.

24         THE COURT:  Okay.  Nevertheless, I have considered

25  whether there is an appropriate basis for departure from the

N472BahS kjc

1    advisory guidelines range and, while recognizing that I have

2    the authority to depart, I don't find any grounds warranting a

3    departure under the guidelines.

4            I also, of course, have the power to impose what we

5    call a variance pursuant to 18 U.S.C. § 3553(a), and I know

6    that that is what the defense is seeking.

7            So with that said, would the government like to be

8    heard today with respect to sentencing?

9            MR. GUTWILLIG:  Yes, your Honor.

10           Your Honor, we are here today because Niloufar

11   Bahadorifar knowingly violated sanctions.  Those sanctions are

12   designed to prevent hostile foreign governments, like Iran,

13   from carrying out its missions of terror and human rights

14   abuses across the globe, from stamping out dissent and

15   silencing criticism and trying to do that right here in New

16   York City.

17           Those sanctions are a bulwark against malign foreign

18   actors and influence, and the defendant violated them.  For

19   years, she accepted money from Mahmoud Khazein, who she knew

20   was affiliated with Iranian intelligence, and she acted on his

21   behalf.  She provided invaluable access, opening the door to

22   the U.S. financial system so that the Iranian intelligence

23   community could walk right through.  And on June 17, 2020, at

24   Khazein's direction, and in coordination with their

25   coconspirator Omid Noori, she sent a $670 payment to a private

N472BahS kjc

1    investigator.  That payment note read:  "Requested from Mr. M.

2    Khazein."

3              Now, as the Court knows, that payment was for the

4    private investigator to conduct surveillance of the victim in

5    this case, Masih Alinejad.  She is here in court today.

6    Ms. Alinejad is a prominent critic of the Iranian regime and

7    she has spoken out against its human rights abuses, compulsory

8    hijab laws, suppression of democratic participation

9    expression, and the use of arbitrary imprisonment, torture,

10   and execution to target its political opponents.  And for that

11   bravery she has paid a price.  She was, as charged in the

12   indictment, the target of a kidnapping plot undertaken by

13   Khazein, Noori, and their coconspirators, Kiya Sadeghi and

14   Alireza Shahvaroghi Farahani.  And you will hear today from

15   Ms. Alinejad about the effect that that kidnapping plot had on

16   her and her family.  She will describe it in a way that I

17   can't.

18             Let me be clear.  The defendant is not charged in

19   that kidnapping conspiracy and the government does not allege

20   that she had specific knowledge of its aims.  The defendant's

21   conduct is, instead, an object lesson in why sanctions

22   violations are gravely serious.  Under the International

23   Emergency Economic Powers Act, or IEEPA, the president has the

24   authority to declare a national emergency with respect to

25   unusual and extraordinary threats to this nation's national

 1   security, foreign policy, and economy when those threats have

 2   their source in whole or in substantial part outside of the

 3   United States.  The government of Iran was identified as such

 4   a threat in 1979 when the current regime came to power,

 5   seizing the United States embassy in Tehran and holding more

 6   than 50 Americans hostage for over a year.

 7          The current sanctions regime came into effect in 1995

 8   when the president declared a national emergency in response

 9   to the government of Iran's support of terrorism, among other

10   things.  And since that time, each successive U.S. president

11   has found that the government of Iran's actions continue to

12   pose an unusual, extraordinary threat.  That is what IEEPA

13   is—a national emergency posed by the government of Iran that

14   has persisted for more than a quarter of a century.  That is

15   the law the defendant broke.

16          She may not have known about the kidnapping

17   conspiracy, but the defendant new very well that she was

18   supporting, assisting, and facilitating the actions of Iranian

19   intelligence assets for years before that plot came to

20   fruition.

21          Beginning in at least 2014, the defendant received

22   regular payments from Iran from Khazein.  Those payments were

23   made through a variety of deceptive and secretive means, and

24   the defendant held up her end of the bargain in exchange.  She

25   gave Khazein credit cards, access to the U.S. financial

1   system, maintained bank accounts, and made payments through

2   U.S. payment facilities.  She facilitated import of

3   commodities to Iran, bought computer tools for him, and

4   offered to act as a straw owner of businesses in the

5   United States on his behalf.  So even if she never made the

6   payment to the investigator and the kidnapping conspiracy

7   never took place, we would be left with someone who

8   repeatedly, willfully and, to put a fine point on it,

9   dangerously violated sanctions.

10          Violating sanctions may sound like some sort of

11   technicality.  It is not.  In plain English, for years, the

12   defendant knowingly supported an intelligence asset of a

13   hostile foreign nation that the United States has deemed a

14   sponsor of global terror.

15          When she was arrested, the defendant initially lied

16   about knowing Khazein and pretended not to recall his name.

17   She later admitted that in fact she had known him for years

18   and understood him to be connected to Iranian intelligence and

19   she admitted that in August of 2020, less that be a year

20   before the kidnapping plot came to light, they met in

21   Khazein's office in Tehran.

22          The government has not and does not allege that the

23   defendant had specific knowledge of the kidnapping plot, but

24   to be crystal clear, there is no dispute that she knew exactly

25   who she was helping.  She is no unwitting participant in her

1    years-long, repeated, and flagrant violation of the sanctions

2    laws.

3              That is also far from her only crime.  The defendant

4    also was charged with bank and wire fraud, money laundering,

5    and structuring, the last of which she was convicted.  She

6    amassed significant unexplained wealth and made concerted

7    efforts to hide that wealth through structured deposits.

8    Between approximately July of 2020 and May of 2021, she made

9    over a hundred cash deposits totaling nearly half a million

10   dollars.

11             Structuring, like IEEPA, may sound like a sanitized

12   technical term, but here's the point.  More than a hundred

13   times the defendant willingly, knowingly, and obviously broke

14   the law when she thought no one was looking, and she amassed

15   significant wealth that remains unexplained.

16             The government took all this into account when

17   fashioning an appropriate plea offer.  The defendant was not

18   required to plead to bank and wire fraud, decreasing her

19   maximum sentencing exposure from 30 years to 20 years.  And

20   the government recognized, through mitigating role adjustment,

21   her relatively less culpable role in committing the IEEPA

22   violation.  The resulting guidelines range of 46 to 57 months'

23   imprisonment reflects that considered judgment and it reflects

24   the seriousness of the crime here.

25             A guidelines sentence is appropriate in this case and

1    it's appropriate because it reflects the seriousness of the

2    defendant's offenses, it provides just punishment, and it

3    sends a message of general deterrence that assisting malign

4    foreign governments can have devastating consequences,

5    including for those targeted by hostile regimes for

6    retribution, people like Masih Alinejad, that those who

7    knowingly provide support and services to those governments,

8    like Iran, will be held to account for their vital role in

9    exporting terror, violence, and repression to the

10   United States, that we will not allow it.

11          Your Honor, for all of those reasons, the government

12   respectfully submits that a guidelines sentence of 46 to 57

13   months' imprisonment is appropriate and necessary in this

14   case.

15          THE COURT:  Thank you.

16          So would Ms. Alinejad like to speak today?

17          MR. GUTWILLIG:  Yes, your Honor.

18          THE COURT:  You are welcome to come to the podium.

19          MS. ALINEJAD:  Your Honor, thank you so much for

20   giving me this opportunity.  Especially coming from a country

21   that women cannot be judge, I am very pleased.

22          My name is Masih Alinejad.  I'm an Iran journalist,

23   American journalist, and activist.  My statement is made to

24   highlight the impact of actions undertaken by or on behalf of

25   the Islamic Republic.

N472BahS kjc

1          I was the target of kidnapping plot that was foiled

2     by the F.B.I., but I am not the only victim here——my husband,

3     Kambiz Foroohar, and my two stepchildren.

4          Physically, I survived.  The ones who wanted to

5     kidnap and harm me failed.  But the emotional and mental scars

6     and wounds are very, very real.  I loved being in America.  I

7     felt the safe place ever that I can express myself, when I

8     could enjoy the benefits of freedom of speech, to campaigning

9     for women inside Iran who don't have the freedom to express

10    themselves.

11         I'm a very strong woman, but they could break me

12    emotionally.  They break -- they broke me emotionally.  This

13    crime left its marks.  I no longer feel safe in America.  This

14    crime's left its mark, and every day when I walk out in the

15    streets, I have to watch over my shoulder.  This crime hurts

16    emotionally, physically, and financially.

17         My life changed in 2020.  That was when the F.B.I.

18    showed me the surveillance photos of myself, my husband, and

19    my two stepchildren.  After that, we moved to a series of safe

20    houses.  As a result of the plot, we lost our home where we

21    had lived for ten years and stayed in a series of temporary

22    accommodations.  We have changed locations many times in the

23    three years.  I can assure you that it is not fun living --

24    living out our -- living out of suitcases.

25         For months, I had troubles sleeping; and when I did,

1    I used to have nightmares.  Even to this day, there are times

2    when I wake up in the middle of the night not quite sure as to

3    where I am.  I stay still trying to figure out whether I'm

4    back in Iran or still in the United States of America.  Even

5    during the day, I sometimes confused the locations of my new

6    safe house.

7           Our changed circumstances has been traumatic for our

8    children, especially my teenage stepson who is only 16 year

9    old.  He spent little time with us.  It has been difficult to

10   create a normal home life during the past three years.

11          Spring is here now, and this is the most difficult

12   part of my life because I really miss the life that I had

13   before this plot.  I miss my tree-lined streets in my little

14   corner of Brooklyn and I miss my neighbors who accepted me as

15   one of their own.  Every morning, I used to wake up and run

16   down the stairs to drink my coffee in my beautiful garden with

17   my daffodils, my roses, lilies.  Yes, I growed roses and I

18   planted sunflowers that climbed more than seven feet tall.

19   You have to visit my garden.

20          The Islamic Republic forced me  to leave my family in

21   Iran.  To remind myself what I had lost, I had planted trees

22   and I named them after my mother, after my father, after my

23   brothers.  They are beautiful trees about the members of my

24   family in my garden.  Now I have been forced to leave my

25   family once again.

1          Beside the emotional pain, which is difficult, there

2     is also financial cost.  We are forced to put our home up for

3     sale.  We have already given most of our furniture to charity.

4          The hardship will not deter me from my mission at

5     all.  The Islamic Republic wanted to silence me, but they have

6     failed.  Thanks to the law enforcement and their incredible

7     job, I'm louder than ever.

8          Islamic Republic is a brutal and repressive regime

9     that kidnaps, tortures, and murders dissidents.  The regime

10    has killed thousands of Iranians, innocent protesters at home

11    and hundreds of dissidents outside its borders.  Many women

12    received lashes, being raped in prison, and my crime is just

13    giving voice to them.  It is beyond belief for

14    anyone——anyone——to claim that they were unaware of the evil

15    nature of the Islamic Republic.

16          I want this Court to impose the maximum sentence not

17    for my pain, not the pain that I have suffered, not the pain

18    that my family suffered, but to send a signal, a message that

19    you cannot commit acts of terrorism or fund act of terrorism on

20    U.S. soil.  I want New York be safe again for me.  I want to

21    go back to my neighbors.

22          Thank you so much for giving me the opportunity to

23    express myself.

24          THE COURT:  Thank you so much for being here today.

25          MS. ALINEJAD:  Thank you.

N472BahS kjc

1              THE COURT:  Mr. Lichtman, would you like to be heard?

2              MR. LICHTMAN:  Yes, Judge.

3              Your Honor, this is a very unusual case and a very

4    unusual defendant for a variety of reasons.

5              First, it is very rare that we have a case in which

6    the harm or the potential harm in this case, although as

7    Ms. Alinejad noted, this is real harm even if the plot failed.

8    This evil plot, my client, Ms. Bahadorifar, is now the face of

9    it in America, is now the face of it in this courtroom, and

10   she wasn't convicted of that plot.  And it is so rare to have

11   a situation where this is the tail that's wagging the dog to

12   the extreme.  If the other defendants that are safely

13   ensconced in Iran right now were in this courtroom being

14   sentenced, she is a minor part of it.  She wasn't convicted.

15   She wasn't even charged.  But here we are, and it's human

16   nature to direct the ire at the one person that's left, that

17   was able to be punished.

18             I want to note also that where this defendant came

19   from, what she's been through as a person, what she's

20   experienced to get here today, it's affected her behavior that

21   landed her here.  This isn't somebody who grew up in a bad

22   neighborhood in New York, where people were selling drugs and

23   she's got PTSD.  This is someone who grew up in a way that is

24   different than -- I don't know if there is any defendant that

25   I have represented -- I have been doing this now for almost 33

1    years, and this is just an incredibly unusual case.

2              She was shaped by the Iranian terror regime that took

3    over, that overthrew the country when she was five years old.

4    The country went from a secular, modern, beautiful place to a

5    dark, repressive, evil, murderous terror regime overnight;

6    where one day girls are walking around wearing skirts,

7    listening to music, and the next day if they show an ankle in

8    public, they are beaten by a morality police.  It is

9    incredible, but it's true.  And I don't know that Americans

10   really appreciate how diseased this Iranian terror regime is

11   and what they have done to the people that they have

12   imprisoned.

13             So when she was five years old, her entire life

14   changed and she grew up under that repressive regime.  As she

15   said in her presentence interview, in her culture, you just

16   take what the men do and you don't report anything.  And it

17   sounds like an excuse but it's not.

18             When she was beaten by her fundamentalist husband in

19   Canada, an arranged marriage, she didn't go to the police.

20   Why?  She is in Canada.  She is free.  She wasn't in Iran

21   anymore.  She didn't do a thing.  She was lucky to escape with

22   her life with her son.  That's because of where she grew up and

23   the impression that she had from the horrifying experience of

24   growing up as a young girl in Iran.

25             So I think trying to pigeonhole Ms. Bahadorifar as a

N472BahS kjc

| | |
|---|---|
| 1 | typical American defendant is wrong and unfair.  Her reactions |
| 2 | to authority, her responses to what people in power ask of her, |
| 3 | all of these things separate her from a typical American |
| 4 | defendant.  And there is no excuse for breaking the law.  I'm |
| 5 | not using that as an excuse, Judge.  But her upbringing, the |
| 6 | factors that shaped her world view, are all pertinent pursuant |
| 7 | to Section 3553(a). |
| 8 |         She's had a very difficult life, as I have said.  To |
| 9 | watch this happen when you are a young child -- and it's |
| 10 | something Americans can't understand.  You know, I view this |
| 11 | case, I'm somebody who personally knows a lot about this |
| 12 | society and I have studied it and it fascinates me.  Why the |
| 13 | courtroom is not filled with international press about this |
| 14 | case tells me all I need to know about Americans just don't |
| 15 | have any interest or enough interest for whatever reason and |
| 16 | Americans should. |
| 17 |         She talks about in the presentence report and in some |
| 18 | of the letters that were submitted about what happened to her |
| 19 | when she was ten years old and she went to a wedding, her |
| 20 | sister's wedding, I believe.  It's incredible.  There were |
| 21 | people that were together dancing, men and women.  That |
| 22 | happens at every wedding.  But what happened at the end of the |
| 23 | wedding, the morality police came in and arrested everybody |
| 24 | because you are not allowed to have men and women that aren't |
| 25 | married together in the same room and, God forbid, dancing. |

1    She was ten years old, taken to a police station and then

2    released.  That's the kind of thing that shapes your world

3    view, and I don't know that you can ever escape from even when

4    you come to a free country, whether it's Canada or America.

5           We learned that her father brought her older sister

6    Azita to America to get educated because her father knew that

7    this was not the Iran that he grew up in.  He knew that,

8    having three daughters, there was no chance that they could

9    ever prosper under that regime where there was no value at all

10   for women, none, just abuse.

11          Her father was rewarded for his concern for his

12   daughter by being arrested upon his return to Iran and all the

13   family's property was taken.  Other relatives were imprisoned.

14   One of them was executed, an uncle, for talking against the

15   regime.

16          The defendant, as I said, finally escaped Iran and

17   moved to Canada.  And as I had said, she didn't escape her

18   upbringing.  She was into -- forced into an arranged marriage

19   and had to leave after being beaten and abused.  She was told

20   that if she left the house uncovered she would be beaten.

21   This is in Canada.  This is what she experienced.  And again,

22   as she said, in her culture you just take what the men do and

23   you don't report anything.

24          Eventually she escaped and moved to America with her

25   young son, Yasha, after seeing him get abused by her husband

1    as well.  She had no money.  She didn't speak the language

2    barely.  It was a new country.  She was raising a young boy on

3    her own without any help, without any relatives, with an

4    ex-husband who had nothing to do with her son.

5          Yasha, her son——you have read his letter, Judge——is

6    now 20 and somehow throughout all of this has turned out to be

7    a wonderful kid.  I read the letter, and I would hope that my

8    children would speak about me in the same way as Yasha spoke

9    about his mother, who sacrificed so much to raise him.  In his

10   letter to the Court, he described what a tremendous mother she

11   was.  As I said, being a single mother in a strange country

12   with no money, no assistance from her ex, her family under

13   siege in Iran, well, that's something.  And raising a son by

14   herself under these circumstances, without any kind of

15   upbringing that could prepare her for this new life, is really

16   extraordinary.  The letter details their close relationship as

17   they really only have each other in this world.  That's it

18   after all these years.  Yasha will attend Penn State in the

19   fall and hopes to go to U.S.C. law school.  He hopes to be --

20   he hopes to be a criminal defense attorney.

21         So we are to think that this woman——who by all

22   accounts is a good person, a generous person, who cares for

23   the homeless on the weekend——is somehow embedded with the

24   Iranian terror regime.  She is not.  The government surely

25   would have provided intelligence upon her if she was.  It's

N472BahS kjc

1    not like the American government is not aware of who is in

2    their midst when they are coming from perhaps America's worst

3    enemy.  They have files on all the people, Judge, especially

4    the expatriots from Iran.

5         Yes, she was involved with a bad person——no

6    question——this Mahmoud Khazein, who had known her for years

7    since she was a young woman, knew her family well before she

8    knew her –– knew him.  Yes, she did what he asked of her.

9         He was not only an authority figure to her, and she's

10   known him for so long, he was also an important government

11   figure in Iran.  He is part of Iranian –– Iran's terror

12   regime.  There is no question.  That's not disputed.  He is

13   part of the Revolutionary Guard, Judge, and that's their

14   military wing of the Iranian government, and part of their

15   task is to crush any dissent within Iran.  This is a very

16   scary terror leader in a country run by the most dangerous

17   terrorists on the planet.  Khazein makes people disappear.

18        But there is zero evidence that Nellie had any clue

19   about this kidnapping plot of Ms. Alinejad, a woman whose

20   hatred of the Iranian terror regime is completely founded.  We

21   should all feel the same way about Iran as Ms. Alinejad does.

22   She is a hero for getting it all out.  Well, she is a victim,

23   as well.  I'm not saying that they are the same, but there is

24   a reason why she is in California.  There is a reason why there

25   is an entire community of ex-Iranians there——to escape the

1    terror regime.

2            Did she do things, Nellie, for financial need for

3    this man?  As noted in the government's submission on page 8,

4    in 2014, Nellie inquired about money she was supposed to

5    receive from family members in Iran and from Khazein.  This

6    was just a bit after she fled her ex-husband in Canada.

7            Regarding Khazein, did she feel morally obligated to

8    help this older authority figure?  was she afraid not to help

9    him?  I suppose a combination of all.  I don't know that we

10   are ever going to get the answer.  I don't know that we as

11   Americans can fully understand her motivation.  But, Judge, I

12   also can't understand as an American why a 19-year-old who

13   finally escaped Iran would enter into an arranged marriage

14   with a fundamentalist lunatic abusive husband.  I can't

15   understand that either.  But this is what happens when you

16   grow up in Iran.  It's not so easy to shed all of the bad.

17           She did know that she had family back in Iran who

18   were exposed when all of this was going on.  And the

19   government knows full well -- and I can tell you this, Judge,

20   I don't want there to even be a hint that I have any problems

21   with the government's handling of this case.  These two

22   prosecutors couldn't have been more fair, more patient, and

23   more decent throughout this entire episode, couldn't be.  They

24   were perfect representatives of this office.  But as I said,

25   the government knew that she didn't have a thing to do with

1    the horrible kidnapping plot.  They read every one of her

2    thoughts in her texts and her What's App messages or e-mails,

3    nothing about the kidnapping.

4           She made a payment of $670 by PayPal to the private

5    investigator and put Mr. Khazein's name in the memo, Judge.

6    He was a known quantity to the U.S. government at that point

7    as a member of the IRGC and she put his name in the PayPal

8    payment memo.  She clearly knew nothing of the plot, and she

9    didn't even attempt to hide his name on the memo.  That speaks

10   volumes.

11          And why was Nellie chosen by Khazein?  Because he

12   felt he could manipulate her.  That's why.  He felt he could

13   get her to do his bidding unknowing what he was actually

14   doing.  If he was dealing with someone who was ideologically

15   aligned with him, Judge, with the Iranian terror regime, he

16   would have included her in on the plot.  He didn't.  He never

17   did.

18          THE COURT:  Don't I have to send a message to people

19   just like Ms. Bahadorifar, who can be manipulated, to say this

20   is what's going to happen?

21          MR. LICHTMAN:  Judge, I'm going to tell you what the

22   message is that may have already been sent, regardless of what

23   happens today, that doesn't happen to a defendant in a regular

24   case.  This woman, who was living in a close-knit expat

25   community in Iran [sic] is marked.  Why?  Because everybody in

1    her community thinks she is aligned with the Iranian terror

2    regime.  In her building, where she lived with friends, they

3    are all Iranian.  This is what they do.  They went to be with

4    each other because they understand each other and they all

5    experienced the same up bringing.  Now she is mud.  Her

6    picture is put up in the elevator.  Most of the people won't

7    speak to her.  She was fired from her job.  That's the first

8    part.  Where can she go?  Is she going to move to Kansas City?

9    Is she going to move as if she is in the witness protection

10   program?  No.  No.  She can't.  She's got roots there, and now

11   she is hated there, even though she herself was manipulated by

12   Khazein and is an opponent of that regime, which is why she got

13   out.  That's part one.

14            Part two, well, she is marked by the Iranian terror

15   regime as well.  You have read our papers, Judge.  You know

16   what they are.  You know what they are capable of.  You know

17   what they have done.  There is nothing beneath this diseased

18   terror regime.  And the idea that she is somehow not in danger

19   herself, or her family, from these people is ludicrous to

20   suggest otherwise.

21            So has a message been sent?  She's got a felony

22   conviction.  She is hated by both sides of the equation here

23   and she was manipulated.  There is no question.  Period.  And

24   as I said, she finds herself in a world of trouble.  She is

25   the only defendant who will ever appear before an American

N472BahS kjc

1    judge in this case.  The others are carefully hidden and

2    protected in Iran.  They are not feeling any pain today.  And

3    the one person who was not charged with the plot is here to

4    take the brunt of it.

5              This is a terror regime, Judge, and I know I have

6    gone on about it, but she has family that's stuck in Iran

7    right now, exposed.  This is a regime that has killed,

8    tortured and imprisoned so many innocent Iranians just in the

9    past few months because a 22-year-old Kurdish Iranian woman

10   named Mahsa Amini dared to wear a loose head covering in

11   public, and for that she needed to be beaten to death by

12   Iran's morality police.

13             Since then, they have had protests in the streets

14   there and the world has watched in horror at the brutal

15   tactics employed to crush it——murder, arrests with no trials,

16   torture, rape, electrocution, removal of nails.  If you simply

17   dance in the street in Iran, you are attacked by the morality

18   police.

19             And you would think that by now that they would want

20   to reach some sort of accommodation with the people that are

21   uprising.  No.  Last week Iran's chief justice warned that

22   women who did not cover their heads in public will be punished

23   and prosecuted without mercy.  This evil regime has taken to

24   poisoning young school girls to prevent them from protesting.

25   Thousands have been poisoned already.

N472BahS kjc

1          The government wrote in its letter that Congress

2     recently enumerated over a dozen alleged plots by the

3     government of Iran over recent years to bomb, shoot, kidnap,

4     harass, and gather intelligence against victims in the

5     United States, Canada, the U.K., France, Germany, Denmark,

6     Turkey, and Africa.  Judge, that's a fraction.

7          How about the last 24 hours?  We've got Iran paying

8     terrorists in Lebanon.  They have killed the prime minister.

9     They bankrupted the country.  They are shooting rockets into

10    Israel.  We have got Iran's Hamas terrorists below Israel

11    shooting rockets into Israel.  I read that there was a plot of

12    two Iranian operatives who were arrested in Azerbaijan

13    yesterday for trying to overthrow the government.  Why?  They

14    want to install a Shi'a government.  This is how utterly sick

15    this is.

16         The day that I filed our sentencing letter, there was

17    an arrest of Iranian operatives who were about to target a

18    Jewish center in Greece, in Athens, in a crowded area, not an

19    Israeli target.  This wasn't an issue with politics.  They are

20    anti-Semites and they wanted to kill Jews in Greece.

21         Similarly, they have a cartoon contest every year

22    about the Holocaust and the best one that says that the

23    Holocaust didn't occur, well, that's your big winner.  That's

24    what we have with Iran.

25         There is nothing that deters this terror

N472BahS kjc

1    regime——nothing.  So that's the message -- and I went on about

2    it, but that's the message that she faces as well.  When this

3    is over, Judge, whatever your Honor does, it doesn't end it

4    for her.  It doesn't end it for her.  It doesn't end it for

5    her in America, it doesn't end it for her anywhere.  It

6    doesn't end it for her with her expats and it doesn't end it

7    for her with the people that are coming into this country to

8    kill and kidnap.

9           During the pendency of this case they tried to kill

10   Ms. Alinejad again.  A man was arrested with an AK-47 who was

11   at her front door during the pendency of this case.  That

12   shows they don't have any concern.  They tried to kill Mike

13   Pompeo and John Bolton.  They have no concern at all.  They are

14   certainly not going to be deterred from going after the

15   defendant.

16          And when the government reports the defendant

17   initially lied to law enforcement officers who arrested her

18   about her relationship with Mahmoud Khazein, should that be

19   any surprise, an Iranian woman afraid to admit any

20   relationship with a member of the Revolutionary Guard when she

21   has family back trapped in Iran?

22          And I'm going to come to the end, Judge.  If we can

23   get past the politics and the need to send a message, I get

24   all of that.  I think that's one thing that we can all agree

25   upon in this courtroom is that somebody, somehow there has to

N472BahS kjc

1     be a message sent to this terror regime.  I would ask you to

2     look at her life, Ms. Bahadorifar, when no one was watching,

3     when she had no need to impress the Court or anyone, for that

4     matter.  This is a person who gives back to her community.

5          I have got clients, Judge, they get arrested, they

6     are incredibly wealthy, and they say to me the first time we

7     had a meeting in my office, well, who could I write a check to

8     to show that I am a charitable person for a judge down the

9     line?  It happens, like, I don't know, like 80 percent of the

10    time.

11         She doesn't have any money.  What she did is, by her

12    sweat equity, she is helping the homeless, she is feeding them

13    on weekends.  There is no matter, no situation too small for

14    her not to try to help her friends, her community.  She

15    listens.  She acts.  The letters are legion in that regard,

16    legion in her charity.

17         And this is why she is so ashamed to be here today,

18    because she loves America.  She didn't come here as an

19    operative.  She came here to raise her son in freedom.  We

20    forget about that because she is here as a criminal defendant.

21    This is a horrible ironic tragedy for her.

22         In conclusion, it is an unusual case for all the

23    reasons I have said.  She is the face of the Iranian terror

24    regime that she had no part of in this courtroom today.  As I

25    said and you know, she wasn't charged with that horrible part

N472BahS kjc

1    of the case.  She was misled, lied to by a long-time family

2    friend, the scary authority figure who is in the Iranian

3    Revolutionary Guard.  But she stills committed the crimes.

4    She should have known better.  Could she ever have imagined

5    that she was getting herself involved in this?  Of course not.

6    She would have been charged.  And she is mortified by what she

7    did.

8            And after such a difficult life, Judge, from an awful

9    childhood, growing up, first, in this idyllic country, and then

10   by age five her world turned upside-down when the revolution

11   occurred.  Suddenly, she is a second class citizen in an

12   Islamic terror state.  She finally escaped, only to find

13   herself in another prison in Canada with a fundamentalist

14   abuser.  When she finally escaped and moved to America, a

15   country that gave her peace and freedom, against all odds she

16   raised, on her own, a wonderful son without speaking the

17   language well, but she persevered.

18           But, sadly, the damage of her upbringing was done,

19   caused her to be manipulated by an authority figure who was a

20   powerful member of Iran's terror regime government.  But she

21   knew better.  America gave her so much, and she knew better.

22           And now she is going to pay the price for this, for

23   her actions for the rest of her life, Judge.  She will always

24   have people -- she will always have to look over her shoulder

25   from both sides of this equation.  She will have difficulty

1    ever working again here, certainly not in her area where she

2    lives.  She still must raise a son who relies -- raise a son

3    who relies on her completely.

4             For all these reasons, Judge -- and I know that it is

5    a difficult decision for you.  I don't envy me.  When I walked

6    in this morning, I was feeling bad, I was feeling bad for

7    myself because this is --

8             THE COURT:  Speak into the mic please so we can all

9    hear you.

10            MR. LICHTMAN:  -- because this is a case that tears

11   at me personally, as well.  It's something that I have a

12   passion about, and it's very hard to be here and it's very

13   hard to represent a woman who I feel it's so easy to make her

14   bear the brunt of what occurred here, and she is the only one

15   that ever will, and she is by far the least involved and was

16   wasn't charged in the main crime.

17            For all those reasons, Judge, I know that it is not

18   easy for you, but I beg of you to give her another chance, to

19   give her a probationary sentence with home confinement with as

20   much community service, to speak to other people, whatever

21   your Honor can do.  I don't want to break up this small family,

22   what's left of it.

23            Thank you, Judge.

24            THE COURT:  Thank you.

25            Ms. Bahadorifar, would you like to say something

N472BahS kjc

1  today?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Bring the microphone a little closer,

4  please, so we can all hear you.

5          THE DEFENDANT:  Your Honor, I would like to sincerely

6  apologize to this beautiful country, the Honorable Court, the

7  prosecutor, to my fiancé Salman, as well as my son Yasha and

8  my sister and the brave people of Iran.  I'm deeply sorry that

9  my crime brought so much discomfort into their lives.  To

10  Ms. Alinejad, I'm humiliated to have been involved in any

11  attempt to harm you, even I was unaware of it.  You are a hero

12  to all Iranian, and especially me and my family.  I'm deeply

13  sorry.  I'm sorry.

14          I moved to United States from Iran to finally

15  experience freedom and happiness and finally have a better

16  life.  The United States has provide me with freedom I had

17  never experienced in Iran.  The United States is the country

18  that does so much for their people and that is why I am beyond

19  ashamed for doing this to my new home which has done nothing

20  but support me, keep me safe, provide me with equal rights as

21  everyone else.  Again, these are all things that everyone in

22  Iran would dream of having it.  I promise to never, ever let

23  this country down in any way again.

24          And to Yasha my son, we have been through so much

25  together.  We have overcome so much.  I never wanted to let

N472BahS kjc

1    you down, and now I have.  I am so sorry.  Please forgive me.

2             Thank you, your Honor.

3             THE COURT:  Thank you.

4             Is there any reason that sentence cannot be imposed

5    at this time?

6             MR. GUTWILLIG:  No, your Honor.

7             MR. LICHTMAN:  No, your Honor.

8             THE COURT:  All right.  So I'm required to consider

9    the advisory guidelines range as well as various other factors

10   that are outlined in a provision of the law that I mentioned

11   earlier—it's 18 United States Code § 3553(a)—and I have done

12   so.  Those factors include, but are not limited to, the nature

13   and circumstances of the offense and the personal history and

14   characteristics of the defendant, because each defendant must

15   be considered individually as a person.

16            Judges are also required to consider the need for the

17   sentence imposed to reflect the seriousness of the offense,

18   promote respect for the law, provide just punishment for the

19   offense, afford adequate deterrence to criminal conduct,

20   protect the public from future crimes of the defendant, and

21   avoid unwarranted sentencing disparities, among other things.

22            You know, sentencing is the hardest thing that a

23   judge does.  It is immeasurably difficult for a human being to

24   judge another human being and decide if they should be

25   deprived of their liberty and, if so, for how long.

1          This sentencing is particularly difficult in my view

2     because I have before me a woman who is sympathetic in many

3     respects.  She has no criminal history.  She is beloved by

4     friends and family, and she has faced many serious challenges

5     in her life.  But she has also engaged in criminal conduct

6     that is not only egregious in and of itself, but conduct

7     through which she endangered the life of another woman, a

8     woman who, in contrast to Ms. Bahadorifar, is a profile of

9     courage in the face of the Iranian terror regime.

10          I think the Probation Department put it so well in

11     the presentence report when it said that almost all organized

12     criminal activity depends on individuals like Bahadorifar,

13     people with clean criminal records and unassuming backgrounds

14     who are unlikely to attract attention.  These individuals

15     provide access to the U.S. financial system to bad actors.

16     They obfuscate the source of money and allow it to be

17     transferred for nefarious purposes——in this case, sanctions

18     evasion and a kidnapping plot.

19          The purpose of the United States's sanctions on Iran

20     is to put economic and political pressure to achieve a

21     peaceful desired outcome, namely, preventing Iran's

22     proliferation of nuclear weapons and stopping their continued

23     support for terrorist groups throughout the Middle East

24     without having to go to war.  If Iran can avoid these

25     sanctions, as they are trying to do with the help of people

1    like Bahadorifar, then sanctions will be ineffective and the

2    risk of war increases.

3            The kidnapping plot on American soil is an affront to

4    our national sovereignty, the values of democracy, and the

5    rule of law.  Bahadorifar played a relatively small role in

6    all this and yet her contribution was crucial.

7            Here, Ms. Bahadorifar had known the Iranian

8    intelligence actor for years and understood him to be

9    affiliated with Iranian intelligence services.  Indeed, she

10   met with him in Tehran in August 2020 when he was engaged in

11   the plot to kidnap, even though she didn't know about that

12   plot.  But nonetheless, knowing what she did, what

13   Ms. Bahadorifar knew, she still provided an attempt to provide

14   this man assistance for a full nine-year period, from 2012 to

15   2021.

16           Moreover, the amount of funds involved in the

17   structuring charge is close to half a million dollars.  In

18   just the two-year period between 2019 and 2021, much of that

19   time at the height of the pandemic lockdown, the defendant

20   made over 100 separate trips to make cash deposits at banks

21   specifically intended to evade reporting requirements.  Those

22   102 deposits totaled well over $400,000 in illicit funds.

23           And she profited from this scheme.  When the F.B.I.

24   searched her home, they found about $150,000 in luxury goods,

25   including watches and handbags and jewelry.  So not only does

1    a sentence in this case have to reflect the seriousness of the

2    offenses, but I have to send a strong message to deter other

3    people like Ms. Bahadorifar from engaging in conduct like this

4    and hopefully prevent dangers like those that befell

5    Ms. Alinejad who has been so brave not only in coming here

6    today but in speaking up against injustice in her homeland.

7              So while I have considered all of the arguments made

8    by Ms. Bahadorifar, including but not limited to her lack of

9    criminal history and her health issues, and I read every one

10   of the many letters submitted by her friends and her family

11   who describe her in glowing terms, and while I am fully

12   cognizant that there is no evidence that she knowingly

13   participated in the kidnapping plot, a very serious sentence

14   must nonetheless be imposed, and I ultimately agree with the

15   government that one within the guidelines range is

16   appropriate.

17             Ms. Bahadorifar, could you please rise for the

18   imposition of sentence.

19             It is the judgment of this Court that you be

20   committed to the custody of the Bureau of Prisons for a term

21   of 48 months on each count to run concurrently, to be followed

22   by a term of supervised release of three years on each count

23   also to run concurrently.

24             I believe that this four-year sentence is sufficient

25   but not greater than necessary to comply with the purposes of

N472BahS kjc

1    sentencing set forth in the law.  And just to be clear, you

2    know, based on the facts before me, I would have imposed the

3    same sentence however I ruled on the guidelines issue that we

4    discussed earlier.

5            You can be seated while I describe the conditions of

6    your supervised release.

7            So all of the standard conditions of supervised

8    release shall apply.  They are on pages 25 through 27 of the

9    presentence report.  Counsel, would you like me at the read

10   these aloud or do you waive their public reading?

11           MR. LICHTMAN:  Judge, we waive the public reading.

12           THE COURT:  I will say the mandatory conditions on

13   the record.

14           You must not commit another federal, state, or local

15   crime.

16           You must not unlawfully possess a controlled

17   substance.  You must refrain from any unlawful use of a

18   controlled substance.

19           You must cooperate in the collection of DNA as

20   directed by the probation officer, and you must make

21   restitution in accordance with the law.

22           In light of the nature of the crime, I'm also taking

23   the recommendation of the probation department and requiring

24   you to provide the probation officer with access to any

25   requested financial information, and you must not incur any

N472BahS kjc

1       new credit card charges or open additional lines of credit

2       without the approval of the probation officer unless you are

3       in compliance with the installment payment schedule.

4                I am not going to impose a fine at the recommendation

5       of the probation department and in light of the amount of

6       forfeiture that I intend to order.

7                I am imposing the special mandatory special

8       assessment of $200, which shall be paid immediately.

9                So a consent preliminary order of forfeiture money

10      judgment was issued on December 15, 2022 in the amount of

11      $476,100.  That order will become part of the judgment in this

12      case.

13               Is the government separately seeking restitution?

14               MR. GUTWILLIG:  No, your Honor.

15               THE COURT:  All right.  So none will be imposed.

16               Is there any objection to voluntary surrender?

17               MR. GUTWILLIG:  Your Honor, the government's position

18      is that remand is appropriate under the applicable standard.

19      I don't think that the defendant can meet her burden to

20      establish that she is not by clear and convincing evidence a

21      flight risk.  I think this is because, among other things, the

22      nature and circumstances of this offense, the amount of money,

23      the illicit payments, the deceptive means used for that, and I

24      think that the distinguishing factor between today and when

25      she pled guilty is that your Honor has just imposed a

1   significant sentence that incentivizes flight.

2          THE COURT:  Counsel, would you like to be heard?

3          MR. LICHTMAN:  Judge, we have known about these

4   sentencing guidelines for a long time now.  The idea that she

5   is a flight risk is ludicrous.  She could have left any time

6   beforehand.  It would be a lot easier for her to have left

7   before she even pled guilty in this case.

8          She followed every single directive from Pretrial

9   Services.  There was not a single issue.  So the idea of what

10  more could be clear and convincing evidence?  This is beyond a

11  reasonable doubt evidence that she is no flight risk.  She's

12  got family here.  She's got a son who is in school who will be

13  going to school in the fall.  The idea that she is going to

14  run away when she's got a four-year sentence and when you

15  factor in the 85 percent, the halfway house, and the First

16  Step Act credits, it's about 29 months in jail.

17         The idea that she is going to leave this country to

18  go where and leave her family is, frankly, a joke, and I would

19  ask that she be given 90 days to self-surrender—she's got a

20  son who is still in school, he is going to be transferring to

21  another school this fall—to give him an opportunity to get

22  him straight, Judge.  That's all they have is each other.

23  There is not one single scintilla of evidence that suggests

24  that she is a flight risk here.

25         THE COURT:  All right.  I am going to set a voluntary

N472BahS kjc

1   surrender date.  I agree that she is has been compliant

2   throughout on pretrial release at all times.  She was well

3   aware of the guidelines range, and I gave a sentence of course

4   within that range, and she does have her son who will be

5   attending school in the United States.  And if she were to

6   flee -- and consider this a warning, Ms. Bahadorifar, you will

7   be arrested immediately, and then she won't be seeing her son

8   again for a very long time.

9          Ms. Cavale, could you choose a date approximately 90

10   days out.

11          THE DEPUTY CLERK:  How is July 7 at 11 a.m.?

12          MR. LICHTMAN:  Thank you.

13          THE COURT:  On that date she shall surrender to the

14   institution designated by the Bureau of Prisons or as notified

15   by the probation or Pretrial Services.

16          Ms. Bahadorifar, the conditions of your release will

17   continue up until the time that you report for sentence.  If

18   you fail to report for sentence.  Not only will you be

19   arrested on a bench warrant, but you will likely be charged

20   with a separate crime of bail jumping.  So I want to make that

21   very, very clear.

22          That is the sentence of this Court.

23          Ms. Bahadorifar, you have a right to appeal your

24   conviction and sentence except to whatever extent you may have

25   validly waived that right as part of your plea agreement.  If

N472BahS kjc

1    you do choose to appeal, the notice of appeal must be filed

2    within 14 days of the judgment of conviction.

3            If you are not able to pay for the cost of an appeal,

4    you may apply for leave to appeal *in forma pauperis* which

5    simply means that court costs, such as filing fees, will be

6    waived.

7            If you request, the Clerk of Court will prepare and

8    file a notice of appeal on your behalf.

9            Is the government moving to dismiss the open counts?

10           MR. GUTWILLIG:  Yes, your Honor.

11           THE COURT:  All right.  They will be dismissed.

12           Are there any other applications?

13           MR. LICHTMAN:  Judge, I would ask for a

14   recommendation for a prison camp in central California.

15           THE COURT:  All right.  I will make that

16   recommendation.  It's ultimately, of course, up to the Bureau

17   of Prisons, but I will make that representation --

18   recommendation.

19           MR. LICHTMAN:  Thank you.

20           THE COURT:  Are there any other applications at this

21   time?

22           MR. LICHTMAN:  Nothing from the defense.

23           MR. GUTWILLIG:  Not from the government, your Honor.

24           THE COURT:  Thank you.  We are adjourned.

25                              oOo

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300