**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

             v.

SERGEY SHESTAKOV,

             Defendant.

Case No. 23 Cr. 16 (JHR)

---

# MEMORANDUM OF LAW IN SUPPORT OF
# SERGEY SHESTAKOV'S MOTION TO DISMISS

Dated:  February 16, 2024
       New York, New York

**GLAVIN PLLC**
Rita M. Glavin
Katherine E. Petrino
Leo S. Korman
156 W. 56th Street, Ste. 2004
New York, NY 10019
rglavin@glavinpllc.com

*Counsel for Sergey Shestakov*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 2

     I.       The IEEPA Counts ............................................................................................ 2

     II.     The Money Laundering Counts .......................................................................... 6

     III.    The False Statement Count ................................................................................ 6

ARGUMENT ................................................................................................................... 7

     I.       The Court Should Dismiss Counts One and Two Because They Violate Due
           Process ............................................................................................................. 7

     II.     Count Five Must Dismissed as a Matter of Law.................................................. 11

A.     Applicable Law................................................................................................. 12

B.     Argument ......................................................................................................... 13

     1.       The "Business Relationship" Question Was Ambiguous and Subject to Subjective
           Interpretation As a Matter of Law ...................................................................... 13

     2.       Mr. Shestakov's Statements Regarding Mr. McGonigal's "Interest" in Mr. Fokin
           Cannot Form the Basis of a False Statement Charge Because the Questions Were
           Fundamentally Ambiguous, and the Answer was Necessarily Subjective and
           Literally True ................................................................................................... 18

CONCLUSION................................................................................................................. 22

## TABLE OF AUTHORITIES

Page(s)

Cases

*Bouie v. City of Columbia*,
  378 U.S. 347 (1964) ..................................................................................................... 7
*Bronston v. United States*,
  409 U.S. 352 (1973) ............................................................................................... 21, 22
*Deripaska v. Yellen*,
  2022 WL 986220 (D.C. Cir. Mar. 29, 2022) ...................................................... 4, 5, 9
*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011) ....................................................................................... 9
*United States v. Ali*,
  68 F.3d 1468 (2d Cir. 1995) ..................................................................................... 12
*United States v. Clifford*,
  426 F. Supp. 696 (E.D.N.Y. 1976) ........................................................................... 12
*United States v. DeFilippo*,
  17 Cr. 585, 2018 WL 11211500  (S.D.N.Y. Jul. 23, 2018) ................................. 17, 18
*United States v. Diogo*,
  320 F.2d 898 (2d Cir. 1963) ............................................................................... 12, 17
*United States v. Gasperini*,
  894 F.3d 482 (2d Cir. 2018) ................................................................................. 7, 11
*United States v. Griffith*,
  515 F. Supp. 3d 106 (S.D.N.Y. 2021) ....................................................................... 9
*United States v. Handakas*,
  286 F.3d 92 (2d Cir. 2002) ....................................................................................... 11
*United States v. Kerik*,
  615 F. Supp. 2d 256 (S.D.N.Y. 2009) ......................................................... 13, 14, 15
*United States v. Lanier*,
  520 U.S. 259 (1997) ................................................................................................... 7
*United States v. Lattimore*,
  127 F. Supp. 405 (D.D.C. 1995) ......................................................................... 16, 17
*United States v. Lighte*,
  782 F.2d 367 (2d Cir. 1986) ..................................................................... 13, 18, 21
*United States v. Mandanici*,
  729 F.2d 914, 921 (2d Cir. 1984) ............................................................................ 22
*United States v. McLaughlin*,
  2018 WL 3148370 (D. Conn. Jun. 27, 2018) ........................................................... 12
*United States v. Oseguera Gonzalez*,
  507 F. Supp. 3d 137 (D.D.C. 2020) ........................................................................... 9
*United States v. Pantelopolus*,
  336 F.2d 421 (2d Cir. 1964) ..................................................................................... 13
*United States v. Perlmutter*,
  656 F. Supp 782 (S.D.N.Y. 1987) ............................................................................ 17

*United States v. Phillips*,
2023 WL 5671227 (S.D.N.Y. Sept. 1, 2023) ............................................................. 7
*United States v. Polos*,
15 Cr. 692 2017 WL 495507 (S.D.N.Y. Feb. 6, 2017) .......................................... 17
*United States v. Rooney*,
37 F.3d 847 (2d Cir. 1994) ...................................................................................... 13
*United States v. Santiago*,
13 Cr. 39, 2014 WL 4827883 (S.D.N.Y. Sep. 26, 2014) ....................................... 18
*United States v. Sarantos*,
455 F.2d 877 (2d Cir. 1972) .................................................................................... 17
*United States v. Shafrick*,
871 F.2d 300 (2d Cir. 1989) .................................................................................... 22
*United States v. Stewart*,
433 F.3d (2d Cir. 2006) ........................................................................................... 13
*United States v. Subeh*,
2006 WL 219968 (W.D.N.Y. Jan. 24, 2006) ......................................................... 22
*United States v. Swaim*,
757 F.2d 1530 (5th Cir. 1985) ................................................................................ 13
*United States v. Takacs*,
424 F. App'x 73 (2d Cir. 2011) ......................................................................... 12, 18
*United States v. Watts*,
72 F. Supp. 2d 106 (E.D.N.Y. 1999) ...................................................................... 13
*United States v. Whab*,
355 F.3d 155  (2d Cir. 2004) ................................................................................... 22

Statutes

18 U.S.C. § 1001 ...........................................................................................................Passim
18 U.S.C. § 1956(h) ............................................................................................................. 1
18 U.S.C. §§ 1956(a)(1)(B)(i)(2) ........................................................................................ 1
50 U.S.C. § 1705 .................................................................................................................. 1

Regulations

31 C.F.R. § 589.201 ............................................................................................................ 8

## PRELIMINARY STATEMENT

Defendant Sergey Shestakov, a longtime U.S. resident and citizen, was charged in a five-count indictment (the "Indictment") following the Department of Justice's ("DOJ") pointed efforts to respond "to Russia's unprovoked military invasion of Ukraine" by "targeting" the "crimes" of "government-aligned elites" with an aim toward "prosecuting violations of…sanctions imposed for prior instances of Russian aggression and corruption."[1] Russia's aggression increased pressure on DOJ to bring cases against Russian oligarchs and those purportedly working with them, culminating in three indictments in this District alone for sanctions violations involving Oleg Deripaska, "a Russian national often referred to as an oligarch, meaning that he has vast wealth and close connections to the Russian state" (Indictment ¶ 4): *United States v. Bonham-Carter*, 22 Cr. 503, *United States v. Deripaska*, 22 Cr. 518, and, this case, *United States v. McGonigal*, 23 Cr. 16. All three indictments charged individuals with conspiring with Mr. Deripaska to evade sanctions during overlapping time periods. The instant Indictment charges Mr. Shestakov with: (i) conspiracy to violate the International Emergency Economic Powers Act (IEEPA), in violation of 50 U.S.C. § 1705 and its accompanying Executive Orders and regulations; (ii) violating IEEPA; (iii) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); (iv) money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i)(2) and 2; and (v) false statements in violation of 18 U.S.C. § 1001. The counts are fundamentally defective and must be dismissed as a matter of law: Counts One and Two are violative of due process; Counts Three and Four are

---

[1] Press Release, United States Dep't of Justice, Attorney General Merrick B. Garland Announces Launch of Task Force KleptoCapture (Mar. 2, 2022), https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-launch-task-force-kleptocapture. As set forth in Mr. Shestakov's memorandum of law in support of his motion to compel discovery, in the year following Russia's invasion, DOJ touted its success in forfeiting, freezing, or otherwise restraining over $500 million in assets belonging to individuals linked to the Russian regime. *See generally* ECF 85.

premised on the infirm IEEPA counts; and the alleged false statements in Count Five are impermissibly premised on ambiguous questions and statements.

The Court should dismiss Counts One and Two (the "IEEPA Counts") because the operative sanctions regime did not provide Mr. Shestakov with fair warning that his conduct, as charged, was criminal. As set forth *infra*, the sanctions regime that Mr. Shestakov is charged with violating fails to provide a person of ordinary intelligence fair notice of what is prohibited. Instead, Mr. Shestakov is charged with criminally violating IEEPA despite the fact that Mr. Shestakov's alleged conduct comports entirely with the U.S. sanction regime's treatment of En+ and Mr. Deripaska. Moreover, because Counts Three and Four (the "Money Laundering Counts") are premised entirely on the defective IEEPA Counts, the Court must dismiss those counts as well.

Finally, the Court should dismiss Count Five because the alleged false statements at issue involve questions and statements that are ambiguous, subjective, literally true, and could not have been made with the requisite mens rea.

## STATEMENT OF FACTS

### I.      The IEEPA Counts

Mr. Shestakov, a former Soviet Union translator and diplomat, has worked and lived in the New York City-area for over forty years. The Indictment alleges that Mr. Shestakov conspired with former FBI Russian Counterintelligence Agent Charles McGonigal, Oleg Deripaska and Evgeny Fokin ("Agent-1" in the Indictment) to investigate Russian metals corporation Norilsk Nickel ("Nornickel") and rival Russian oligarch Vladimir Potanin ("Oligarch 2" in the Indictment), the president and largest shareholder of Nornickel, on behalf of Mr. Deripaska in the latter half of 2021. Indictment ¶ 21. According to the Indictment, Mr. Deripaska, through his purported agent Mr. Fokin, contracted with a New Jersey-based corporation associated with Mr. McGonigal,

Spectrum Risk Solutions ("Spectrum"), for Spectrum and Mr. McGonigal to provide "business intelligence services, analysis, and research relevant to [Nornickel], its business operations, and shareholders" in exchange for payment to Spectrum, out of which Mr. McGonigal and Mr. Shestakov would be paid. *Id.* ¶¶ 18-19. Mr. Deripaska was not a signatory or party to the contract, which was between Spectrum and a Cyprus entity, Pandean Ltd. ("Pandean"). *Id.*

During the time period that Mr. Shestakov was allegedly conspiring with Mr. Fokin, Mr. McGonigal, and Mr. Deripaska to provide business intelligence services to Mr. Deripaska, the Indictment alleges that Mr. Shestakov was "aware" that his actions violated sanctions imposed by the United States on Mr. Deripaska on April 6, 2018 pursuant to Executive Orders 13660, 13661, and 13662 (the "Ukraine-Related Executive Orders"). *Id.* ¶¶ 1, 4-11. Specifically, the Indictment asserts that pursuant to Executive Order 13660, Mr. Deripaska was subject to sanctions prohibiting "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person." *Id.* ¶ 6. Mr. Deripaska was subject to sanctions, according to the Indictment, "for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation . . . [and] for operating in the energy sector of the Russian Federation Economy." *Id.* ¶ 11 (citing Executive Orders 13661 and 13662).

Following the execution of the contract between Spectrum and Pandean, according to the Indictment, Mr. McGonigal allegedly "sought to gather information about [Mr. Potanin] and [Nornickel]. Among other things, McGonigal retained subcontractors to assist in this endeavor." *Id.* ¶ 21. The Indictment vaguely asserts that, between August 2021 through November 2021, Mr. Shestakov's conduct included that he, Mr. Fokin and Mr. McGonigal "drafted and executed [the]

contract" between Spectrum and Pandean, (*id.* ¶ 19) and, together with Mr. McGonigal, purportedly "negotiated with [Mr. Fokin] to obtain funds from Deripaska" to purchase "dark web" files as part of the business intelligence work. *Id.* ¶ 22.

As set forth in the Indictment, at all relevant times Mr. Fokin was an officer of En+ in which Mr. Deripaska had a controlling interest. *Id.* ¶ 12. En+ is an energy and metals company, and has majority control over United Company Rusal PLC ("Rusal"), one of the world's largest aluminum producers. Declaration of Rita M. Glavin (the "Glavin Decl."), Ex. 1 (Dec. 19, 2018 Letter).[2] En+ and Rusal were subject to U.S. sanctions beginning in April 2018, because those companies were owned and/or controlled by Mr. Deripaska.[3] On January 27, 2019, OFAC removed En+ and Rusal from the sanctions list pursuant to an agreement that En+ would take steps to diminish Mr. Deripaska's ownership and control over the company.[4] Specifically, the U.S. agreed that Mr. Deripaska could own no more than 45 percent of En+, vote no more than 35 percent of his shares, and control no more than four seats on the board. Ex. 1. Notably, OFAC chose to lift sanctions on En+ on the claimed basis that Mr. Deripaska no longer "own[ed]" it, even as OFAC maintained that Mr. Deripaska continues to "operate" in Russia's energy sector—one of the enumerated reasons for sanctioning Mr. Deripaska in the first place. *See Deripaska v. Yellen*, No. 21-5157, 2022 WL 986220, at *3 (D.C. Cir. Mar. 29, 2022). Indeed, after delisting En+ from the sanctions list, OFAC found that Mr. Deripaska, acting within the confines on OFAC's set terms,

---

[2]     All citations to the Glavin Decl. are cited as "Ex. __." *See also* Ex. 2 (Dec. 19 OFAC Press Release).
[3]     Press Release, U.S. Dep't of Treasury, Office of Foreign Assets Control, Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity (April 6, 2018), https://home.treasury.gov/news/press-releases/sm0338.
[4]     Press Release, U.S. Dep't of Treasury, Office of Foreign Assets Control, OFAC Delists En+, Rusal, and EuroSibEnergo (Jan. 27, 2019), available at https://home.treasury.gov/news/press-releases/sm592 (Ex. 3) ("Under the terms of their removal from OFAC's List of Specially Designated Nationals and Blocked Persons ('SDN List'), En+, Rusal, and ESE have reduced Oleg Deripaska's direct and indirect shareholding stake in these companies and severed his control.")

"owns 44.95 percent of En+, votes 35 percent of En+ shares, and appoints four of 12 board members." *Id.* (citation omitted). Though he no longer "owns" En+, OFAC has specifically agreed that Mr. Deripaska may maintain just under 45 percent ownership and still exert considerable control over En+ and the board by appointing four board members. Ex. 1.  As such, Mr. Deripaska continues to have "extensive" operations in the Russian energy sector and a very substantial interest in En+ (remaining the largest single shareholder in En+). *See Deripaska*, 2022 WL 986220, at *3. What's more, the target oligarch and Russian corporation of Mr. McGonigal's alleged "business intelligence"—Mr. Potanin and Nornickel—were vitally important to En+'s business interests. Specifically, at all relevant times, En+ has had majority control over Rusal,[5] which owned approximately 28% of Nornickel,  a Russian "metals giant" that is purportedly "the world's biggest produced of palladium and refined nickel."[6] And, Mr. Potanin was the other largest shareholder of Nornickel, with approximately 35% of the shares.[7] In 2021 and 2022, En+, through Rusal, and Nornickel were at odds over the direction of Nornickel and Mr. Potanin's leadership of the company. The tension between the companies culminated in a lawsuit filed by Rusal against Nornickel and Mr. Potanin in October 2022.[8]

---

[5]   Ex. 1. "En+, once it is no longer subject to sanctions, shall continue to control Rusal through a 56.88 percent stake and that En+ shall retain its right to nominate the CEO of Rusal." *Id.*

[6]   REUTERS, Potanin Says Sanctions Constrain Nornickel, Force It To Adjust Strategy (Jan. 23, 2023), https://www.reuters.com/markets/commodities/potanin-says-sanctions-constrain-nornickel-force-it-adjust-strategy-2023-01-23/

[7]   *Id.*

[8]   REUTERS, Rusal Accuses Potanin Of Breaching Nornickel Shareholder Pact (Oct. 24, 2022) https://www.miningweekly.com/article/rusal-accuses-potanin-of-breaching-nornickel-shareholder-pact-2022-10-24 (hereinafter "October 2022 Reuters Article"). "Russian aluminium producer Rusal said on Monday it has filed a lawsuit in London alleging Vladimir Potanin, CEO of metals giant Norilsk Nickel, is in breach of a decade-old deal, renewing a row between two of Russia's largest metals companies." *Id.* "Rusal, which holds a 26.2% stake in Nornickel said that the lawsuit, filed in London's High Court of Justice on October 21 against Potanin and his affiliate Whiteleave Holdings, is aimed at protecting the interests of the company's shareholders. The statement said: 'Rusal's claims are based on Mr. Potanin's failure to fulfil his duties as Norilsk Nickel's managing partner and CEO. Under the management of Mr. Potanin, Norilsk

## II.        The Money Laundering Counts

Counts Three and Four of the Indictment allege that Mr. Shestakov conspired to and did "conduct[] and attempt[] to conduct" a financial transaction, "which in fact involved the proceeds of specified unlawful activity, to wit, violations of IEEPA[.]" Indictment ¶¶ 31, 33. Accordingly, the Money Laundering Counts are predicated on Mr. Shestakov's alleged liability to the IEEPA Counts.

## III.       The False Statement Count

Count Five of the Indictment alleges that, on or about November 21, 2021, Mr. Shestakov made false statements to FBI agents. *Id.* ¶ 35. As described in the Indictment, Mr. Shestakov was "interviewed" by "Special Agents of the FBI." *Id.* ¶ 35. ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ In particular, the Indictment alleges that during this brunch, Mr. Shestakov: (i) "concealed the nature of the relationship between Charles McGonigal and [Mr. Fokin]" in violation of § 1001's prohibition against "knowingly and willfully falsify[ing], conceal[ing], and cover[ing] up by a trick, scheme, and device a material fact"; and (ii) "falsely stated that he (Shestakov) did not have any business relationship with [Mr. Fokin]" and thereby "made a materially false, fictitious, and fraudulent statement and representation." *Id.* Notably, the Indictment does not provide the full exchange between the FBI Agents and Mr. Shestakov on those two topics, which reflects ambiguous, clumsy, imprecise and compound questions that elicited answers requiring subjective

---

Nickel lost a number of assets that played a key role in group's activities. This resulted in Norilsk Nickel and its shareholders suffering significant losses.'" *Id.*

interpretation of the question and answer, non-answers, and/or literally true statements.  The precise exchanges, as set forth *infra* and reflected in Exs. 4.1 and 4.2, demonstrate that the False Statement count must be dismissed as a matter of law.

## **ARGUMENT**

I.     **The Court Should Dismiss Counts One and Two Because They Violate Due Process**

The Court should dismiss the IEEPA Counts because, even accepting the allegations in the Indictment as true, Mr. Shestakov could not have been on notice that his work with Mr. Fokin, a high-level employee of En+, and En+ would be the basis for criminal liability.

Fair notice is a derivative of the Due Process Clause of the Fifth Amendment which ensures that no one shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST., Amd. 5. The Supreme Court has "often" recognized the principle that a "criminal statute must give fair warning of the conduct that it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964). The fair warning requirement manifests itself in three related doctrines: "the vagueness doctrine, the rule of lenity, and a bar on the application of a 'novel construction' of a statute." *United States v. Phillips*, No. 22-CR-138 (LJL), 2023 WL 5671227, at *13 (S.D.N.Y. Sept. 1, 2023) (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997)). Where, as here, the operative statute and accompanying regulations and Ukraine-Related Executive Orders "fails to provide a person of ordinary intelligence fair notice of what is prohibited," they are unconstitutionally vague and do not "comport with due process" as applied. *United States v. Gasperini*, 894 F.3d 482, 487 (2d Cir. 2018); *see Rubin v. Garvin*, 544, F.3d 461, 467 (2d Cir. 2008) (same).

As alleged in the Indictment, a person of ordinary intelligence would not reasonably understand Mr. Shestakov's alleged conduct to be prohibited under the controlling regulations and Executive Orders. The Indictment alleges that Mr. Shestakov conspired to and did violate IEEPA, in violation of the Ukraine-Related Executive Orders and 31 C.F.R. § 589.201, which prohibit "mak[ing] and receiv[ing] a contribution of funds, goods, and services to and for the benefit of Oleg Deripaska, a specially designated national." Indictment ¶¶ 6, 11, 25-26, 28. The regulations plainly prohibit providing "funds, goods, or services" to or for the benefit of a sanctioned individual; but nothing in the regulations or Ukraine-Related Executive Orders elucidate that providing the same "funds, good, or services" to a person or entity who is *not* sanctioned would constitute a criminal offense.

The majority of the allegations specific to Mr. Shestakov concern his conduct working together with Mr. Fokin, a well-known official of En+, and Mr. McGonigal—neither of whom were sanctioned—because, according to the government's theory, Mr. Fokin served as an agent solely of Mr. Deripaska, *despite Mr. Fokin's longtime role at En+ as the director of international cooperation*.[9] Under this theory, Mr. Fokin's high-ranking role at En+ and the fact that the business intelligence work about Nornickel and its CEO would, in fact, directly benefit En+ is of no moment. Rather, a natural consequence of the government's agency theory means that even conduct with direct benefit to En+ and to Mr. Deripaska himself runs afoul of the sanctions regime. Accordingly, the statutory and regulatory sanctions regime is unconstitutionally vague as applied to Mr. Shestakov because it could not be reasonably understood that conduct with an official of

---

[9]    *Evgeny Fokin*, MarketScreener (Feb. 16, 2024), https://www.marketscreener.com/insider/EVGENY-FOKIN-A1HT0V/

En+ and for En+'s benefit that may also benefit Mr. Deripaska—En+'s largest shareholder and the individual who appoints one-third of the En+ board—would be criminalized.

Indeed, *by OFAC's own admission and acknowledgment*, the demarcation of interests between En+ and Mr. Deripaska is blurry at best. *Deripaska*, 2022 WL 986220, at \*3. Even after OFAC delisted En+ from the sanctions list, Mr. Deripaska maintained a 44.95 percent ownership interest and controls four out of twelve board seats. *Id.* OFAC further observed that Mr. Deripaska continued substantial operations in the Russian Federation energy sector, *see id.*, of which En+ is part and parcel. The business intelligence work that is at the heart of the Indictment targeted Mr. Potanin, and Nornickel, in which En+ had a longstanding and extraordinary business interest through Rusal and at that particular time the relationship between En+ and Nornickel was fraught.[10] Due process precludes the government from pursuing a theory that would criminalize conduct where the interests of and benefits to Mr. Deripaska and En+ happen to directly converge, and are one and the same. *Cf. United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011) (prosecution for supplying weapons to a known terrorist organization was not fundamentally unfair as it was "self-evidently criminal").

Although a scienter requirement may mitigate vagueness, IEEPA's proscription against those who "willfully" violate the law or regulations does not save the IEEPA Counts against Mr. Shestakov. *United States v. Griffith*, 515 F. Supp. 3d 106, 121 (S.D.N.Y. 2021) (citing *Rubin*, 544 F.3d at 467); *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 151 (D.D.C. 2020). Mr. Shestakov's alleged "awareness" of sanctions against Mr. Deripaska did not put him on notice that working with an officer of En+ and on business intelligence conduct that would directly benefit

---

[10]     *See* October 2022 Reuters Article, *supra* note 8.

9

En+ and—by natural extension—Oleg Deripaska was similarly criminal. Nor does Mr. Shestakov's work with Mr. McGonigal and the well-known international law firm Kobre & Kim LLP (the so-called "Law Firm" in the Indictment) resolve the vagueness problem. *See* Indictment ¶¶ 14-17. The government alleges that Mr. Deripaska engaged the Law Firm to undertake lawful efforts at delisting him, and Mr. McGonigal and Mr. Shestakov were engaged by the Law Firm. *Id.*¶¶ 15-16. But as the government acknowledges, the work for Mr. Deripaska began in 2019, was interrupted by the Covid-19 pandemic, and thereafter ended in March 2020. *Id.*¶¶ 15-17. That Mr. Shestakov, Mr. McGonigal, and En+ employee Evgeny Fokin are alleged to have reconnected for a business intelligence project related to a business of vital importance to of En+ and Rusal does not suggest a "willful" violation of law nor that a defendant sought to avoid detection because the conduct was evidently criminal.

Nor does Mr. Shestakov's November 29, 2021 Foreign Agents Registration Act (FARA) registration evince "willful" conduct. Rather, this FARA registration—which was filed with the assistance of Mr. Shestakov's attorney eight days after the FBI seized his phone—only underscores the lack of notice that typifies a fair warning violation. The government has previously referenced Mr. Shestakov's November 29, 2021 FARA registration as evidence that Mr. Shestakov understood that any services he performed were for Mr. Deripaska. *See* ECF 87 (citing sealed Ex. 2 thereto). Not so: in the FARA filing, Mr. Shestakov identified Mr. Fokin as an "[e]xternal relations manager for En+ group" who was supervised by the En+ board of directors which was "[c]haired by Lord Barker," along with Mr. Deripaska's "significant minority interest," and reported to "Lord Barker and presumably Mr. Deripaska." *See* (Sealed) Ex. 2 to ECF 87. These statements mirror exactly what OFAC signed-off on when it delisted En+: that although Mr. Deripaska no longer "owned" En+, he still exercised considerable control and influence and the

10

U.S. government agreed to this. That Mr. Fokin might sometimes answer to Mr. Deripaska was no secret given that OFAC found, and de facto approved, that Mr. Deripaska appointed a third of En+'s board and remained En+'s largest single shareholder. Brief for Plaintiff-Appellant to the D.C. Circuit Court of Appeals, *Deripaska v. Yellen*, 2021 WL 5084615 (Nov. 1, 2021). The government's theory against Mr. Shestakov betrays what OFAC has approved, and cannot stand under principles of fair notice.

Accordingly, the IEEPA Counts should be dismissed because, as alleged, they do not comport with the Due Process Clause's fair warning requirement. *See, e.g.*, *Gasperini*, 894 F.3d at 487. Where the IEEPA Counts must fail, so to must the Money Laundering Counts because they are premised on the IEEPA Counts. Indictment ¶¶ 31, 33. Specifically, Counts Three and Four allege that the "proceeds of specified unlawful activity" were derived from "violations of IEEPA." *Id.* Because the Court should dismiss the IEEPA Counts on vagueness grounds, the Money Laundering Counts must be similarly dismissed. *United States v. Handakas*, 286 F.3d 92, 112-13 (2d Cir. 2002) ("Since the mail fraud conviction has been reversed in this opinion, the money laundering conviction falls with it.")

## II.   Count Five Must Dismissed as a Matter of Law

Count Five is premised on two alleged false statements by Mr. Shestakov to FBI Agents ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮   The alleged false statements and concealed facts are: (1) Mr. Shestakov's  "denial" of having a business relationship with Mr. Fokin; and (2) Mr. Shestakov's "concealment" of Mr. McGonigal's interest in- and relationship with- Mr. Fokin. For the reasons set forth below, Count

Five must be dismissed as a matter of law because the alleged statements were in response to "fundamentally ambiguous question[s]," were subject to an individual's subjective interpretation, and/or were literally truthful.

### A.     Applicable Law

Section 1001's proscription against false representations, "like common law perjury, require proof of actual falsity" and against concealment, "requires proof of willful nondisclosure by means of a 'trick, scheme or device.'" *United States v. Diogo*, 320 F.2d 898, 902 (2d Cir. 1963) (citation omitted). A § 1001 conviction involves a scienter requirement, proof of falsity, and materiality. 18 U.S.C. § 1001. *First*, a violation of § 1001 may only be sustained if "the defendant either knew the statement was false or acted with a conscious purpose to avoid learning the truth." *United States v. Takacs*, 424 F. App'x 73, 74 (2d Cir. 2011); *see United States v. Clifford*, 426 F. Supp. 696, 702, n.2 (E.D.N.Y. 1976) (reasoning that Second Circuit precedent requires the government to prove that the statement-maker did not believe the statement to be true)."[T]he test for determining the falsity of a statement under both the perjury and the false statements sections appears to be the same." *Clifford*, 426 F. Supp. at 702. *Second,* "'false' is generally defined as not true." *United States v. McLaughlin*, No. 3:17-cr-00129 (MPS), 2018 WL 3148370 at *3 (D. Conn. Jun. 27, 2018). Beyond mere falsity, the government must prove the alleged false statement are "material." *See United States v. Ali*, 68 F.3d 1468, 1475 (2d Cir. 1995). "A false statement is material if it tends to or is capable of influencing the decision-making body to which it was addressed." *United States v. Stewart*, 433 F.3d, 318 (2d Cir. 2006).

A § 1001 prosecution cannot be premised on an answer to a fundamentally ambiguous or vague question. *See United States v. Kerik*, 615 F. Supp. 2d 256, 271 (S.D.N.Y. 2009). "This proscription holds even where the answer is unquestionably false or fraudulent." *Id.* "The determination of fundamental ambiguity is a question of law." *Id.*; *see United States v. Watts*, 72

F. Supp. 2d 106, 109 (E.D.N.Y. 1999) ("[w]here a question is so excessively vague as to fall within a category identified as 'fundamentally ambiguous,' the answer may not, as a matter of law, form the basis of a prosecution for perjury or false statement.") "A question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answer unless it were defined at the time it were sought and offered as testimony." *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986).

Under a Section 1001 concealment theory, the government must prove a defendant "(1) knowingly and willfully; (2) conceal[ed] and cover[ed] up by trick, scheme or device; (3) a material fact; (4) in any matter within the jurisdiction of a department or agency of the United States." *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994) (quoting *United States v. Swaim*, 757 F.2d 1530, 1533 (5th Cir. 1985). "Trick, scheme or device" requires "some artifice to deceive, or some illusory or deceptive appearance or some plan of action designed to attend that end or some contrivance or invention of the conspirators." *United States v. Pantelopolus*, 336 F.2d 421, 424 n.3 (2d Cir. 1964) (affirming district court's jury instruction of concealment under Section 1001).

B.      Argument

1.      The "Business Relationship" Question Was Ambiguous and Subject
        to Subjective Interpretation As a Matter of Law

The Indictment charges that Mr. Shestakov made a willfully false statement in response to an FBI Agent's question as to whether he had a personal or "business relationship" with En+ official Mr. Fokin.  Specifically, the Indictment charges that Mr. Shestakov allegedly answered that he "did not have any business relationship" with [Mr. Fokin]." Indictment ¶ 35.   It is well-established that a false statements prosecution cannot be premised on the answer to a

fundamentally ambiguous question. *Kerik*, 615 F. Supp 2.d at 271. The Indictment, quite deliberately, does not lay out the complete precise exchange between the FBI Agents and Mr. Shestakov on that issue.  And this is because of the vague and ambiguous nature of the question, which necessarily called for a subjective interpretation and answer.

The specific colloquy between FBI Special Agents ("SA") Maniscalco and Schlessinger and Mr. Shestakov was as follows:



The recorded interview makes clear that the "business relationship" false statement count is improperly predicated on Mr. Shestakov's response to a poorly worded and vague question. Specifically, SA Maniscalco asked Mr. Shestakov whether Mr. Fokin was "just a personal friend or have you ever engaged in a business relationship with [Fokin]?" Ex. 4.2 at 00:15-00:1:10. After Mr. Shestakov responded "no no business" and, the FBI agents did not seek to clarify Mr. Shestakov's response or ask direct follow-up questions, and instead changed subjects to ask about Mr. McGonigal and Mr. Fokin. This colloquy between Mr. Shestakov and SA Maniscalco is impermissibly ambiguous and vague as a matter of law. *Kerik*, 615 F. Supp 2.d at 271. Whether Mr. Shestakov believed he had "engaged in" a "business" relationship with Mr. Fokin is entirely subjective to Mr. Shestakov's own belief and understanding of "business" as it pertains specifically and individually to Mr. Fokin, *as opposed to En+—Mr. Fokin's employer*, or as opposed to Spectrum, Mr. McGonigal's company and the signatory to the contract.  Indeed, even under the government's (wrong) theory of the case, *i.e.*, that Mr. McGonigal and Shestakov were actually working for Mr. Deripaska, *Mr. Shestakov could have viewed himself as having engaged in a business relationship with Mr. Deripaska, as opposed to Mr. Fokin—whom the government asserts was just an agent of Mr. Deripaska*.

Here, as in *United States v. Lattimore*, 127 F. Supp. 405, 410 (D.D.C. 1995), the relevant question and statement is fundamentally ambiguous, as it is easily subject to divergent interpretation. In *Lattimore*, the court overturned a perjury conviction based on the defendant's statement that he was "not a follower of the Communist line" and "he had never been a 'promoter of Communist interests.'" 127 F. Supp. at 410. In overturning the conviction, the court formulated the "fundamentally ambiguous" doctrine, reasoning that the meaning of the phrase, "follower of the Communist line," "varies according to a particular individual's political philosophy." *Id.* at

411. Further, the court took issue with asking a jury to decide on a definition of the phrase, reasoning that it is akin to determining what the defendant "had in mind and denied believing in, [and] to ask the jury to aspire to levels of insight to which the ordinary person is incapable, and upon which speculation no criminal indictment should hinge." *Id.* The court continued: "[w]hen elements in an indictment are so easily subject to divergent interpretation, the accused is not adequately appraised of the charges as to enable him to prepare a defense," and thus "fails to conform to the requirement of the Sixth Amendment." *Id.* at 410-411.

As an initial matter, the question posed to Mr. Shestakov is subject to varying understanding according to a particular individual's interpretation and experience. *See Lattimore*, 127 F. Supp. at 410-11. ███████████████████████████████████████████

███████████ an FBI Agent asked Mr. Shestakov to define Mr. Fokin as either a "personal friend" or someone with whom he had "engaged in a business relationship." Ex. 4.2. Stated in the disjunctive, this question presupposes that the terms are mutually exclusive, *i.e.*, that either an individual is a personal friend or some type of business associate. Mr. Shestakov responded to this vague and ambiguous question within the context that he has known Mr. Fokin for decades. Neither SA followed up on Mr. Shestakov's response to further clarify his response.

Moreover, what constitutes engaging in a "business relationship" is both fundamentally ambiguous and vague because it is subject to individual interpretation. *See Lattimore*, 127 F. Supp. at 410. For instance, the term "business relationship" could refer to a formal partnership, a contractual relationship, individuals that often do business with each other or refer business to one another, or a relationship premised solely on business. *United States v. Sarantos*, 455 F.2d 877, 881 (2d Cir. 1972) ("to ascertain truth or falsity one must look to the meaning intended by the party who gave the answer and not to the interpretation, however reasonable, given it by

government authorities."). It is of no moment that the government had in mind a particular definition of "business relationship" when it charged this statement in Count Five; rather the relevant inquiry is what the defendant intended and if the term is unduly ambiguous, it cannot support a Section 1001 charge. *See Diogo*, 320 F.2d at 905-06 (when interpreting fundamentally ambiguous statements, courts should look at the meaning intended by the defendant rather than the interpretation the government made or could have reasonably made.); *cf. United States v. Polos*, No. 15 Cr. 692 (PGG), 2017 WL 495507, at *6–7 (S.D.N.Y. Feb. 6, 2017) (finding "self-employment" unambiguous wherein national security form "requires applicants to disclose "all" outside "work," whether "full-time [or] part-time work, paid or unpaid."). This is not a § 1001 prosecution where the question was targeted and asked for an unambiguous, objective response. *Cf. United States v. Perlmutter*, 656 F. Supp 782, 792 (S.D.N.Y. 1987) (upholding Section 1001 conviction wherein defendant lied to federal agents that she did not possess a check that was ultimately found in her files); *see also United States v. DeFilippo*, 17 Cr. 585, 2018 WL 11211500, at *1 (S.D.N.Y. Jul. 23, 2018) (defendant convicted under Section 1001 forging letter of false prior police service to Amtrak Police Department.); *United States v. Santiago*, No. 13 Cr. 39, 2014 WL 4827883, at *4 (S.D.N.Y. Sep. 26, 2014) (defendant convicted under Section 1001 for lying to federal investigators during interview and then subsequently singing sworn statement admitting to his false statement).

Having a jury decide the definition of "engaged in a business relationship" in this context is necessarily asking them to (a) substitute their own divergent definitions of what is a "business relationship" or what it means to "engage in" a "business" relationship, and (b) speculate as what Mr. Shestakov intended regarding a vague term in place of facts. *See Lighte*, 782 F.2d at 377

(overturning perjury count for it was premised on the imprecise use of pronoun "you," during questioning and thus, the jury should have never considered it).

Moreover, because the false statements charge against Mr. Shestakov is improperly predicated on answering a fundamentally ambiguous question, it negates the statute's prerequisite "knowingly and willfully" mens rea. 18 U.S.C. § 1001. To establish that someone acted "knowingly" the Government must prove beyond a reasonable doubt a defendant's knowledge that the statements were false or were made with a conscious purpose to avoid learning the truth. *DeFillippo*, 2018 WL 11211500, at *2 . "An act is willful if it is done intentionally." *Takacs*, 424 F. App'x at 74. The fundamental ambiguity of "business relationship"—particularly where even the Indictment alleges that Mr. Fokin was acting as an agent of another party—kneecaps the requisite mens rea because Mr. Shestakov, as a matter of law, cannot face criminal penalty in responding to a vague question that improperly set up a disjunctive between a personal versus business relationship.

In this circumstance, the false statement charged in Count Five concerning Mr. Shestakov's "business relationship" with Mr. Fokin should be struck.

> **2.      Mr. Shestakov's Statements Regarding Mr. McGonigal's "Interest" in Mr. Fokin Cannot Form the Basis of a False Statement Charge Because the Questions Were Fundamentally Ambiguous, and the Answer was Necessarily Subjective and Literally True**

Count Five's false statement "concealment" charge that alleges Mr. Shestakov unlawfully "concealed the nature of the relationship between" Mr. McGonigal and Mr. Fokin ██████ ████████████████████████████ the FBI Agents must likewise be dismissed as a matter of law.  Notably, the Indictment did not provide or quote the exact exchange between Mr.

Shestakov and the FBI Agent that forms the basis for this charge.  That charge is based on the

following exchange November 21, 2021



Like the alleged false statement regarding a "business relationship," for this alleged "false statement" by concealment, FBI Agents Maniscalco and Schlessinger continued to ask Mr. Shestakov a series of fundamentally ambiguous questions regarding Mr. McGonigal and Mr. Fokin's relationship, which called for subjective interpretation and answer. Mr. Shestakov provided concise but accurate, and subjective answers in response. The government's efforts to

recast Mr. Shestakov's answers to the questions as concealment are nothing more than poor attempts to mitigate the agents' clumsily worded, vague, and compound questions. *See Lighte*, 782 F.2d at 375. Here, as in *Lighte*, the questions were fundamentally ambiguous in their imprecision as to whether: Mr. Shestakov mentioned Mr. Fokin to Mr. McGonigal, when the three met, and what Mr. McGonigal's "interest" in Mr. Fokin was. *See* Ex. 4.2. Thus, it is unclear what Mr. Shestakov is alleged to have concealed *given the questions asked*. Mr. Shestakov told the SAs that Mr. Fokin and Mr. McGonigal knew each other and had met; that Mr. McGonigal had an interest in Russian affairs, and that Mr. McGonigal "definitely" maintained an interest in Mr. Fokin when he left the FBI for "business connections and all." Ex. 4.2 at 2:30-3:40.

Moreover, Mr. Shestakov's answers were also literally true. In *Bronston v. United States*, 409 U.S. 352 (1973), in overturning a perjury conviction predicated on non-responsive answers, the Supreme Court stated: "that any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' *and not by a federal perjury prosecution*." 409 U.S. at 362 (emphasis added). The Court reasoned, "[u]nder the pressure and tensions of interrogations, it is not uncommon for the most earnest witness to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it." *Id.* at 358.

In *United States v. Mandanici*, the Second Circuit extended *Bronston*'s application to prosecutions under Section 1001: "a defendant may not be convicted under § 1001 on the basis of a statement that is, although misleading, literally true." 729 F.2d 914 (2d Cir. 1984); *United States v. Subeh*, No. 04-CR-6077T, 2006 WL 219968, at *11 (W.D.N.Y. Jan. 24, 2006) ("[T]he Second Circuit is one of the courts that has recognized the applicability of the *Bronston* literal truth defense to Section 1001 prosecutions"). Here, though not misleading, Mr. Shestakov provided limited and

accurate responses. If the government wanted more information, they were on notice to ask Mr. Shestakov more questions. The "burden [is] on the examiner to probe for details during the examination." *United States v. Shafrick*, 871 F.2d 300, 303 (2d Cir. 1989).  But the SAs  instead changed subjects. Ex. 4.2 at 3:43. Mr. Shestakov should not bear the consequences of the FBI Agents' clumsy questions and decision not to ask any follow-up questions. *See Shafrick*, 871 F.2d at 303 The rule prevents an examiner from resolving ambiguities in the elicited testimony with a perjury prosecution after the fact.") Accordingly, Count Five's false statement "concealment" charge regarding Mr. McGonigal's alleged "interest" in Mr. Fokin, should be dismissed as a matter of law.

Furthermore, Mr. Shestakov could not have "knowingly and willfully" intended to conceal anything in explaining Mr. McGonigal's interest in Mr. Fokin, for he told the literal truth—the exact opposite of intentionally concealing— ████████████████████

████████████████████████ *Cf. United States v. Whab*, 355 F.3d 155, 160  (2d Cir. 2004) (to prove a "defendant acted 'willfully' under § 1001, the Government was required to show that he acted with a purpose to do something the law forbids, and with an awareness of the generally unlawful nature of his actions.")

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Shestakov respectfully requests that the Court dismiss the Indictment.

Dated: New York, New York
      February 16, 2024

Respectfully submitted,

*Rita M. Glavin*

Rita M. Glavin
Katherine E. Petrino
Leo S. Korman
Glavin PLLC
156 West 56th Street, Ste. 2004
New York, NY 10019
Tel: (646) 693-5505
rglavin@glavinpllc.com

*Counsel for Sergey Shestakov*