

Glavin PLLC  
156 W. 56th Street, Suite 2004  
New York, NY 10019

glavinpllc.com  
646.693.5505

July 5, 2024

**VIA ECF**

Honorable Jennfier H. Rearden  
United States District Court  
Southern District of New York  
500 Pearl Street  
New York, NY 10007

      Re: <u>United States v. Sergey Shestakov</u>, 23 Cr. 16 (JHR)

Dear Judge Rearden:

  I represent Sergey Shestakov in the above-referenced matter and respectfully request that the Court "So Order" the attached Rule 17(c) subpoena duces tecum to the National Security Agency (the "NSA") directing the production of records prior to the August 6, 2024 trial date in this matter. Ex. A. As the Court is aware, the defense previously submitted to the Court an *ex parte* application for a Rule 17(c) subpoena to the NSA on May 28, 2024, and the Court informed the defense on July 1, 2024[1] that the application was denied without prejudice to renew the application upon notice to the government.

**I. <u>Background</u>**

   **A. The Government's Allegations**

  The Indictment alleges that Mr. Shestakov conspired with co-defendant Charles McGonigal and unindicted co-conspirators Oleg Deripaska and Evgeny Fokin to violate the U.S. sanctions imposed on Mr. Deripaska in April 2018, in violation of the International Emergency Economic Powers Act ("IEEPA"). Specifically, the government alleges that, beginning in or about the spring of 2021, Mr. Deripaska's "agent" Mr. Fokin hired Mr. McGonigal and Mr. Shestakov to investigate a rival Russian oligarch, Vladimir Potanin, on behalf of Mr. Deripaska. Indictment ¶¶ 18-21. According to the government, Mr. Potanin had a controlling stake in Norilsk Nickel ("Nornickel") and was the CEO of Nornickel, and Mr. Deripaska was "contesting control" by Mr. Potanin over Nornickel. *Id.* In August 2021, Mr. Deripaska, through his agent Mr. Fokin, allegedly entered into a contract through a Cyprus corporation, Pandean Limited ("Pandean"), with a New Jersey-based corporation associated with Mr. McGonigal, Spectrum Risk Solutions ("Spectrum"), for "business intelligence services, analysis, and research relevant to [Nornickel], its business operations, and shareholders." *Id.* That contract with Pandean was signed by Arina Lazarou, who is listed as a director of Pandean. According to the government, Mr. Deripaska then purportedly paid Mr. McGonigal and Mr. Shestakov by sending money to Spectrum Risk Solutions from a

---

[1]   The Court's Order denying the application without prejudice is dated June 30, 2024, but the Court emailed the order to defense counsel just after midnight on Monday, July 1, 2024.

The Hon. Jennifer H. Rearden
July 5, 2024
Page 2 of 8

Russian bank account in the name of Pandean. As alleged, Spectrum then paid Mr. McGonigal and Mr. Shestakov for this purported work on behalf of Mr. Deripaska. *Id.* ¶ 20. According to the Indictment and discovery provided to the defense, payments were made under the contract on or about August 13, 2021, August 18, 2021, September 15, 2021, October 18, 2021 and November 18, 2021. USAO_00000148 - USAO_00000152.

**B.      The Defense Theory**

Mr. Shestakov's defense will be that: (1) there was no IEEPA criminal conspiracy or substantive IEEPA violation; (2) his actions did not violate the U.S. sanctions imposed on Mr. Deripaska; (3) he was not part of any conspiracy with Mr. Fokin, Mr. Deripaska, or Mr. McGonigal to violate U.S. sanctions laws as alleged in the Indictment; (4) he understood, including based on discussions with his longtime friend Mr. Fokin, that the business intelligence work to be performed was to be done on behalf of En+ and/or its subsidiary Rusal—not Oleg Deripaska; and (5) Mr. Fokin, in truth and in fact, was working on behalf of En+ when he arranged the contract at issue with Spectrum and there was no violation of the sanctions on Mr. Deripaska. Mr. Shestakov expects to offer evidence at trial that Mr. Deripaska was not a participant in this contractual arrangement between Spectrum and Pandean for business intelligence services, including the fact that the Russian bank account from which payments were made to Spectrum for the business intelligence services is not associated with Mr. Deripaska. Further, the defense will introduce evidence at trial that the individual who signed the contract on behalf of Pandean for this business intelligence work, Arina Lazarou, was listed by En+ in an official corporate filing in 2021 as an individual associated with En+.

At all relevant times, Mr. Fokin was an En+ official and neither En+ nor its subsidiary Rusal were under U.S. sanctions. Indeed, Mr. Fokin remains an En+ official and he resides in Russia. We expect to elicit evidence at trial that Mr. Shestakov has a longstanding personal relationship with Mr. Fokin and his family dating back to the 1980s.

En+ is an energy and metals conglomerate and owns United Company Rusal PLC ("Rusal"), one of the world's largest aluminum producers. En+ and Rusal were subject to U.S. sanctions beginning in April 2018, because those companies were owned and/or controlled by Mr. Deripaska. On January 27, 2019, OFAC removed En+ and Rusal from the U.S. sanctions list pursuant to an agreement that En+ would take steps to diminish Mr. Deripaska's ownership and control over En+. Specifically, the U.S. agreed that Mr. Deripaska could own no more than 45 percent of En+, vote no more than 35 percent of his shares, and control no more than four seats on the board. Notably, Mr. Deripaska remained very actively involved with En+ and is still En+'s largest single shareholder.

Nornickel and its CEO, Mr. Potanin, were in 2021, and remain, vitally important to En+'s business interests. Specifically, En+ owns Rusal, and Rusal owns approximately 28 percent of Nornickel. Mr. Potanin is the other largest shareholder of Nornickel, with approximately 35 percent of the shares. In 2021 and 2022, En+, through its subsidiary Rusal, was at odds with Nornickel

over the direction of Nornickel and Mr. Potanin's leadership of the company. The tension between the companies culminated in an October 2022 lawsuit that Rusal filed in the United Kingdom against Mr. Potanin and his company Whiteleave Holdings Inc. to protect the interests of Nornickel shareholders.[2] The lawsuit alleges that Mr. Potanin and Whiteleave transferred crucial subsidiaries out of Nornickel's corporate group to divert value away from Nornickel.  Thus, it made perfect sense for En+, as communicated to Mr. Shestakov by Mr. Fokin, to want business intelligence on Mr. Potanin and Nornickel at the time of the alleged conspiracy in 2021—which is exactly what Mr. Shestakov thought to be the transaction at issue and was, in fact, the transaction at issue.

Mr. Fokin informed Mr. Shestakov that the work at issue was to be performed on behalf of En+. To that end, communications Mr. Fokin had **and did not have** with Mr. Deripaska, Mr. Shestakov, and En+ officials, and Rusal officials during the relevant period charged in the Indictment—Spring 2021 through November 2021—are critical to Mr. Shestakov's defense. *See* Indictment ¶¶ 18-22.

## II. Applicable Legal Standard

Fed. R. Crim. P. 17(c) permits the Court to direct a witness to produce any documents, before trial, if they (1) are "evidentiary and relevant"; (2) "are not otherwise procurable reasonably in advance of trial by exercise of due diligence"; (3) "the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonable to delay the trial"; and (4) "the application is made in good faith and is not intended as a general 'fishing expedition.'" *United States v. Nixon*, 418 U.S. 683, 699-700 (1974) (citation omitted); *see United States v. Tucker*, 249 F.R.D. 58, 65 n. 43 (S.D.N.Y. 2008), as amended (Feb. 20, 2008) (collecting cases that apply the *Nixon* standard to a defendant's subpoena on a third party). "Criminal defendants have the right to 'put before a jury evidence that might influence the determination of guilty.' To effect this right, a defendant must have the ability to obtain that evidence." *Tucker*, 249 F.R.D. at 65 (citation omitted).

Though *Nixon* is the generally accepted standard, its application may be "inappropriate where production is requested by (A) a criminal defendant; (B) on the eve of trial; (C) from a non-

---

[2]    *Rusal Plans Further Lawsuit Against Potanin Over Nornickel Pact* , REUTERS, (Mar. 23, 2023), https://www.mining.com/web/rusal-plans-further-lawsuit-against-potanin-over-nornickel-pact/ ("Rusal alleges Potanin and Whiteleave procured the transfer of 'crucial subsidiaries' out of Nornickel's corporate group 'with the sole or main purpose of diverting value away from the (Nornickel) Group, as part of a wider strategy of entrenching (Whiteleave and Potanin's) control'"); , *Rusal Accuses Potanin Of Breaching Nornickel Shareholder* , REUTERS (Oct. 24, 2022), https://www.mining.com/web/rusal-plans-further-lawsuit-against-potanin-over-nornickel-pact/ ("Rusal, which holds a 26.2% stake in Nornickel said that the lawsuit, filed in London's High Court of Justice on October 21 against Potanin and his affiliate Whiteleave Holdings, is aimed at protecting the interests of the company's shareholders. The statement said: 'Rusal's claims are based on Mr. Potanin's failure to fulfil his duties as Norilsk Nickel's managing partner and CEO. Under the management of Mr. Potanin, Norilsk Nickel lost a number of assets that played a key role in group's activities. This resulted in Norilsk Nickel and its shareholders suffering significant losses.'").

party; (D) where the defendant has an articulable suspicion that the documents may be material to his defense." *United States v. Goldstein*, 21 Cr. 550 (DC), 2023 WL 3662971, at *2 (E.D.N.Y. May 25, 2023) (citing *Tucker*, 249 F.R.D. at 66 and *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 322 n. 1 (S.D.N.Y. 2011)). In *Goldstein*, Judge Denny Chin reasoned that "[i]n such circumstances, a standard less stringent than *Nixon* is appropriate, requiring a defendant to 'only show that the request is (1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond.'" *Id.* (citing *Tucker*, 249 F.R.D. at 66).

For the reasons set forth below, the proposed NSA subpoena (Ex. A) should be issued. These materials are needed prior to trial because: (1) those materials factor heavily into the defense strategy in preparing for trial and opening statements; and (2) those materials will need to be translated. Thus, the subpoena return date is July 19.

### III. The Proposed NSA Subpoena

The proposed subpoena to the NSA seeks specific, relevant, and admissible records that are not otherwise procurable reasonably in advance of trial by the defense. As the Court may be aware, the NSA plays a central role in U.S. intelligence and provides "foreign signals intelligence (SIGINT) to [U.S.] policymakers and military forces" and provides U.S. "leaders with critical information . . . to defend our county, save lives, and advance U.S. goals and alliances globally."[3] SIGINT "is intelligence derived from electronic signals and systems used by foreign targets, such as communications systems."[4] Further, the NSA gathers "information about international terrorists and foreign powers, organizations or persons" through the use of SIGINT, i.e., intercepted communications, which is then provided to "America's leaders" so they have "critical information they need to defend our country, save lives, and advance U.S. goals and alliances globally."[5] In connection with its work, the NSA routinely intercepts communications of foreign nationals. *See* U.S. Executive Orders 12333, 13355, and 13470 (authorizing the collection of data by the U.S. intelligence community); *see also* Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 et seq., Section 702 (permitting the NSA to intercept communications of foreigners outside the United States if the NSA has a basis to believe it will acquire certain types of foreign intelligence information that have been authorized for collection).

From discovery provided to the defense in this case and public reporting,[6] the U.S. intelligence community was very interested in Mr. Fokin, even conducting physical surveillance

---

[3] NATIONAL SECURITY AGENCY/CENTRAL SECURITY SERVICE, Our Mission, https://www.nsa.gov/ (last accessed July 5, 2024).

[4] NATIONAL SECURITY AGENCY/CENTRAL SECURITY SERVICE, Signals Intelligence (SIGINT) Overview, https://www.nsa.gov/Signals-Intelligence/Overview/ (last accessed July 5, 2024).

[5] *Id.*

[6] "British Companies Owned by Russian Oligarchs to be Investigated by US Congress to Examine Link to Intelligence Agencies," The Telegraph (Dec. 5, 2018), https://www.telegraph.co.uk/news/2018/12/05/british-companies-owned-russian-oligarchs-investigated-us-congress/ (produced in discovery as USAO_00018533) (reporting that "interest in EN+ comes after FBI officers identified Evgeny Fokin, who is the company's Director of

The Hon. Jennifer H. Rearden
July 5, 2024
Page 5 of 8

of him during trips to the U.S. in 2019 and 2021 and documenting who he met with. Indeed, in one unclassified government document provided to the defense, there is reference to speculation Mr. Fokin may have been associated with Russian Intelligence and the document stated: "Additional information pertaining to Fokin is maintained at a higher classification." USAO_00000047. Thus, the NSA most certainly would have intercepted the communications of Mr. Fokin. Further, given that the government decided to sanction Mr. Deripaska in 2018, the NSA would also have intercepted Mr. Deripaska's communications during the relevant time period given the U.S. interest in monitoring those sanctions and their impact, as well as the fact that Mr. Deripaska is publicly perceived to have a relationship with Vladimir Putin and Russian government officials —with whom the NSA would routinely gather intelligence for many U.S. policy interests. There is no question that the U.S. intelligence has been highly interested in Mr. Deripaska for many years given his ties to Putin and Russian security services and global business connections that include his large ownership stake in world's aluminum supply. [7] Thus, the NSA would have routinely intercepted his communications.

The subpoena seeks specific, highly relevant and admissible records that are not otherwise procurable reasonably in advance of trial by the defense, given that the NSA's routinely intercepts communications of foreign officials and individuals of interest to U.S. intelligence and the NSA does not make that information publicly available. *See Tucker*, 249 F.R.D. at 66 (finding a subpoena to the Bureau of Prisons for recorded telephone conversations involving a cooperating witness to be "material" to the defense and not unreasonably onerous as modified); *see also Rajaratnam*, 753 F. Supp. 2d at 322-23; *United States v. Akhavan*, 505 F. Supp. 3d 289, 290-291 (S.D.N.Y. 2020) (two categories of supplemental subpoenas were reasonable and not unduly oppressive); *United States v. Nachamie*, 91 F. Supp. 2d 552, 563 (S.D.N.Y. 2000) (records and communications were "evidentiary and relevant" where they may contain "possible statements of co-conspirators" which "are relevant to the issues of knowledge and intent, because they reveal

---

International Cooperation, as formerly being the SVR's declared liaison officer with U.S. intelligence agencies in Washington DC in the mid-1990s….A spokesman for Mr. Fokin denied that he had been a member of the SVR.")

[7]     *See* S. Rep. No. 116-209, Vol. 5, at vii (2020) (Russian Active Measures Campaigns and Interference In The 2016 U.S. Election) ("The Committee found that Deripaska conducts influence operations, frequently in the countries where he has a significant economic interest. The Russian government coordinates with and directs Deripaska on many of his influence operations."); Sarah Westwood & Sara Murray, *Former Trump Campaign Aide Is Helping Russian Firm Shed Sanctions*, CNN (May 14, 2014), https://www.cnn.com/2018/05/12/politics/washington-lobbying-trump-era/index.html ("Bryan Lanza, who is in regular contact with White House officials, is lobbying on behalf of the chairman of EN+ Group, an energy and aluminum firm presently controlled by Oleg Deripaska, according to several sources."); Peter Stone, *Is Oleg Deripaska The Missing Link In the Trump-Russia Investigation*, The Guardian (Jan. 29, 2019), https://www.theguardian.com/world/2019/jan/29/oleg-deripaska-paul-manafort-trump-russia-investigation ("The meeting came just days after Kilimnik met with Oleg Deripaska, a powerful oligarch and close ally of the Russian president, Vladimir Putin."); *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Volume 1, Special Counsel Robert S. Muller, III at 131 (Mar. 2019), https://www.justice.gov/archives/sco/file/1373816/dl ("Manafort's Russian contacts during the campaign and transition periods stem from his consulting work for Deripaska from approximately 2005 to 2009 and his separate political consulting work in Ukraine from 2005 to 2015, including through his company DMP international LLC (DMI).")

the work done by [the defendant] on an ongoing and regular basis, or the work done by similarly situated companies, or the interaction between the doctors, the billers, and the alleged co-conspirators"). The relevance of these records goes directly to Mr. Shestakov's defenses, and these records are critical to preparing the defense for trial, as set forth *supra*. Further, though we reasonably expect the requested records exist, even the absence of such records concerning communications with Mr. Deripaska regarding the business intelligence work to be performed by Mr. McGonigal is highly material to Mr. Shestakov's defense that the work to be performed was for En+ and not Mr. Deripaska.

>**Request No. 1.** The records to be produced in response to Request No. 1 are:
>
>For the time period June 1, 2021 through November 30, 2021, communications (including records of communications) between Oleg Deripaska and Evgeny Fokin (DOB 12/24/1962), including phone records and intercepted communications.

What Mr. Fokin and Mr. Deripaska communicated about, and did not communicate about--during the time period when the contract with Spectrum Solutions was negotiated and signed, the intelligence work to be performed was discussed by Mr. Fokin with Mr. McGonigal and Mr. Shestakov, and payments under the contract discussed--is highly material to the defense and issues at trial. The communications would be admissible for a variety of reasons, including: (1) the fact of what Mr. Fokin and Mr. Deripaska did and did not discuss, particularly to the extent there are no conversations between them concerning Pandean, Arina Lazarou, payment to Mr. McGonigal and his company Spectrum, and the business intelligence work at issue; (2) the fact that Mr. Fokin did not discuss with Mr. Deripaska his trips to the United States between June 2021 and November 30, 2021, including Mr. Fokin's August 16, 2021 trip when U.S. Customs Officials stopped and questioned him about his relationship with Mr. McGonigal and the contract with Spectrum Solutions, and imaged his phone; and (3) the fact that Mr. Fokin was not acting as Mr. Deripaska's agent for the charged transaction. All of those communications, and the records of them, would prove that there was not a criminal conspiracy with Deripaska, and not a sanctions violation as charged by the government. *See, e.g.*, *United States v. Soliman*, No. 06CR236A, 2009 WL 1531569, at *4 (W.D.N.Y. May 29, 2009) (subpoena could issue where the connection was established between the requests and the defendant's defenses, including "his argued defenses in his pending motion to dismiss as well as his general defenses, including any showing that leads to reasonable doubt of his guilt").

>**Request No. 2.** The records to be produced in response to Request No. 2 are:
>
>For the time period June 1, 2021 through November 30, 2021, communications (including records of communications) between Evgeny Fokin and Sergey Shestakov.

During the relevant time period, Mr. Shestakov communicated with Mr. Fokin about the business intelligence work to be performed for En+, and therefore those communications are material to the defense that no conspiracy existed with Mr. Deripaska to evade sanctions. Those

communications, and what Mr. Fokin did and did not say go directly to Mr. Shestakov's state of mind.  The communications will reflect that Mr. Fokin gave every indication to Mr. Shestakov that he was working for En+ on this project and was communicating with En+ officials about the project, including for payments to Spectrum. Those communications are admissible for the fact of what was said, and what was not said and go directly to undermining any claim that there was a criminal conspiracy and that Mr. Shestakov was part of that conspiracy. *See Nachamie*, 91 F. Supp. 2d at 563 (narrowed requests would be "specific" when the time frame aligned with the indictment and alleged co-conspirator records were relevant to intent).

> **Request No. 3.** The records to be produced in response to Request No. 3 are:
>
> For the time period June 1, 2021 through November 30, 2021, communications (including records of communications) between Evgeny Fokin and officials of En+ Group International or Rusal PLC concerning: Fokin's travel to the United States in that time period; an August 2021 contract involving Spectrum Risk Solutions; Arina Lazarou; business intelligence work related to Vladimir Potanin; Atomyze; Symbridge; documents received by Fokin on or about September 15, 2021 concerning Vladimir Potanin and/or Norilsk Nickel; documents received by Evgeny Fokin on or about November 5, 2021 concerning Vladimir Potanin; and/or documents or information received by Evgeny Fokin on or about November 9, 2021 concerning Vladimir Potanin.

Given (1) Mr. Fokin's conversations with Mr. Shestakov that the work would be done for En+, (2) text messages (produced by the government) in which Mr. Fokin discusses the intelligence work at issue (including records and information Mr. McGonigal provided to Mr. Fokin on September 15, 2021, November 5, 2021 and November 9, 2021 pursuant to that work) and Mr. Fokin's interest getting more information from Mr. McGonigal about the Potanin-related entities "Symbridge" and "Atomyze", and (3) text messages (produced by the government) in which Mr. Fokin and Mr. McGonigal discuss payment for the work to be done, Mr. Fokin would have had communications with En+ and/or Rusal employees about: his travel to the United States during the relevant time period in which he met with Mr. McGonigal; the fact that his travel was for En+ and/or Rusal business; the contract to be signed with Spectrum; payments to Spectrum; and the intelligence work product he received from Mr. McGonigal.. The fact that Mr. Fokin discussed the intelligence work, contract, and/or payments to Spectrum with En+ and/or Rusal employees would be proof of Mr. Fokin's state of mind regarding who that work was to be done for, the interest that EN+ and Rusal had in that intelligence work,  the fact that En+ and/or Rusal were aware of this transaction with Spectrum, that the work was to be done on behalf of the interests of En+ and Rusal, and that the work was in connection with a lawsuit that En+'s subsidiary Rusal was considering and ultimately filed against Mr. Potanin concerning Nornickel. Further, intercepted communications demonstrating that Mr. Fokin sent results of the business intelligence work through EN+/Rusal channels, as well as sent the Spectrum contract and related requests for payment through En+/Rusal channels for discussion and/or approval is critically important to prove the Mr. Fokin's work was done on behalf of En+ and/or Rusal and the charged criminal

conspiracy with Deripaska did not exist. *See Rajaratnam*, 753 F. Supp. 2d at 322-23 (third party documents reflecting communications with defendant and any agent or employee of the hedge fund were required to be produced as evidentiary and relevant). Such communications could not be more material to the defense.

\* \* \*

      For the foregoing reasons, we respectfully request that the Court "So Order" the attached Rule 17(c) subpoena duces tecum to the NSA. Ex. A. We appreciate the Court's attention to this matter.

Respectfully submitted,

*/s/ Rita M. Glavin*

Rita M. Glavin