

Glavin PLLC  
156 W. 56th Street, Suite 2004  
New York, NY 10019

glavinpllc.com  
646.693.5505

July 5, 2024

**VIA ECF**

Honorable Jennfier H. Rearden  
United States District Court  
Southern District of New York  
500 Pearl Street  
New York, NY 10007

      Re:    <u>United States v. Sergey Shestakov</u>, 23 Cr. 16 (JHR)

Dear Judge Rearden:

      I represent Sergey Shestakov in the above-referenced matter and respectfully request that the Court "So Order" the attached Rule 17(c) subpoena duces tecum to Olga Shriki (the "Shriki subpoena," attached hereto as Ex. A), a longtime trusted employee and business associate of unindicted co-conspirator Oleg Deripaska, who resides in the United States, directing the production of records prior to the August 6, 2024 trial date. As the Court in aware, the defense previously submitted to the Court an *ex parte* sealed application for a Rule 17(c) subpoena to Ms. Shriki on March 8, 2024, and the Court informed the defense on July 1, 2024 that the application was denied without prejudice to renew the application upon notice to the government.[1]

### I.    Background

#### A.  The Government's Sanctions Case: Counts One and Two

      The Indictment alleges that Mr. Shestakov conspired with co-defendant Charles McGonigal and unindicted co-conspirators Oleg Deripaska and Evgeny Fokin to violate the U.S. sanctions imposed on Mr. Deripaska in April 2018, in violation of the International Emergency Economic Powers Act ("IEEPA"). Specifically, the governments alleges that, beginning in or about the spring of 2021, Mr. Deripaska's "agent" Evgeny Fokin hired Mr. McGonigal and Mr. Shestakov to investigate a rival Russian oligarch, Vladimir Potanin, on behalf of Mr. Deripaska. Indictment ¶¶ 18-21. According to the government, Mr. Potanin had a controlling stake in Norilsk Nickel ("Nornickel") and was the CEO of Nornickel, and Mr. Deripaska was "contesting control" by Mr. Potanin over Nornickel. *Id.* In August 2021, Mr. Deripaska, through his agent Mr. Fokin**,** allegedly entered into a contract through a Cyprus corporation, Pandean Limited ("Pandean"), with a New Jersey-based corporation associated with Mr. McGonigal, Spectrum Risk Solutions ("Spectrum"), for "business intelligence services, analysis, and research relevant to [Nornickel], its business operations, and shareholders." *Id.* That contract with Pandean was signed by Arina

---

[1]     The Court's order denying the application without prejudice to renew is dated June 30, 2024, but the order was sent to the defense via email just after midnight on July 1, 2024.

Hon. Jennifer H. Rearden
July 5, 2024
Page 2 of 7

Lazarou, who is listed as a director of Pandean. According to the government, Mr. Deripaska then purportedly paid Mr. McGonigal and Mr. Shestakov by sending money to Spectrum from a Russian bank account in the name of Pandean. As alleged, Spectrum then paid Mr. McGonigal and Mr. Shestakov for this purported work on behalf of Mr. Deripaska. *Id.* ¶ 20. The payments from the Russian bank in the name of Pandean was located a Gazprom bank, and payments were made under the on or about August 13, 2021, August 18, 2021, September 15, 2021, October 18, 2021, and November 18, 2021. The government's theory of the case is that Deripaska structured and conducted the transaction in this matter to evade the sanctions that had been placed upon him in 2018.

### B. Defense Theories and Olga Shriki's Documents[2]

Mr. Shestakov's defense will include that: (1) there was no IEEPA criminal conspiracy or substantive IEEPA violation; (2) his actions did not violate the U.S. sanctions imposed on Mr. Deripaska; (3) he was not part of any conspiracy with Mr. Fokin, Mr. Deripaska, or Mr. McGonigal to violate U.S. sanctions laws as alleged in the Indictment; (4) he understood, including based on discussions with his longtime friend Mr. Fokin, that the business intelligence work to be performed was to be done on behalf of En+ and/or its subsidiary Rusal—*not* Oleg Deripaska; (5) Mr. Fokin, in truth and in fact, was working on behalf of En+ when he arranged the contract at issue with Spectrum and there was no violation of the sanctions placed on Mr. Deripaska.

Mr. Shestakov expects to offer evidence at trial that Mr. Deripaska was not a participant in this contractual arrangement between Spectrum and Pandean for business intelligence services, including the fact that the Russian bank account from which payment was made to Spectrum for the business intelligence services is not associated with Mr. Deripaska nor is the Cyprus entity, Pandean. Further, the defense will introduce evidence at trial that the individual who signed the contract on behalf of Pandean for this business intelligence work, Arina Lazarou, *was listed by En+ in an official corporate filing in 2021 as an individual associated with En+*.

At all relevant times, Mr. Fokin was an En+ official and En+ was not under U.S. sanctions. We expect to elicit evidence at trial that Mr. Shestakov has a longstanding personal relationship with Mr. Fokin and his family.

En+ is an energy and metals conglomerate and owns United Company Rusal PLC ("Rusal"), one of the world's largest aluminum producers. En+ and Rusal were subject to U.S. sanctions beginning in April 2018, because those companies were owned and/or controlled by Mr. Deripaska. On January 27, 2019, OFAC removed En+ and Rusal from the U.S. sanctions list pursuant to an agreement that En+ would take steps to diminish Mr. Deripaska's ownership and control over En+. Specifically, the U.S. agreed that Mr. Deripaska could own no more than 45 percent of En+, vote no more than 35 percent of his shares, and control no more than four seats on

---

[2] In connection with this application for a Rule 17(c) subpoena to produce records prior to trial, the defense also relies upon the facts and arguments set forth (to extent applicable) in the defense papers in support of its motion to compel discovery. *See generally U.S. v. Shestakov*, 23 Cr. 16 (JHR) (S.D.N.Y.), ECF Nos. 85, 86, and 91.

the board. Notably, Mr. Deripaska remained very actively involved with En+ and is still En+'s largest single shareholder.

Nornickel and its CEO, Mr. Potanin, were in 2021, and remain, vitally important to En+'s business interests. Specifically, En+ owns Rusal, and Rusal owns approximately 28 percent of Nornickel. Mr. Potanin is the other largest shareholder of Nornickel, with approximately 35 percent of the shares. In 2021 and 2022, En+, through its subsidiary Rusal, was at odds with Nornickel over the direction of Nornickel and Mr. Potanin's leadership of the company. The tension between the companies culminated in an October 2022 lawsuit that Rusal filed in the United Kingdom against Mr. Potanin and his company Whiteleave Holdings Inc. to protect the interests of Nornickel shareholders.[3] The lawsuit alleges that Mr. Potanin and Whiteleave transferred crucial subsidiaries out of Nornickel's corporate group to divert value away from Nornickel. Thus, it made perfect sense for En+, as communicated to Mr. Shestakov by Mr. Fokin, to want business intelligence on Mr. Potanin and Nornickel at the time of the alleged conspiracy in 2021—which is exactly what Mr. Shestakov thought to be the transaction at issue and was, in fact, the transaction at issue.

In presenting his defense, Mr. Shestakov expects to elicit evidence that Mr. Deripaska had several close business associates around the world, including his longtime employee and business associate Olga Shriki in the United States, who handled Mr. Deripaska's most sensitive personal, business and financial transactions through various corporate entities and international bank accounts. And those particular associates actively assisted Mr. Deripaska in evading U.S. sanctions from 2018 through 2022. Indeed, the government charged Mr. Deripaska and those associated in two other indictments alleging sanctions violations for those business and financial transactions on behalf of Mr. Deripaska. *See United States v. Bonham-Carter*, 22 Cr. 503 (PAE) (charging Graham Bonham-Carter, a longtime business associate and employee of Mr. Deripaska); *United States v. Deripaska*, 22 Cr. 518 (PKC) (charging Oleg Deripaska, Olga Shriki, and Natalina Bardakova).

In Mr. Shestakov's case, the defense will present evidence and argue to the jury that it would make no sense for Mr. Deripaska—an extraordinarily wealthy and sophisticated Russian oligarch with intelligence and business ties throughout the world—to contract with Spectrum through Pandean for the business intelligence work as alleged in the Indictment. Mr. Deripaska had plenty of other entities through which such transactions were routinely performed by Mr. Deripaska's experienced and longtime trusted business associates and *would have done so here* if

---

[3] *Rusal Plans Further Lawsuit Against Potanin Over Nornickel Pact*, REUTERS, (Mar. 23, 2023), https://www.mining.com/web/rusal-plans-further-lawsuit-against-potanin-over-nornickel-pact/ ("Rusal alleges Potanin and Whiteleave procured the transfer of 'crucial subsidiaries' out of Nornickel's corporate group 'with the sole or main purpose of diverting value away from the (Nornickel) Group, as part of a wider strategy of entrenching (Whiteleave and Potanin's) control'"); , *Rusal Accuses Potanin Of Breaching Nornickel Shareholder*, REUTERS (Oct. 24, 2022), https://www.mining.com/web/rusal-plans-further-lawsuit-against-potanin-over-nornickel-pact/ ("Rusal, which holds a 26.2% stake in Nornickel said that the lawsuit, filed in London's High Court of Justice on October 21 against Potanin and his affiliate Whiteleave Holdings, is aimed at protecting the interests of the company's shareholders. The statement said: 'Rusal's claims are based on Mr. Potanin's failure to fulfil his duties as Norilsk Nickel's managing partner and CEO. Under the management of Mr. Potanin, Norilsk Nickel lost a number of assets that played a key role in group's activities. This resulted in Norilsk Nickel and its shareholders suffering significant losses.'").

Mr. Deripaska was really involved in the transaction with Mr. McGonigal and Mr. Shestakov as charged in the Indictment. This is critical to the defense theory that Mr. Deripaska was not part of the charged transaction with Mr. McGonigal and Mr. Shestakov. The fact that Mr. Deripaska had nothing to do with Pandean, was not involved in the business intelligence work at issue, nor was involved in the payment for that work to Spectrum is why the records the defense seeks from Ms. Shriki records are critically important to the defense. We fully expect that—based in part on the allegations in the government's indictments of Ms. Shriki and Mr. Bonham-Carter for sanctions violations, and the government's statements regarding the Shriki and Bonham-Carter case including to the court and in press releases[4] —Ms. Shriki's records of her work for Oleg Deripaska will show: the bank accounts through which Mr. Deripaska regularly funneled money for transactions, including transactions to evade sanctions; entities through which Mr. Deripaska transacted personal business through his "agents" (*i.e.*, close business associates); and the regular manner in which Mr. Deripaska transacted business to evade sanctions, including the individuals and entities. Those records will be critical to the defense that Mr. Deripaska was not involved in the charged conspiracy. Further, the defense needs these records well in advance of trial to formulate the strategy for opening statements and cross-examination of government witnesses, to determine what witnesses to call in the defense case, and to have those records translated as needed.

1. **Olga Shriki**

Ms. Shriki, a U.S. citizen who resides in New Jersey, was a long-time employee of Mr. Deripaska and worked for years at the New York office of Mr. Deripaska's company, Basic Element Limited ("Basic Element"). Deripaska Indictment ¶ 15. Basic Element is a private investment and management company for Mr. Deripaska's various business interests. After Mr. Deripaska's designation on the SDN list in 2018, Ms. Shriki was tasked with closing that office. *Id.* Once closed, Ms. Shriki continued to work for Mr. Deripaska in the United States, carrying out numerous business and financial tasks for his benefit and the benefit of companies he owned or controlled, including: handling the proceeds of a $3 million sale of a music studio that Mr. Deripaska owned through a serious of corporate shell companies to obscure his ownership; working to expatriate the $3 million in proceeds from that music studio sale through a shell company "Ocean Studios California LLC" to a Russia-based account belonging to another Deripaska entity (not Pandean); working with Mr. Deripaska through the corporate entity "Gracetown Inc." to utilize the U.S. financial system; working with Natalina Bardakova, a Russian resident and close associate of Mr. Deripaska, to engage in various transactions on behalf of Mr. Deripaska, including obtaining U.S. goods and technology for Mr. Deripaska, providing gifts to Mr. Deripaska's social contacts in the United States and Canada; and making arrangements—involving $300,000 in financial transactions—to assist Mr. Deripaska's girlfriend, Ekaterina Voronina, in obtaining a U.S. visa and staying in the U.S. to give birth to Mr. Deripaska's child. *See* USAO Press Release September 29, 2022 (attached as Exhibit B). Mr. Deripaska, with the assistance of Ms. Shriki and Ms. Bardakova, allegedly expended $400,000 in the effort to have Ms. Voronina give birth in the U.S. *See* Deripaska Indictment ¶ 19(i)–(m). Further, at Mr. Deripaska's direction, Ms. Shriki created a consulting business called "Global Consulting Services

---

[4]     *See also* ECF No. 85 at pp. 9-14 (memorandum of law in support of Mr. Shestakov's motion to compel), 86 (Glavin Declaration and exhibits, including the related indictments), and 91 at pp. 2-6, 8-12 (reply brief and accompanying exhibits).

LLC," through which she coordinated with Ms. Bardakova to receive funds from Mr. Deripaska for her work in assisting him with U.S. financial transactions. *See id.* ¶ 16.

The records Mr. Shestakov seeks from Ms. Shriki are relevant to Mr. Shestakov's defenses that Mr. Deripaska did not contract with Spectrum through Pandean, Pandean was not associated with Mr. Deripaska, the Russian bank account through which Spectrum was paid was not associated with Mr. Deripaska, the woman who signed the contract on behalf of Pandean (Ms. Lazarou) was not an employee or agent of Mr. Deripaska, and Mr. Deripaska would not have (and did not) conduct the transaction as charged in the instant Indictment. Described further below, the records Mr. Shestakov seeks from Ms. Shriki are: communications regarding financial and business transactions on behalf of Mr. Deripaska; contact information for Mr. Deripaska's associates that Ms. Shriki maintained on her phone or other electronic devices; lists of Deripaska-related entities and bank accounts; financial records (*e.g.*, wire transfer records, receipts, account statements) for various bank accounts and credit cards associated with Mr. Deripaska, including accounts in Russia; business records for the various entities through which Mr. Deripaska conducted business, including Ocean Studios California LLC, Gracetown Inc., and Global Consulting Services LLC.

## II. Applicable Legal Standard and Proposed Shriki Subpoena

Fed. R. Crim. P. 17(c) permits the Court to direct a witness to produce any documents, before trial, if they (1) are "evidentiary and relevant"; (2) "are not otherwise procurable reasonably in advance of trial by exercise of due diligence"; (3) "the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonable to delay the trial"; and (4) "the application is made in good faith and is not intended as a general 'fishing expedition.'" *United States v. Nixon,* 418 U.S. 683, 699-700 (1974) (citation omitted) ; *see United States v. Tucker*, 249 F.R.D. 58, 65 n. 43 (S.D.N.Y. 2008), as amended (Feb. 20, 2008) (collecting cases that apply the *Nixon* standard to a defendant's subpoena on a third party). "Criminal defendants have the right to 'put before a jury evidence that might influence the determination of guilty.' To effect this right, a defendant must have the ability to obtain that evidence." *Tucker*, 249 F.R.D. at 65 (citation omitted).

Though *Nixon* is the generally accepted standard for the production of records prior to trial, its application may be "inappropriate where production is requested by (A) a criminal defendant; (B) on the eve of trial; (C) from a non-party; (D) where the defendant has an articulable suspicion that the documents may be material to his defense." *United States v. Goldstein*, 21 Cr. 550 (DC), 2023 WL 3662971, at *2 (E.D.N.Y. May 25, 2023) (citing *Tucker*, 249 F.R.D. at 66 and *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 322 n. 1 (S.D.N.Y. 2011)). In *Goldstein*, Judge Denny Chin reasoned that "[i]n such circumstances, a standard less stringent than *Nixon* is appropriate, requiring a defendant to 'only show that the request is (1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond.'" *Id.* (citing *Tucker*, 249 F.R.D. at 66).

The Shriki subpoena seeks specific, relevant, and admissible records that are not otherwise procurable reasonably in advance of trial by the defense. *See Tucker*, 249 F.R.D. at 66 (finding a

subpoena to the Bureau of Prisons for recorded telephone conversations involving a cooperating witness to be "material" to the defense and not unreasonably onerous as modified); *see also Rajaratnam*, 753 F. Supp. 2d at 322-23; *United States v. Akhavan*, 505 F. Supp. 3d 289, 290-291 (S.D.N.Y. 2020) (two categories of supplemental subpoenas were reasonable and not unduly oppressive); *United States v. Nachamie*, 91 F. Supp. 2d 552, 563 (S.D.N.Y. 2000) (records and communications were "evidentiary and relevant" where they may contain "possible statements of co-conspirators" which "are relevant to the issues of knowledge and intent, because they reveal the work done by [the defendant] on an ongoing and regular basis, or the work done by similarly situated companies, or the interaction between the doctors, the billers, and the alleged co-conspirators"). The relevance of these records goes to Mr. Shestakov's defenses, and are critical to preparing the defense for trial, as set forth *supra*. *See, e.g.*, *United States v. Soliman*, No. 06CR236A, 2009 WL 1531569, at *4 (W.D.N.Y. May 29, 2009) (subpoena could issue where the connection was established between the requests and the defendant's defenses, including "his argued defenses in his pending motion to dismiss as well as his general defenses, including any showing that leads to reasonable doubt of his guilt"). Further, the *absence* of such records concerning transactions with or by, records of, or mention of Pandean, Charles McGonigal, Arina Lazarou, Spectrum Risk Solutions, and the Russian bank account through which Spectrum Risk Solutions was paid, is relevant to Mr. Shestakov's defense that the business intelligence work at issue was not performed on behalf of Mr. Deripaska, Mr. Deripaska did not cause the payments to be made to Spectrum, and Mr. Deripaska was not part of the charged transaction. *Cf. Rajaratnam*, 753 F. Supp. 2d at 322-23 (third party documents reflecting communications with defendant and any agent or employee of the hedge fund were required to be produced as evidentiary and relevant).

**Request No. 1.** The records to be produced in response to Request No. 1 are:

For the time period January 1, 2017 through September 2022, documents and/or communications concerning:

(a) Oleg Deripaska, Natalina Bardakova, Graham Bonham-Carter, Arina Lazarou, Evgeny Fokin, Charles McGonigal, Sergey Shestakov, Vladimir Potanin, GBCM Limited, Global Consulting Services LLC, Gracetown Inc, Ocean Studios LLC, Pandean Limited, and/or Spectrum Risk Solutions;

(b) bank accounts, credit card accounts, and/or wire transfers related to Mr. Deripaska and/or the persons and entities listed in Request 1(a).

Given that Ms. Shriki was an employee of Mr. Deripaska who conducted his business, these communications are admissible as business records under Federal Rule of Evidence ("FRE") 803(6), evidence of habit, routine and practice under FRE 406, and absence of entry in business records under FRE 803(7). Those records will show the manner of how Mr. Deripaska conducted business and communicated during the time he was sanctioned. With respect to Mr. Bonham-Carter, he is a longtime employee and business associate of Mr. Deripaska based in the United Kingdom, who worked for an entity controlled by Mr. Deripaska and conducted international

financial transactions for him after Mr. Deripaska was designated an SDN in 2018.[5] After Mr. Deripaska's designation in 2018, Mr. Bonham-Carter set up a company, GBCM Limited, to: manage properties owned by Deripaska; receive money that Mr. Deripaska wired, and then wire that money to pay for various expenses on behalf of Mr. Deripaska. Bonham-Carter Indictment ¶¶ 16-22. GBCM Limited also wired money to bank accounts in New York of an entity controlled by Mr. Deripaska, Gracetown Inc., which Mr. Bonham Carter ran. *Id.* ¶ 16. Any such records are also relevant to show the entities through which Mr. Deripaska continued to conduct business after he was placed on the sanctions list, and how he evaded such sanctions.

The subpoena calls for records dating back to January 2017, because those records will show how Mr. Deripaska conducted business and financial transactions prior to, and then after, he was put on the sanctions list in April 2018. Such records are relevant to how he conducted business, and changes specifically made to evade the sanctions, including new entities and bank accounts utilized. Ms. Shriki's records would be admissible as business records, given she was Mr. Deripaska's employee and ran businesses on his behalf. Such records would also be admissible under Fed. R. Evid. 406 as evidence of a habit or routine practice as it concerns how Mr. Deripaska conducted business after he was placed on the SDN list in 2018.

The records are needed prior to trial because (1) those records will factor into the defense's opening statements and trial strategy, and (2) some of the records will need to be translated. Thus, the return date for the subpoena is July 19, 2024.

\*          \*          \*

For the foregoing reasons, we respectfully request that the Court "So Order" the attached Rule 17(c) subpoena duces tecum to Olga Shriki. Ex. A.

Respectfully submitted,

  /s/ Rita M. Glavin
Rita M. Glavin

---

[5] Press Release, U.S. Dep't of Treasury, Office of Foreign Assets Control, Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity (April 6, 2018), https://home.treasury.gov/news/press-releases/sm0338.