XP1RAShe                    SEALED

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         23 Cr. 016 (JHR)

5    SERGEY SHESTAKOV,

6                                         Conference
                   Defendant.
7    ------------------------------x

8
                                         New York, N.Y.
9                                        January 27, 2025
                                         2:34 p.m.
10

11   Before:

12                   HON. JENNIFER H. REARDEN,

13                                         District Judge

14                          APPEARANCES

15   DANIELLE R. SASSOON
          United States Attorney for the
16        Southern District of New York
     BY:  OLGA ZVEROVICH
17        REBECCA DELL
          AMANDA C. WEINGARTEN
18        Assistant United States Attorneys

19   GLAVIN PLLC
          Attorneys for Defendant
20   BY:  RITA MARIE GLAVIN
          KATHERINE E. PETRINO
21        LEO KORMAN

22

23

24

25

1          (Case called)

2          MS. ZVEROVICH:  Good afternoon, your Honor.  Olga

3    Zverovich, Rebecca Dell, and Amanda Weingarten for the United

4    States.

5          THE COURT:  Hello.

6          MS. GLAVIN:  For Mr. Shestakov, Rita Glavin with my

7    colleagues Katherine Petrino and Leo Korman, along with my

8    client Sergey Shestakov.

9          THE COURT:  Good afternoon.  Please be seated.

10         Ms. Glavin, we're here on your application.

11         MS. GLAVIN:  Yes, your Honor.  I've had some time over

12   the weekend to consider Mr. Olson's declaration.  And I also

13   conferred this morning with Mr. Fokin's counsel in anticipation

14   of the conference and here's where I'm at and what I'd like the

15   Court -- propose that the Court do.

16         Mr. Shestakov for some time has wanted Mr. Fokin's

17   testimony, and we are at a point where we can get it and he's

18   willing to do it.  And we learned that for the first time in

19   December.

20         We have consulted with local counsel in Dubai and

21   there is no -- we are certain that there is no requirement that

22   we submit letters rogatory.  This is a defense request.  It is

23   a Russian citizen voluntarily appearing without court process

24   or the need for a court order requesting assistance.

25         But from what we take from the government's

1    submissions on January 9th, or may have been the 10th, and

2    January 22nd, and the affidavit of Mr. Olson, is that the

3    government OIA, the Office of International Affairs, which is

4    within the criminal division of the Justice Department, has a

5    policy that prosecutors, they're not going to let this team

6    participate in the deposition unless an MLA request is made or

7    we go through the process of letters rogatory.

8         Because of the importance of Mr. Fokin's testimony,

9    because the whole case could hinge on that, what I would like

10   to do, because I think there are unanswered questions in

11   Mr. Olson's declaration.  What I would like is for the Court to

12   direct that Mr. Olson and the prosecution team confer with

13   defense counsel this week on this issue.  Because what I would

14   like to understand from Mr. Olson is, first, where he states in

15   at the end of his declaration that ███████████████████████████

16   ██████████████████████████████████████████████████████

17   ███████████

18        What I would like to understand from Mr. Olson is what

19   were the circumstances of those cases.  Because I'm guessing

20   that those cases did not involve a defendant who had been

21   charged, who would be calling them -- if would be a defense

22   witness, a private witness, that the witness is voluntarily

23   coming to UAE and that witness has exculpatory information,

24   that is, information that there was not a sanctions violation,

25   that the witness's testimony would not be used to prove up a

```
 1    case against on behalf of the United States Government.  But

 2    rather, is coming to say the government got this wrong.  And

 3    that's the reason he's coming.

 4            And that what I told the government and what I, you

 5    know, two years ago, and then what I told my company's counsel

 6    when they asked me about it this summer, is that this is not

 7    what happened.  This was done on behalf of En+, Rusal, and this

 8    was legal as far as their perspective.  I would like to

 9    understand that from a discussion with Mr. Olson.  That's the

10    first part.

11            The second part is if we do letters rogatory, we make

12    application to the Court, we do letters rogatory, I want to

13    understand that process as well.  Because I know this came up

14    in *United States v. Fargesen*, the case in front of Judge

15    Preska, we looked at the docket on that case.  And I want to

16    understand with him, you know, what the differences are, not

17    differences are.

18            The second thing I would like to know in talking to

19    Mr. Olson is, because I don't want to spin my wheels, if he's

20    telling me no way no how this is going to happen, and I consult

21    with my counsel who I've been talking with in Dubai to get his

22    perspective on this, which is entirely aligned with the

23    government's, if I speak to Mr. Olson and he says, Rita, it may

24    be able to happen in Cyprus or Turkey, in which case this is

25    what you should do, I would like to understand from him if
```

1    there are alternatives in his experience dealing with the

2    specific facts that we are facing here.  Which is why I reached

3    out to Mr. Fokin's counsel this morning to see.

4           While Mr. Fokin, understanding what the time schedule

5    was, for him and when the trial was and, yes, he was willing to

6    come here as soon as he could work it with my schedule and with

7    his attorney's schedule.

8           THE COURT:  Here, I'm sorry, who are you referring to

9    was willing to come here?

10          MS. GLAVIN:  No, not willing to come here because the

11   government isn't promising him safe passage.  And even if the

12   government promised him safe passage, what he's made clear and

13   is in my affidavit from December 17th is he doesn't trust the

14   government, among a bunch of reasons that they got this wrong.

15          So he's not willing to come here.  But the question is

16   understanding the importance of his testimony, understanding it

17   may be able to get done in another place, I would like to

18   explore that with Mr. Olson.  It's why I raised it with

19   Mr. Fokin's counsel this morning.  Mr. Fokin is in Russia right

20   now as far as I know.  So it takes him a little time to get in

21   touch with him.  But he assured me that he would relay that and

22   see what he could get back.

23          So that, your Honor, is how I would propose to

24   proceed, because I want to get this done in the most efficient

25   way possible.  I did not want to give up the February 3rd date

1   for a host of reasons, because everyone was available and we

2   could keep the pressure on everybody.  And I also bought a

3   plane ticket.  But -- nonrefundable.  But the reality is, from

4   what I'm reading in the government's papers, their practices

5   and procedures at the Justice Department say we're not going to

6   let them do this.  And this is what's going to have to happen.

7   And if it means that the letters rog might be enough and if it

8   means that it's coming from the defense, because I think how

9   the request is made is also particularly important.  And I want

10  to raise that with Mr. Olson.  How we phrase it in a letters

11  rogatory to make it quite clear what we understand he would

12  testify to, that he is coming willingly with affidavits, not

13  just from myself but maybe perhaps from his counsel, could that

14  make a difference?

15         Secondly, I'm concerned about the government's MLA

16  request and what that would look like going to UAE.  And my

17  concern about that and not seeing it before its transmitted to

18  UAE is that this is entirely a defense request.  It's a proffer

19  of what we believe he will say based on representations to us

20  by his counsel, based on representations that En+, his outside

21  counsel at Boies Schiller has told us, he has, you know,

22  reiterated to them when they interviewed him this summer

23  given -- knowing what the importance was.

24         MLA requests, in my experience, and it is drawn upon

25  my time at the Justice Department, are written in a certain way

1    that don't necessarily layout what the defense is doing and

2    what the defense case is, in a way that we would lay it out.

3    And because this is our request, that's something I would also

4    like to pose to Mr. Olson.

5         So that's where we stand on this and sort of the

6    proposal I'm putting forward to the Court to try to get this

7    done.

8         THE COURT:  Did the government know about these new

9    ideas before coming in here this afternoon or?

10        MS. GLAVIN:  No, your Honor.  I literally -- this has

11   all happened over the course of our talking internally this

12   morning, me talking to Mr. Shestakov outside the courtroom for

13   the first time about this.  He's been aware of this, of where

14   we were at on Friday.  And me taking some time to talk with my

15   team this morning.

16        But I think that these are, to me, reasonable

17   proposals to try and get through this.  And I'm happy, if the

18   government wants to consult with me outside now, I'm happy to

19   do that and take a break.

20        THE COURT:  Ms. Zverovich, do you wish to give me your

21   reaction now?  Would you like to confer with Ms. Glavin?  I

22   have thoughts of my own, but I would like to hear from you

23   first.

24        MS. ZVEROVICH:  Your Honor, I think the government is

25   prepared to give the Court its reaction.

1        First, as the Court knows from the correspondence that

2    the government has submitted, we have conferred extensively

3    with OIA and we have conferred with the state department with

4    respect to this.  And I think the papers set forth the full set

5    of facts relevant to this issue, which is that it remains the

6    position of OIA and the state department that the defendant is

7    required to submit a request for approval to the UAE in order

8    to be able to conduct this Rule 15 deposition.  The customary

9    way, and this is on the state department's website for such a

10   defense request, is a letters rogatory.

11       That is separate from the MLA process.  The MLA

12   process is required in order for the government to be able to

13   participate in the deposition of Mr. Fokin.  And the government

14   has acted expeditiously in finalizing that MLA.  And its

15   currently -- it's been signed by OIA.  It is pending

16   translation and that process is underway.

17       The MLA process is a diplomatic process between the

18   executive branches of two different governments, from the U.S.

19   government to the UAE.  It is a process in which private

20   parties and defense counsel do not play a role.  And,

21   therefore, we would submit, your Honor, that it would be

22   improper for the defendant to inspect this MLA or to ask

23   Director Olson any questions.

24       To the extent there are any additional issues that

25   need to be answered, we think the declaration is fulsome, but

1    to the extent there are any additional questions, we're happy

2    to try to get additional information from OIA.  But we submit

3    it would not be proper to allow the defense to inspect the MLA.

4         That said, we do represent to the Court that the MLA

5    accurately summarizes all of the charges in this case.  It

6    attaches the Court's order granting the Rule 15 deposition,

7    which sets out the relevance of Fokin's testimony.  It explains

8    that it's a defense initiated request and that the government

9    is seeking authorization to participate in the deposition.  And

10   as I said, your Honor, that request is pending translation to

11   Arabic currently.

12        THE COURT:  All right.  Is it your position then that

13   it would be -- again, I have my own thoughts -- but that it

14   would be improper to have Ms. Glavin interact directly with

15   Mr. Olson?

16        MS. ZVEROVICH:  Correct, your Honor.  That is our

17   position.

18        THE COURT:  Okay.  Is there any precedent for a

19   defendant in a criminal case to -- what is the precedent,

20   Ms. Glavin?

21        MS. GLAVIN:  Your Honor, my understanding is Mr. Olson

22   is a DOJ lawyer.  He can participate on any phone call and

23   interact with us in the same way that the AUSAs interact with

24   us.  My experience has also been that defense lawyers can reach

25   out to OIA as well when they have questions about the process.

1          There is no harm, no foul here.  Mr. Olson doesn't

2     want to answer questions, he doesn't have to answer the

3     questions.  So I don't see any prejudice to them.

4          Secondly, with respect to being able to see the MLA,

5     my understanding, it's not a secret document.  It's a document

6     using, as I understand it, public information from the case.  I

7     don't know why the government wouldn't want to share that with

8     the Court and with defense counsel given our interest is in

9     making this happen.

10          I don't want to wordsmith it because --

11          THE COURT:  Well, that's good.

12          MS. GLAVIN:  Yeah, I don't have the time to wordsmith

13     it.  But what I do want to do is make sure there are certain

14     points in there.  And so that's another reason I want to look

15     at it.

16          The last is with respect to letters rogatory.  When

17     your Honor was asking had we raised this with the government

18     before we came here.  We certainly put in the papers we were

19     willing to consider that -- doing that and going through the

20     process if it could expedite things.

21          And Mr. Olson is very experienced, I don't question

22     that.  We overlapped together at the department.  Which is why

23     I think it would be very helpful to get -- to have the

24     discussion with him about if we were to propose and be able to

25     get Mr. Fokin to agree to appear in Cyprus or in Istanbul, what

1    kind of assistance we could get from OIA to make that happen

2    expeditiously.

3         One of the things is, and we cited a bunch of these

4    cases in our last letter, but it would be extraordinarily

5    helpful, you know, the Court has already directed us to confer

6    in good faith in making sure that we can try to get this done

7    expeditiously.  And having Mr. Olson participate on those

8    conversations, because I am guessing this is probably one of

9    the first times that this prosecution team has dealt with an

10   issue like this.  And this, certainly from my perspective on

11   the defense side, I have not asked for Rule 15 before.  I do

12   know it fairly well from the government side.  But I do think

13   having somebody from OIA who does it on a regular basis and

14   routinely advises prosecutors about what they can and cannot

15   do, and I think when defense counsel has letters rogatory and I

16   can, you know, I can ask around among my colleagues on the

17   defense side about this, I think they had been able to engage

18   with OIA.  It's very difficult for us to get a phone call back.

19        So when your Honor issued an order granting the Rule

20   15, we, you know, promptly reached out to get court reporter

21   services.  We have tried to get in touch with the U.S. Embassy

22   so that we can get someone available to do the oath.  We've had

23   difficulties getting a response back to them, but I think the

24   government could help on that tremendously.

25        THE COURT:  I'm not going to direct the government to

1   do that.

2               MS. GLAVIN:  To assist us?

3               THE COURT:  To assist you in getting someone to

4   administer the oath?

5               MS. GLAVIN:  No.  To make reasonable efforts to assist

6   us, yes.  There is case law, your Honor, and I think it may

7   have been in Judge Preska's decision, but it also may have been

8   in either the *Vallar* case or there was a case recently by Judge

9   Cronan.  But certainly for the government to make reasonable

10  efforts to be in touch with the consulate to assist the defense

11  in arranging it.

12              THE COURT:  All right.  Well, you cited both *Mashinsky*

13  and *Alexandre*.  I have already directed the government to act

14  in good faith.  You cited *Mashinsky* and *Alexandre* and I don't

15  see them as supporting a request to direct the government to

16  act to do anything in particular.  And *Mashinsky*, Judge Koeltl

17  declined to direct the government to take any specific actions,

18  and that's what Judge Cronan did in the *Alexandre* case as well.

19              MS. GLAVIN:  But I think, your Honor, what we're

20  asking for is direct them to make reasonable efforts.  Not to

21  do X, Y and Z, but to make reasonable efforts.

22              THE COURT:  And reasonable efforts, again, to?

23              MS. GLAVIN:  Help us in arranging to get in touch with

24  the counsel's office -- the consular's office.

25              THE COURT:  No, I've already directed them to act in

1    good faith throughout this process.  And I'm not going to

2    direct them to do anything specific.  I don't think there's a

3    basis for that and I don't think it's appropriate.  And I do

4    want to also say that we are -- and I'm considering it, but

5    we're going pretty far afield from the case law here on your

6    request for more information from Mr. Olson.

7           Judges in this district regularly consider the

8    government's representations about OIA guidance, and I went

9    beyond that here.  So in the *Menendez* case, for example, Judge

10   Stein accepted the government's representations about OIA

11   guidance and he did it, you know, he accepted the government's

12   representations as credible even against the defendant's

13   affidavit to the contrary.  I don't have that here.  That was

14   also the case in *Mashinsky* with Judge Koeltl and in *Alexandre*

15   with Judge Cronan.  In all of those cases, those judges

16   accepted the government's representations about what the

17   government was hearing from OIA.  Now, I went beyond that here

18   and I directed that OIA provide a declaration.  We have that

19   now.

20          I am not opposed to asking Mr. Olson to address some

21   additional matters in a supplemental declaration, but I'm not

22   going to order him or condone in any way or put my *imprimatur*

23   on a joint phone call with you where you can question Mr. Olson

24   directly.

25          If you want to try to do that yourself, I guess

1    there's nothing stopping you.  But that's not going to come

2    from me.

3            So if would you like to talk to government now or you

4    can say out loud again what you would like Mr. Olson to address

5    that you don't believe he's already covered.  Let's see what

6    the government's position would be on having him speak to those

7    additional questions.  I mean, one that I have in mind is he

8    could address the propriety or impropriety about the MLA being

9    shared with defense counsel.

10           Ms. Zverovich, is the government on board with what

11   I'm saying at this point, or what is your position?

12           MS. ZVEROVICH:  One moment, your Honor.

13           Your Honor, generally, yes, I will say with respect to

14   sharing the MLA, the government did speak with OIA about this

15   very issue this morning and I'm happy to relay what they

16   conveyed.

17           THE COURT:  I think you did.  Did you already say that

18   they do not consider that to be appropriate to share it,

19   correct?

20           MS. ZVEROVICH:  Correct, your Honor.

21           THE COURT:  I'm saying if we're going to have

22   Mr. Olson address additional questions, why not have him direct

23   that one also.

24           MS. ZVEROVICH:  Understood, your Honor.

25           THE COURT:  All right.  Ms. Glavin, I know you have

1   concerns that Mr. Olson might not realize some important facts

2   and circumstances here that, in your view, distinguish this

3   request for a deposition from others that might have come up.

4   ███████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████

6   █████████████████████████████████      But I take it you want to

7   know from him directly that he has considered the exact

8   situation here.

9           Okay.  So can you articulate that again what the

10  question would be?

11          MS. GLAVIN:  Sure, your Honor.  With respect to that,

12  just simply where it is a defense request, where it is a

13  witness who's non-UAE, voluntarily and willingly coming to the

14  UAE.  And it is not to give testimony for a prosecution, but

15  for the defense.

16          THE COURT:  Okay.

17          MS. GLAVIN:  And then to the extent -- and to the

18  extent it is also what will his experience with Cyprus and

19  Turkey, which we may be able to do as well.

20          THE COURT:  Meaning how would the process differ and

21  would it potentially be faster if the deposition took place in

22  Cyprus or Turkey?

23          MS. GLAVIN:  Yeah.  And have they dealt with sanctions

24  as well.  And then I think the last is to the extent -- one of

25  the other questions I had, is it simply said ████████████

1 ██████████████████   ████████████   ██████████████

2 █████████

3          What does that mean?  If a country who doesn't have an

4  MLA treaty, which UAE does not have with the U.S., which is one

5  of the reasons we were focused on UAE is because there is not a

6  ratified MLA between them.  And as I understood it from the

7  government's initial submission, the MLA is discretionary.  But

8  internal policies say even if you don't have the MLA, DOJ or

9  OIA wants the prosecutors to do it.  ██████████████

10 █████████  why would the prosecutors be prohibited even if they

11 participate remotely?

12          THE COURT:  Remotely meaning they would plug in by

13 Teams or Zoom?

14          MS. GLAVIN:  Yeah, meaning they would be on U.S. soil,

15 that we fully intend to go personally to the UAE to the

16 deposition because we're going to have documents.  It's going

17 to be easier that way.  But for the government to be able to

18 participate doing it in their office, you know, at 26 Fed, if

19 there is no response.

20          THE COURT:  Ms. Zverovich.

21          MS. ZVEROVICH:  Your Honor, we addressed several of

22 these.  With respect to the last, Mr. Olson's declaration makes

23 clear that with respect to the government's ability to

24 participate, a formal MLA request is required and it's required

25 for it to be approved to the UAE prior to the government's

1  participation in any way in this deposition.  And that would be

2  a violation of UAE sovereignty for the United States to

3  participate in this deposition without getting that approval.

4          THE COURT:  Do you read that to -- I don't think he

5  addressed virtual participation.  Do you read that to extend to

6  virtual participation?

7          If not, perhaps he could answer that question

8  directly.

9          MS. GLAVIN:  He did make a representation, your Honor,

10  about not being able to participate remotely.

11          THE COURT:  Okay.

12          MS. GLAVIN:  But I think it was with respect to OIE's

13  policy.

14          MS. ZVEROVICH:  Your Honor, it's actually in paragraph

15  13 of Mr. Olson's declaration.  Which sets forth the

16  requirements for the government to be able to participate.  And

17  it says that the UAE authorities have explained to OIA, that

18  this, the MLA requirement, applies regardless of which party

19  initiates the deposition, whether the deposition occurs in

20  person or remotely, via telephone or video conference.

21          THE COURT:  All right.  Well, that question has been

22  answered then.  So we don't need to go back to him on that.

23          MS. ZVEROVICH:  Your Honor, I will also say that the

24  government believes its inappropriate to pose additional

25  hypothetical questions about other countries to OIA.  This is

1  the first time the government is hearing Cyprus.  I think at

2  the very least the defense should be required to represent that

3  Mr. Fokin is willing to travel to any of these countries before

4  we go down this rabbit hole.

5           THE COURT:  I agree.

6           MS. GLAVIN:  I agree with that, your Honor.

7           THE COURT:  All right.  Ms. Glavin, so you can put

8  that in writing.

9           MS. GLAVIN:  Yes, once we confer, yes.

10          THE COURT:  So by my count, we have four additional

11 questions.  I do want to make sure that the two sides come to

12 ground on what the questions are before they relay to

13 Mr. Olson, because we're not doing a third round of this.  This

14 is it.  So I want to make sure that there's agreement to the

15 maximum possible extent on what he's going to be answering this

16 time.

17          Ms. Zverovich, when do you think Mr. Olson, you may

18 have to check with him, could come through with a supplemental

19 declaration?

20          MS. ZVEROVICH:  Your Honor, considering that we'll

21 need some time to confer with respect to the set of questions,

22 we would say -- we would ask for ten days.

23          THE COURT:  Well, now we confront the question about

24 trial and Ms. Glavin's request for a brief adjournment and what

25 is meant by brief.  The government has pointed out I believe a

1  willingness to consent to a brief adjournment noting, not

2  unreasonably, that it doesn't know what is meant by brief.

3        So let's get into that now.  Wait a second, I do have

4  to say, Ms. Glavin.

5        MS. GLAVIN:  Yes.

6        THE COURT:  That in my view you waited too long to do

7  this, and I'm unhappy about it.  And this is not even the first

8  time.  So in your declaration you say that you made several

9  attempts to contact Mr. Fokin during February and March of

10  2024.  In February and March of 2024, until the end of March,

11  we were set to go to trial in June.  That was too late to start

12  the process for a trial in June.  So that's the first time you

13  waited too long.

14        Not to mention that that was already more than a year

15  after the case was indicted.  We're now at two years since this

16  case has been indicted.  Then you say that counsel for En+

17  informed you that if the Court authorized a deposition, the

18  company would make best efforts to make Mr. Fokin available,

19  but the motion wasn't brought until mid November.  Twice you

20  asked to adjourn the briefing schedule.

21        It shouldn't have played out that way.  I'm going to

22  consider the adjournment request, but I think that this has

23  not -- you should have started this earlier.

24        MS. GLAVIN:  Can I just walk through, your Honor,

25  chronology, just to make my record.

1          THE COURT:  Yes.  And I would like to know, by the

2     way, exactly when did you find out that Mr. Fokin would be

3     unavailable to come to trial here?

4          MS. GLAVIN:  In December.  I think we filed -- I think

5     we learned a few days before we filed our reply brief.

6          THE COURT:  All right.

7          MS. GLAVIN:  So, your Honor, the chronology went as

8     this.  We did not know anything about what would be the

9     government process for this.  Okay.  We did not know that it

10    would take them months to do this.  We thought this could be

11    done relatively quickly.

12          Particularly, Mr. Fokin, one, was he willing to come

13    to the U.S.; or, two, would he go to, you know, another country

14    in which the government could more easily get approvals.

15          So we put the government on notice six months before

16    the trial that we may try to get a Rule 15 deposition.  But the

17    issue that we had was all we had from Mr. Fokin was what the

18    government had produced in their border report.

19          THE COURT:  Excuse me, the what?

20          MS. GLAVIN:  In the border report from when he had

21    been stopped.

22          THE COURT:  Oh.

23          MS. GLAVIN:  So he had been stopped in 2021.  We knew

24    that the border report wasn't going to be enough to get a Rule

25    15 granted.

1          We reached out repeatedly to Mr. Fokin in February and

2     in March.  Called repeatedly.  Reached out through written

3     electronic message.  And we got nowhere.  To find out if he

4     would come here.  So it was unclear, A, if we would have to do

5     a Rule 15 at that point.  Because we repeatedly could not get

6     in touch with them, with Mr. Fokin.

7          We then were in touch with En+'s counsel as we were

8     getting ready for trial.  And because En -- I viewed it as I

9     could no longer get in touch with Mr. Fokin directly because

10    once I engaged with En+'s counsel, I took that under the ethics

11    rules to mean I couldn't contact him directly and had to work

12    through En+'s counsel.  En+'s counsel at Boies Schiller told me

13    that they were taking steps, things would take time.  They did

14    not know what Mr. Fokin would testify to.

15         So at this point in time I did not know what he would

16    say, if he would come to the United States, and I was on

17    regular phone conversations with Boies Schiller on this issue.

18         Boies Schiller was also seeking trying to get

19    information from the company.  Once the trial date got

20    adjourned, I think that they met with him.  I think from the

21    government's notes is that En+'s counsel met with Mr. Fokin and

22    I think the government had also made requests of En+'s counsel

23    from their end.  And that they took a trip to Russia.  And they

24    then met, they met with Mr. Fokin, and then En+'s counsel met

25    with the government and proffered to the government what they

1    had learned, what Mr. Fokin told them.  The government then

2    provided those notes from that conversation to the defense in

3    July on the eve of the August trial.

4              So up until that point, A, we did not know precisely

5    what he was going to testify to.  Other than what he said at

6    the border years -- three years earlier, which wasn't going to

7    be good enough for me to get a Rule 15 from the Court.  And I

8    knew that from the case law.  B, then the question was would he

9    be willing to come to the United States and would he be

10   unavailable, which we did not know.

11             After -- so the government produced these *Brady* notes

12   to us in July right about the same time asked for an

13   adjournment of the August trial date.  We then had -- I had

14   numerous discussions with En+'s counsel because we were also

15   discussing with the government getting documents from En+.

16             After the trial got adjourned, I continued talking to

17   En+'s counsel about we need to know if he will testify.  And

18   what En+'s counsel said repeatedly is we are trying to obtain

19   counsel for him and we are trying to get the company to get

20   individual counsel for him.  We waited, probably five to six

21   weeks, waiting for Mr. Fokin to get counsel who could advise

22   him and so that we would be able to present to the Court, is he

23   unavailable, would he be willing to go to the United States or

24   another country, and what would that look like.  Otherwise, I

25   didn't have the ability to make a Rule 15 motion.

1      So this is something we had been working on for

2   months.

3          THE COURT:  I understand that all of that takes time,

4   but my problem is by your own admission in your declaration,

5   you didn't start this process until February or March of 2024,

6   more than a year after the case was indicted, and not very long

7   before the trial that was scheduled at that point.

8          So I get that all of this back and forth takes time,

9   but what were you doing the first year?

10         MS. GLAVIN:  The first year, your Honor.

11         THE COURT:  Yeah, in terms of Mr. Fokin and his

12  deposition.

13         MS. GLAVIN:  Your Honor, we were -- we did not think

14  Mr. Fokin would testify.  And what we were getting from the

15  government is that it wouldn't have been good for us.  So it

16  was a lot of back and forth and discussion with our team.  Do I

17  wish now knowing that a -- what Mr. Fokin was going to testify

18  to with detail is exactly what we've been saying all along, and

19  that the company would make reasonable efforts to do it,

20  absolutely not.  It took months for that.  I never dreamed it

21  would take as long as it was going to take.  Ever.

22         THE COURT:  You were talking to the government in 2023

23  about --

24         MS. GLAVIN:  We raised -- we asked them about Fokin.

25  We were actually asking them about Fokin's devices.  Part of

1    the issue, we did not -- Fokin's devices, there were issues

2    with them as we went through them because we were like who is

3    Fokin talking to.  And before I was going to start making

4    representations to the Court in putting affidavits together, I

5    wanted to know.  And then I subsequently learned it took a long

6    time to learn they don't have full images of Mr. Fokin's

7    devices.

8            But, yes, we were going through that.  We were

9    translating documents.  We did not actually get, your Honor --

10   the government produced to us some translations.  We did not

11   find, except through our own translations that were of a

12   Russian document and a French document -- and I think I called

13   it the proverbial needle in the haystack in discovery.  We did

14   not get those translations probably until a year into the case.

15   And those translations also informed us going to Fokin when it

16   became clear to us Arena Lazaru was very much tied to En+ and

17   Rusal.

18           THE COURT:  Were they required to provide those

19   translations?

20           MS. GLAVIN:  I think, your Honor, if you're going to

21   put *Brady* front of us, they should have done that.  For

22   instance, if the government had provided to me the e-mail that

23   they got, two e-mails they got, in May and June of 2022 from an

24   FBI analyst, attaching documents, including some of the ones

25   that the French and Russian one.  If they had provided that in

1   the Rule 16 discovery when they should have, that would have

2   helped short circuit things.  They didn't provide that to us

3   until July of 2024.  And that had been sitting in their files,

4   that they had those documents.

5          So, yes, if I had been on the case, and I was the

6   government, and I knew in the discovery that there was a French

7   document and a Russian document that I had not given the

8   defense translations for that were entirely exculpatory to

9   their case, yeah, I would have tried to make translations

10  available to them, or pointed them to them.

11         THE COURT:  How much an adjournment are you looking

12  for?

13         MS. GLAVIN:  I don't know right now until I get --

14  until I get some type of information from, you know, Mr. Olson

15  on this.  And typically, because I need to do -- now I'm going

16  to do a letters rogatory to the extent it will expedite the

17  process.  But what I think we should do is come back for a

18  status conference.  I mean, I've talked to Mr. Shestakov with

19  this -- about this at length.  And, particularly, where we are

20  today, which is that the hold up in this, is I can go do this

21  deposition tomorrow.  Defense can do the deposition tomorrow.

22  The issue is because there is no law, there is no treaty, there

23  is no statute that says I need a letters rog to go take this

24  deposition.

25         This is OIA saying, well, it's customary for defense

1    lawyers to do that.  There is no law requiring it.  But the

2    issue here is what DOJ's internal processes are and what

3    they're being told by the state department about what they can

4    and cannot do.  That's the issue here.  And I don't think any

5    of this would have been delayed if that could have been done.

6            And I will say, my experience with OIA, although it's

7    dated, is that, and I said this to the government, they can

8    make the sun and the moon move when the government needs a

9    deposition done of somebody that they need to get done quickly

10   in a Rule 15.

11           THE COURT:  ███████████████████████████

12   ████████████████████     █████████████████████

13   ███████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ███████████████████████████████████████████████

16   ██████████████████████████████████████

17           MS. GLAVIN:  So the issue is, your Honor, I don't

18   know -- ████████████████████████████████████████

19   ███ then are there other places it can be done?  That's what I

20   want Mr. Olson to work with the government on so that we can

21   propose this to Mr. Fokin and get this done.

22           THE COURT:  Well, first, you're going to confirm in

23   writing that Mr. Fokin is willing to appear in Cyprus, and/or

24   Turkey.

25           MS. GLAVIN:  Yes.

1            THE COURT:  All right.

2            MS. GLAVIN:  As soon as I hear back from Mr. Nadler.

3    I posed that today, he would take it to Mr. Fokin.

4            THE COURT:  Is Mr. Nadler at a firm?

5            MS. GLAVIN:  I think he is.  But he's in Miami and I

6    can't -- hold on.

7            I don't think you would recognize the firm.  It's

8    Stumphauzer Kolaya Nadler & Sloman.

9            THE COURT:  Thank you.

10            Ms. Zverovich.

11            MS. ZVEROVICH:  Yes, your Honor.  Your Honor, if I may

12    just briefly correct the record and set out the government's

13    position.

14            The government's position is that the defendant very

15    much dragged his feet with respect to this Rule 15 deposition.

16    In the very first discovery production in this case, which was

17    made in early February of 2023, the government produced to the

18    defense a statement that Mr. Fokin made during a border stop in

19    2021.  And the substance of that statement is materially the

20    same, which is that he said that this contract with Spectrum at

21    issue in this case was the business of En+.  So the defendant

22    has been on notice of that statement since early February of

23    2023.

24            The defendant then in January of 2024, so almost a

25    year after getting that information in discovery, advised the

1   government by e-mail that he intended to file a motion in the

2   next few weeks seeking a Rule 15 deposition of Mr. Fokin.  That

3   motion was not filed until nine months later, your Honor.

4          So that is the record in this case.  And so had the

5   defendant pursued this deposition and filed a letter rogatory

6   request a year, almost two years ago at this point, we would

7   not be in this situation.  And so while the government, as we

8   said in our letter, do not oppose a brief adjournment of the

9   trial date in order to allow this process to play out, we do

10   think it should be brief, your Honor.

11          And further, as we stated in our letter, this case

12   involves the testimony of multiple out-of-state witnesses, who

13   require their travel to be arranged, etc.  And so we would ask

14   the Court, it would be important for us to have some certainly

15   with respect to the trial date.

16          THE COURT:  Absolutely.  We're not going to adjourn

17   *sine die.*

18          MS. ZVEROVICH:  Thank you, your Honor.

19          MS. GLAVIN:  If I might be heard briefly on this, your

20   Honor.  One is with respect to what is required to make a Rule

21   15 motion.  We did not have -- and we did not know literally

22   until December I think it was 15th or 16th and we filed our

23   motion on the 17th.  We asked for extra time on that reply

24   because we had been told that Mr. Nadler had been retained,

25   that En+ had retained him for Mr. Fokin.  But we still didn't

1   have answers to our questions.  The Rule 15 would have been

2   denied and we did not know he would be unavailable.

3        With respect to of course we knew and were on notice

4   when we got the border report, but that doesn't make you make

5   your Rule 15 motion then and there.

6        We, subsequently, going through the discovery, saw

7   other things that we thought would be able to be in a position

8   to corroborate the testimony and things that we found on our

9   own that would corroborate the testimony.  But just because you

10  get the discovery -- and I might add, the discovery, we still

11  are getting the discovery even now.  More keeps coming across

12  the transom.

13       But the defense doesn't make a Rule 15 motion right

14  away because you don't know that he's even not going to come to

15  the United States.  In fact, we had some hope that perhaps he

16  might come to the United States and none of this would have

17  been necessary.  But whether or not we were going to call him

18  in our case in chief and seek this out, certainly was not

19  something that we decided was a number of months.

20       And when we informed the government about that in

21  January, we fully expected that we would be able to get in

22  touch with Mr. Fokin one way or another, through phones,

23  through e-mails.  And then there is also the issue of

24  Mr. Fokin's visa having been revoked at the government's

25  request, which is something that we did not learn about and we

1    got in discovery.  I think sometime in 2024 we got the papers.

2    So it just isn't, as the government presents, that you

3    automatically do this.

4           And, second, with respect to the prejudice to the

5    government, there is no, in our view, prejudice with respect to

6    them.  They waited -- they investigated this case for two

7    years, at least two years before they brought it.  And the

8    amount of discovery, you know, we were told several times they

9    were done with it.  And they weren't and there were a lot of

10   stuff missing.  There were problems and there was, you know,

11   I've had -- I've said my piece on this, but there was egregious

12   belated *Brady* disclosures to us that were critical.

13          We have also learned new things.  Your Honor now has

14   in front of her our motion from learning that Mr. McGonigal had

15   a relationship with the CIA after he retired from the FBI.

16   That was just in text messages that we got in December.

17          With respect to prejudice to them, almost all of the

18   government witnesses are law enforcement in this case.  You're

19   going to have Mr. Neza, who's a cooperator who can testify.

20   There is someone I've identified as a defense witness that the

21   government learned about recently and I think they want to call

22   her in her case in chief.  But these are law enforcement

23   officials, the people who had the interviews of Mr. Shestakov.

24   These are the people who are going to be putting in the text

25   messages.  This is a document driven case.  This is what those

law enforcement agents do.  They can come here when they're

told to come here, to the extent they're not testifying some

place else.  But the vast majority of witnesses in this case

are going to be law enforcement.

          I've, you know, asked the government about who the

witnesses are.  I'm not getting, you know, responses.  We have

not received, we're now two weeks from trial, we have not

received any 3500 material for the witnesses because they

wanted to wait to see what your Honor was going to do on the

adjournment.  But I expect that the 3500 material is going to

be extremely voluminous.  And the one thing is, I can't agree

to stipulations until I see what the 3500 material -- a number

of stipulations until I see the 3500 material.  So that factors

into it as well.  But the prejudice actually is, to me, is if

Mr. Fokin -- and Mr. Shestakov does not have his testimony.

There is not -- this is a circumstantial case.  There will not

be a witness from the government that is going to take the

witness stand and say I committed these crimes, here's how we

did it.  Here are the text messages and I did it with

Mr. Shestakov.  That's -- it's unusual for government to be in

that position.  But it's not unusual when my client didn't

violate the sanctions.  That's why they don't have that

witness.

          Most of this case is going to come in through text

messages or communications they had with Mr. Fokin, which is

1   why his testimony could not be more critical.  Because they're

2   not going to have anybody explain what Mr. Fokin or know what

3   Mr. Fokin was talking about or what he said.

4           Charlie McGonigal is not going to be a witness in this

5   case, but they're going to be putting his text messages in with

6   no one to be able to explain what those text messages meant

7   with my client or what they meant with Mr. Fokin.  There will

8   be a number of documents that will come in that Mr. Fokin

9   received from Mr. McGonigal as they related to what we've told

10  the Court we believe really happened here.  Which is that

11  Mr. McGonigal got Mr. Fokin business intelligence information,

12  so that En+ Rusal could make decisions about a business dispute

13  and ultimate lawsuit that was filed in the U.K., including

14  information, and you'll see this in the text messages, about

15  Atomyze, which made its way into the lawsuit that they filed,

16  about Interros, I-N-T-E-R-R-O-S, about a company called

17  SinBridge.  All of that was used by En+/Rusal when they filed

18  the lawsuit against Potanin for its misuse of Nornickel for its

19  assets.

20          So the prejudice to the government is getting these

21  FBI agents in who did the seizures, who did the extractions

22  from the phones.  They will likely have a summary witness and

23  they will create a big Excel spreadsheet to try to argue this

24  is what happened.

25          With respect to -- and then they will have Agron Neza

1   who has no personal knowledge of what this transaction was with

2   Spectrum, but was Mr. McGonigal's business partner.  So the

3   prejudice to the government, with all due respect, is these FBI

4   agents and law enforcement can make themselves available

5   because that's what they do.  If this were all civilian

6   witnesses, civilian cooperating witnesses, etc., that might be

7   another thing.  But this is a different type of case.

8           The prejudice to Mr. Shestakov is this is his life.

9   And the more information that we have gotten in this case, and

10  particularly from the government in the last eight months, has

11  been amongst the most critical information that we have.  And

12  we have also been doing some of our own investigation.  And,

13  you know, which goes to -- and, your Honor, I would like to

14  schedule a time to make argument on some of the motions that

15  are pending because there are some documents that we need, that

16  we desperately need, and there's a witness that we desperately

17  need to call.  But the prejudice is to Mr. Shestakov.  And in

18  my discussions with him over and over in this case, it's yes,

19  he would like to go to trial, but he's like we're not ready.

20  We need to get this stuff and we need to get Mr. Fokin.  And so

21  that is -- I don't think you should adjourn *sine die*, but

22  certainly so there's enough time for me to submit a letters

23  rog.  ████████████████████████████████████████████

24  ███████████████████████████████████████  it may be that I am

25  able to, through letters rogue and trying to work through Dubai

1   counsel, and I may do the same with respect to Cyprus and

2   Turkey if Mr. Fokin will testify there as well.

3           But it is the prejudice to Mr. Shestakov, you know, on

4   Fokin, it's the whole ball game.  It's the whole case.  And,

5   you know, I'm fighting hard.  I think you can see it in the

6   motions.  I'm fighting hard, because we think they got it

7   wrong.

8           THE COURT:  All right.  Ms. Zverovich, talk to me

9   about the prejudice to the government.  Of course the public is

10  prejudiced by extended pretrial delays.

11          MS. ZVEROVICH:  Right, your Honor.

12          The public has an interest in having a speedy trial.

13  And Ms. Glavin is just not correct that the government would

14  not be prejudiced by a lengthy delay.  This case, the

15  government expects to call many witnesses, and not all of them

16  are law enforcement witnesses.  There will be civilian

17  witnesses.

18          The conduct in this case is from 2021.  So we are

19  coming up on it being four years old at this point, your Honor.

20  As the Court well knows, people's memories fade over time.  It

21  becomes much more difficult to put on a case the longer you get

22  from the conduct at issue.

23          And so Ms. Glavin in her papers indicated that she

24  would be seeking a brief adjournment, that's a quote from the

25  defense papers.  And we just would like to understand how long

1  of an adjournment the defense is seeking.

2           THE COURT:  All right.  Ms. Glavin.

3           MS. GLAVIN:  Your Honor, with respect to -- just on

4  this issue, the public interest in a speedy trial.  The public

5  interest is that justice is done.  And that's what the speedy

6  trial provides and that's why it's the defendant that has the

7  Constitutional right, and it's why there are exclusions.

8           THE COURT:  Well, the Second Circuit has said that

9  extended pretrial delays may impair the deterrent effect of

10 punishment.  So there is that.

11          MS. GLAVIN:  It may impair it, but Mr. Shestakov, in

12 this particular case, I think the most important thing is that

13 it get -- is that it get done right.  What I would like to do

14 is come back to the Court after we get the declaration from

15 Mr. Olson, after I can -- so what we will do is this week we

16 will prepare letters rogatory to send to your Honor.

17          I was looking at the *Fargesen* case with Judge Preska.

18 She did set a trial date, but had the parties come back for a

19 pretrial conference to give a status report.  I just, my goal

20 is to get this done and for the government to do everything in

21 their power to help us for this to get done expeditiously.

22          THE COURT:  Ms. Zverovich.

23          MS. ZVEROVICH:  Your Honor, as I mentioned to the

24 Court, we would ask for certainty as to the trial date at this

25 conference because we do have a lot of out-of-state witnesses.

1    We're in the process of interviewing them and arranging travel,

2    and it is important for us to have a date certain.  And if the

3    defense intends to pursue this deposition, it is clear that it

4    cannot happen by the current trial date.

5            And so we would ask for the Court to make a

6    determination as to that adjournment request at this

7    conference.

8            THE COURT:  Yeah.  I mean, it's also challenging for

9    the Court.  I've been holding four weeks open for a long, long

10   time.  And, you know, if I'm going to move that we're not --

11   I'm just not going to -- or we're going to be looking at 2026

12   to do this.  I'm not doing that.

13           So my first thought was pushing it by a couple of

14   weeks and starting later in February.  I know you're going to

15   tell me that doesn't work for you, Ms. Glavin.

16           MS. GLAVIN:  No, I think the issue, your Honor, is

17   that ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ██████████████████████████████  I know that was

20   presented to Judge Preska in the *Fargesen* case that the

21   government took the position that ████████████████████████

22   This can go on for a long time.

23           So what Judge Preska did, was she set it down for a

24   conference for the parties to advise her on what progress, if

25   any, had been made, and then set a trial date after that.  I

1   don't think we're going to have an answer in a couple weeks,

2   but I'm going to get the letters rogatory out, to the extent we

3   need it in Cyprus and Turkey to do that.  But what I'm

4   understanding is it's the government that is saying that their

5   internal processes are going to take months.  That's the

6   problem.

7           THE COURT:  Well, you don't expect to take a

8   deposition without government's participation, do you?

9           MS. GLAVIN:  Exactly.  No, that's the issue.

10          THE COURT:  All right.

11          MS. GLAVIN:  Unless the government waives it.

12          THE COURT:  Well, you think you'll be able to use that

13  at trial, a deposition where the government wasn't present?

14          MS. GLAVIN:  If the government -- no.  I would make a

15  motion to the Court and say they had the opportunity to attend

16  and didn't.  But I had no idea that it would take them months

17  to be able to get the approvals to participate.  None.

18          THE COURT:  I mean, it's also the case that we're just

19  not going to put this trial off indefinitely.  We're going to

20  have to pick a time.  I know the *Fargesen* case, but I don't

21  remember offhand if in that case -- I really doubt it -- there

22  had already been two previous adjournments before this issue

23  came up and the trial date was set.

24          So we probably have a different backdrop here than

25  Judge Preska was looking at there.

1          What about April?

2          MS. ZVEROVICH:  That works for the government, your

3     Honor.

4          THE COURT:  By the way, I should say that there have

5     been references in different submissions to three weeks, four

6     weeks.  I think more recently, Ms. Glavin, you mentioned three

7     weeks.  I mean, what are the parties estimating in terms of

8     length of trial at this point?

9          MS. ZVEROVICH:  Your Honor, the government's current

10    estimate for the government's case is approximately two weeks,

11    with the caveat that we did propose eight stipulations to

12    defense counsel and we asked for their position one way or the

13    other on those stipulations.  If reached, those would allow the

14    government to streamline its case by avoiding the need to call

15    multiple custodians.  And we have not heard from defense

16    counsel on those, and so that can effect the length of the

17    trial.

18         MS. GLAVIN:  Yes, your Honor.  With respect to the

19    stipulations, I have told them on some stipulations, we

20    actually can't stipulate.  And then on some others, it really

21    is going to be determination on what we see in the 3500

22    material.

23         With respect to what we expect for the defense case, I

24    think we're going to have at least a week for the defense case.

25    It could be longer.  You know, like the government, we're

1    actually interviewing witnesses and doing our own prep, and we

2    have continued to do that.  I just am conferring with my team,

3    your Honor, with respect to just some things that are coming up

4    that we planned.

5            THE COURT:  All right.  You can do that.  Go ahead.

6            MS. GLAVIN:  Your Honor, we would respectfully

7    request, given another matter, we would respectfully request a

8    trial date of June 2nd.

9            THE COURT:  Let's see if I can do it.

10           Well, I have another criminal trial planned for that

11   week or so.  I could do it in June, but it would have to be a

12   little bit later.  And I want to get the government's position.

13   I will say, this is going to be the last adjournment.  There

14   will be no more adjournments after this one.  Once we settle on

15   a date, I'll go back to that.

16           Ms. Zverovich.

17           MS. ZVEROVICH:  I'm sorry, your Honor.

18           THE COURT:  What is the government's position on June?

19           MS. ZVEROVICH:  Just one moment, your Honor.

20           THE COURT:  Yeah.

21           MS. ZVEROVICH:  Your Honor, the government does not

22   object to an adjournment to June, with the caveat that our

23   position would be that no further adjournments on the basis of

24   the deposition will be appropriate.

25           THE COURT:  Well, there are going to be no further

1    adjournments of this trial.  Ms. Glavin, do you understand?

2              MS. GLAVIN:  Yes, your Honor the record should reflect

3    the last adjournment was at the government's request.

4              THE COURT:  Well, you consented to that adjournment

5    and gave your own reasons that you wanted an adjournment as

6    well.

7              MS. GLAVIN:  Yes.

8              THE COURT:  And the previous one was your request that

9    the government consented to.

10             MS. GLAVIN:  Yes.  But I just want to be clear the

11   government asked for an adjournment, your Honor.

12             THE COURT:  All right.  They asked for a brief

13   adjournment and I tried to move the trial to August to later

14   2024 and you said you were booked for the entire fall, all the

15   way through the month of December, which left us having to

16   delay it six months, and here we are.

17             Mr. Shestakov, do you understand there will be no

18   further adjournments of this trial?

19             THE DEFENDANT:  I do, your Honor.

20             THE COURT:  All right.  And the government, I assume,

21   understands that as well?

22             MS. ZVEROVICH:  We do, your Honor.

23             THE COURT:  All right.  So, Ms. Glavin, I know you

24   don't like a Tuesday start date, but we're going to have to do

25   that here.  We'll get fresh jurors for you that day.

1           MS. GLAVIN:  Okay.

2           THE COURT:  All right.  We will start on Tuesday,

3    June 17th.  I do want updates, though, in the near term on

4    whether hurdles are being cleared with respect to letters rog,

5    MLA, and whatever else.

6           Let's talk about some other dates and deadlines now.

7           So we have from late yesterday an application from the

8    defense relating to Mr. McGonigal.  I don't remember if that

9    was sealed, so I'm not going to say more.  I know everyone

10   knows what I'm talking about.

11          MS. GLAVIN:  It's on the public record, your Honor.

12          THE COURT:  It is.  Okay.  Thank you.

13          When can the government respond?

14          MS. ZVEROVICH:  Your Honor, we would ask for two

15   weeks, please.

16          THE COURT:  All right.  And then, Ms. Glavin, if would

17   you like to reply, you will have a week after that.

18          MS. GLAVIN:  Yes, your Honor.

19          THE COURT:  All right.  I would like that text,

20   please.

21          MS. GLAVIN:  Yes, your Honor.

22          THE COURT:  There are some new applications that came

23   in about an hour before the conference.  I haven't had a chance

24   to even look at those.  I don't imagine the government did

25   either.  But I will expect a response and a reply on the

1    ordinary timetable unless I hear otherwise from you all as to

2    that application or applications.

3            MS. GLAVIN:  On the ordinary timeframe, I think maybe

4    we should just maybe agree on some dates.

5            THE COURT:  All right.

6            MS. GLAVIN:  Yeah.

7            THE COURT:  Whatever you like.

8            MS. ZVEROVICH:  Your Honor, we would propose three

9    weeks for the response and two weeks for the reply.

10           THE COURT:  All right.  My understanding is that other

11   than an application relating to Mr. McGonigal and the new

12   applications for today, everything else is fully briefed.  Is

13   that correct?

14           MS. GLAVIN:  Yes, your Honor.  And we would actually

15   request to have some argument in front of the Court at a time

16   at your convenience.

17           THE COURT:  Yeah.  Absolutely.  We can do that.

18           MS. GLAVIN:  With respect to the issue on the

19   documents we are seeking from the Deripaska indictment, it's

20   just the sooner we can do that, the better, because to the

21   extent your Honor agrees and directs them to be turned over, we

22   really need those in getting other subpoenas out.

23           THE COURT:  Yes, you will have additional rulings from

24   me soon.

25           MS. GLAVIN:  So could we schedule a date now perhaps?

1          THE COURT:  I don't want to do that yet because I --

2     we'll schedule a date soon, but the date itself doesn't need to

3     be -- when are you thinking for argument?  It can be in

4     February now, can't it?

5          MS. GLAVIN:  That's why I was just like let's do it.

6          THE COURT:  I see.

7          MS. GLAVIN:  Yeah, that's what I was hoping.  Because

8     I have a window.

9          THE COURT:  Yeah.  We all do suddenly.

10         Tuesday, February 11th.

11         MS. ZVEROVICH:  That works for the government, your

12    Honor.  Thank you.

13         MS. GLAVIN:  Works for the defense, your Honor.

14         THE COURT:  All right.  11:30.

15         MS. GLAVIN:  Would that be on all of the fully briefed

16    motions or?

17         THE COURT:  I mean, I'm open to hearing whatever

18    people want to argue about.

19         MS. GLAVIN:  Okay.

20         THE COURT:  I guess I should set aside some time then

21    for that day.  Depending on how many additional motions you

22    bring, Ms. Glavin, between now and then, I do reserve the right

23    not to hear argument on an endless number of motions that day.

24         MS. GLAVIN:  Yes.

25         THE COURT:  We'll say 11:30, and I'll hold the

1   afternoon.

2          Ms. Williams.

3          THE DEPUTY CLERK:  Yes, Judge.

4          THE COURT:  Okay.

5          Now, I think that there is no issue with Mr. Olson,

6   the supplemental Olson declaration coming in in ten days.

7   Correct?  Although if he can do it in a week, you know.

8          MS. ZVEROVICH:  Your Honor, we would ask for ten days

9   from the time where we finalize the set of questions with

10  defense counsel.  We will work as quickly as possible to do

11  that.  And then --

12         THE COURT:  All right.  I hope that.  I hope you will,

13  yes, because --

14         MS. GLAVIN:  Do it tomorrow.

15         THE COURT:  All right.  I assume there's no need to

16  come back to me with what the questions are.  I'll just see

17  them addressed in the supplemental declaration.

18         We're going to have to deal with speedy trial now I

19  guess for a day.

20         Wait, before we do that, I want to ask if, I want to

21  ask the government if there's any need to seal any portion of

22  this transcript relating to the declaration?

23         MS. ZVEROVICH:  Yes, your Honor.  Because the --

24  because today's proceeding referenced a sealed portion of the

25  declaration, we would ask for the transcript to be partially

1   redacted.  And we can propose redactions for the Court's

2   consideration.

3           THE COURT:  Okay.  Why don't you do that, propose

4   redactions of the transcript.

5           MS. ZVEROVICH:  Your Honor, also just one scheduling

6   question with respect to the argument.

7           THE COURT:  Yeah.

8           MS. ZVEROVICH:  We would just note that

9   February 11th I think is before the latest motions will become

10  fully briefed.

11          THE COURT:  Oh, then we don't want to do that.  So

12  there was something you were going to take three weeks and two

13  weeks, so we have to go five weeks out, right.  Let's see.

14          Well, we have plenty of time in February.  I mean, we

15  would have to go into March then.  I'm not opposed to having

16  two separate argument dates so that we can move things along.

17          Okay.  So why don't we do that.  Why don't we stick

18  with February 11th, and then we can pick a date in March.

19          So the new motion will not be fully briefed until

20  Monday, March 3rd.  Right?  If we're going out five weeks from

21  today.

22          MS. GLAVIN:  Well, actually, your Honor, with respect

23  to the new motion that was filed this morning, that is a motion

24  to compel testimony from a subpoenaed witness.  She is

25  represented by counsel.

1          THE COURT:  Yes.

2          MS. GLAVIN:  So we should confer with Mr. Maffeo about

3    his availability and whether he's going to be briefing as well.

4          THE COURT:  Well, didn't something come in at like

5    1:00 something this afternoon, what was that?

6          MS. GLAVIN:  That was it.

7          THE COURT:  Okay.

8          MS. GLAVIN:  So we have a witness that we subpoenaed

9    for the February 10th trial, that is a motion to compel her

10   testimony.  It is Olga Shriki, who your Honor is probably

11   familiar with.

12         THE COURT:  Yes.

13         MS. GLAVIN:  She has informed us, her counsel informs

14   us, she intends to assert the Fifth.  We have reason to believe

15   she's a cooperator with the government and that the motion

16   addresses that.  And she is represented by counsel Bruce

17   Maffeo, who just should be made aware of any of the scheduling

18   and appearing before the Court.

19         THE COURT:  All right.  So we can't pick a date then

20   for that particular motion.  So you'll come back to me and let

21   me know the status on that and then we'll schedule argument.

22         So is there an application from the government to

23   exclude time?

24         MS. GLAVIN:  One other housekeeping matter I wanted to

25   raise with the Court.

1          THE COURT:  Yes.

2          MS. GLAVIN:  Is that I had heard that the government

3     may be seeking its own Rule 15 deposition in this case.  And if

4     that is the case, sort of what that would be and what that

5     looks like.  They had told me they had not made up a decision

6     on whether they would be making a Rule 15 application.  So I

7     just wanted to tee that up if that's something that's on the

8     radar screen.

9          THE COURT:  Okay.  Does the government wish to say

10    anything about that now?

11         MS. ZVEROVICH:  No, your Honor.  Other than it's

12    something that we are contemplating.  We do not have a witness

13    identified yet, and so it's premature to raise that at this

14    point.

15         THE COURT:  All right.  Well, I'll see your

16    application when it comes, if there is one I suppose.

17         I should mention one matter relating to trial and

18    trial days, which I'm sure you all are used to from practicing

19    in this district.  Consistent with the typical approach in this

20    district, which is judges either sit Monday through Thursday

21    and deal with the rest of their docket on Fridays, or they hold

22    trial five days a week but end it around 2:30.

23         I would opt for the latter.  And so I don't imagine

24    anyone was thinking we would be doing five days a week of full

25    trial days, but just want to let you know that that will be my

1   plan.  And if that pushes us out, I don't know what the

2   underlying assumptions were when you thought about four weeks

3   but.

4           All right.  Ms. Zverovich, speedy trial.

5           MS. ZVEROVICH:  Your Honor, the government moves to

6   exclude time through the new trial date of June 17th, 2025

7   under 18, U.S.C., 3161(h)(7), and we would ask the Court to

8   make a finding that the interest of justice served by the

9   continuance outweigh the interests of the public and the

10  defendant in a speedy trial based on the defense request for

11  this deposition.

12          THE COURT:  Ms. Glavin?

13          MS. GLAVIN:  Mr. Shestakov fully consents.

14          THE COURT:  All right.  The time between today and

15  June 17, 2025 is excluded under the Speedy Trial Act pursuant

16  to 18, U.S.C., Section 3161(h)(7) in order to allow for the

17  parties to pursue the Rule 15 deposition of Mr. Fokin, to

18  complete briefing and argument pending motions, and to prepare

19  for trial.

20          I find that the ends of justice served by the granting

21  of this continuance outweigh the best interest of the public

22  and the defendant in a speedy trial.

23          Anything else for today?

24          MS. ZVEROVICH:  No, your Honor.  Thank you.

25          MS. GLAVIN:  No, your Honor.

XP1RAShe                    SEALED

1           THE COURT:  All right.  Thank you all.  We are

2   adjourned.

3           (Adjourned)