

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 10, 2025

**BY ECF**

Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States v. Sergey Shestakov*, 23 Cr. 16 (JSR)

Dear Judge Rakoff:

  The Government respectfully submits this letter in advance of the October 16, 2025 sentencing of defendant Sergey Shestakov. For the reasons set forth below, the Court should impose a sentence of six months' imprisonment and a fine of at least $5,000.

### I. Offense Conduct and Procedural History

  On November 21, 2021, during a meeting with Special Agents of the Federal Bureau of Investigation (the "FBI"), the defendant made materially false statements about (i) his relationship with Evgeny Fokin, and (ii) the nature of the relationship between co-defendant Charles McGonigal and Fokin. (Presentence Investigation Report ("PSR")[1] ¶¶ 36-37). On January 21, 2023, the defendant was arrested in part based on this conduct. (PSR ¶ 43).

  Prior to his arrest, the defendant worked as an interpreter for the federal courts and United States Attorneys' Offices for the Southern and Eastern Districts of New York. (*Id.* ¶ 13). McGonigal served as the Special Agent in Charge of the Counterintelligence Division of the FBI's New York Field Office. (*Id.* ¶ 12). The defendant and McGonigal have known each other for decades, and, in March 2018, the defendant introduced McGonigal to Fokin. (*Id.* ¶ 18).

  Fokin is a Russian national who, from January 2012 to at least August 2025, served as the Director of International Cooperation for EN+ Group—a Russian-based energy and aluminum company formerly controlled by Oleg Deripaska and of which Deripaska continues to be a 45% shareholder. (*Id.* ¶ 15). Deripaska is a Russian oligarch who, in April 2018, was designated as a Specially Designated National by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), in connection with its finding that Russia's actions toward Ukraine constituted

---

[1] The PSR was last revised on September 25, 2025. (Dkt. 290).

Hon. Jed S. Rakoff                                                                                                          Page 2
October 10, 2025

an unusual and extraordinary threat to the national security and foreign policy of the United States. (*Id.* ¶ 14). OFAC imposed sanctions on Deripaska for having acted or purported to act for or on behalf of, directly or indirectly, Russian President Vladimir Putin and for operating in the energy sector of the Russian Federation economy. (*Id.*).

In 2019, the defendant and McGonigal introduced Fokin, who was working on behalf of Deripaska at the time, to an attorney at an international law firm (the "Law Firm") for the purpose of hiring the Law Firm to work on having the OFAC sanctions against Deripaska removed. (*Id.* ¶ 19). The defendant submitted an invoice to the Law Firm seeking $25,000 for assistance with "a delisting application," and the Law Firm subsequently sent $25,000 to a company owned by the defendant's wife. (*Id.* ¶ 20).

In the spring of 2021, Fokin, working on behalf of an unnamed client, began interacting with the defendant and McGonigal on another business project without the involvement of the Law Firm: gathering information on Norilsk Nickel and its Chief Executive Officer, Russian oligarch Vladimir Potanin, including identifying whether Potanin had any passports and/or visas, had alias identifications, used drugs or prostitutes, used phones and/or email addresses known to be used to conceal activities, had close associates (globally outside of Russia), and had involvement in political favors. (*Id.* ¶ 21). In August 2021, the defendant, McGonigal, and Fokin drafted and executed a contract (the "Contract") memorializing the business project, but did not list or sign their own names on the Contract. (*Id.* ¶ 22). Instead, the parties listed on the Contract were Spectrum Risk Solutions (a company owned by McGonigal's friend (the "Friend")) and Pandean Ltd., a Cyprus-based corporation. (*Id.*).

On August 11, 2021, the defendant informed McGonigal that Fokin wanted the Contract signed as soon as possible, or "[t]he big brain will loose [*sic*] his mind." (*Id.* ¶ 26). Shortly thereafter, the defendant forged the Friend's signature on the Contract. (*Id.* ¶ 26). The Friend knew nothing about the Contract and had never authorized the defendant to sign the Contract on his behalf. (*Id.*). The defendant, McGonigal, and Fokin maintained copies of the Contract on their electronic devices. (*Id.* ¶¶ 22, 26).

While negotiating and performing work under the Contract, the defendant, McGonigal, and Fokin met in person, spoke on the phone, and exchanged hundreds of messages over encrypted messaging applications, but never referred to Fokin's client by name in writing, and instead referred to him as "the big guy," the "big brain," and the "brain." (*Id.* ¶ 23). In August 2021, Pandean Ltd. sent Spectrum Risk Solutions its first payment, and McGonigal directed the Friend to transfer $8,000 to the defendant. (*Id.* ¶¶ 27-29). However, the defendant did not receive that initial transfer. (*Id.* ¶ 29). As a result, the defendant followed up directly with the Friend, and, on October 18, 2021, Spectrum Risk Solutions paid the defendant $8,000 with the description "Sergey Shestakov for Due Diligence." (*Id.*).

From August 11, 2021 (when the defendant forged the Friend's signature on the Contract) to November 21, 2021, the defendant, McGonigal, and Fokin continued to discuss performance under the Contract—including the purchase of dark web files—in person, via the phone, and over encrypted messaging. (*Id.* ¶¶ 30, 32). For example, on November 9, 2021, investigative specialists with the FBI observed a meeting between the defendant, McGonigal, and Fokin in New York City. (*Id.* ¶ 32(c)). In addition, on November 21, 2021, at 7:04 a.m., Fokin told the defendant that he

Hon. Jed S. Rakoff                                                                                                              Page 3
October 10, 2025

would "only go to the United States this year for the sake of our friend, if there is something worthy to pick up," which presumably referred to the dark web files. (*Id.* ¶ 33).

On November 21, 2021, FBI Special Agents met the defendant at a restaurant in Manhattan. (*Id.* ¶ 34). The defendant knew that he was obligated to tell the FBI the truth. (*Id.* ¶ 48). During the meeting, the defendant lied to the FBI about his relationship with Fokin, as shown in the following exchange:

| | |
|---|---|
| FBI Special Agent: | Are you are you still in contact with Fokin? |
| SHESTAKOV: | Yep. |
| FBI Special Agent: | How, like **how recently have you been in contact with him**? |
| SHESTAKOV: | We we speak you know **once in a while** and and uh exchange *pause* notes. He's a personal friend and and uh he's a good guy. |
| FBI Special Agent: | Ok. **Just just a personal friend or have you ever engaged in a business relationship with him?** |
| SHESTAKOV: | *Pause* **No no business** he he you know asks things about *pause* you know how things are and and uh what I'm doing basically he has friends in the um circle of former colleagues of of uh uh Gusinsky and all and and uh he knows Andrey Kolosovsky who is uh uh the former boss of mine in in back in the Media Most who used to be first deputy foreign minister to Russia in the 90s. |

(*Id.* ¶¶ 35-36 (bold and italics added)).

During the meeting, the defendant also lied to the FBI about the nature of the relationship between McGonigal and Fokin, as shown in the following exchange:

| | |
|---|---|
| FBI Special Agent: | Um, **does Charlie McGonigal know Yevgeny Fokin, do you know?** |
| SHESTAKOV: | Um *pause* **he probably does**. Uh because cause I said to him um mentioned uh uh those uh uh names back then because I've always been in touch with Yevgeny. |
| FBI Special Agent: | You mentioned Fokin's name to Charlie? |
| SHESTAKOV: | I I I may have yeah. Absolutely yes, absolutely. |
| FBI Special Agent: | Did you just mention his name or have you ever all met together? |

| | |
|---|---|
| SHESTAKOV: | Uh uh at some point, yeah we did. |
| FBI Special Agent: | Like recently or long time ago or? |
| SHESTAKOV: | Um. |
| FBI Special Agent: | When he was working with us or? |
| SHESTAKOV: | Um *pause* some time ago yeah yeah. |
| FBI Special Agent: | Like a year ago, 4 years ago or? |
| SHESTAKOV: | Um *pause* Um *pause* It it uh *pause* on occasion when when when *pause* Fok Fokin was was uh in town I I would mention it to to Charlie. |
| FBI Special Agent: | While he was still working with us or? |
| SHESTAKOV: | Um *pause* um *pause* both both. |
| FBI Special Agent: | What, *what was Charlie's interest in Fokin*? |
| SHESTAKOV: | Um *he was actually uh wanted to to oh somehow you know be nominally in in in touch with with uh you know uh*. |
| FBI Special Agent: | *Why why*? |
| SHESTAKOV: | Who who, Charlie? |
| FBI Special Agent: | Yeah. |
| SHESTAKOV: | *I guess he he's always uh trying to you know be somehow interested in uh things Russian*. |
| FBI Special Agent: | Okay. |
| FBI Special Agent: | He was interested in on behalf of his work for the FBI with Fokin or was it a personal interest or a financial interest or? |
| SHESTAKOV: | Uh *pause* I think it was originally from from his work in the FBI and then then then then then he's definitely *pause* as a private person *I guess staying on top of of uh things for business connections and all so*. |

(*Id.* ¶¶ 35, 37 (bold and italics added)).

At the end of the meeting, the FBI executed a search warrant for the defendant's electronic devices. (*Id.* ¶ 34).

Eight days later, on November 29, 2021, the defendant, for the first time, registered as a foreign agent under the Foreign Agents Registration Act ("FARA"), by filing a Registration Statement with the U.S. Department of Justice. (*Id.* ¶ 39). In his filing, the defendant: (1) listed Fokin as the foreign principal for whom he was acting; (2) explained that Fokin was "[s]upervised [by] EN+ Group [which] has a Board of Directors Chaired by Lord Barker, significant minority interest owned by Oleg Deripaska"; and (3) stated that Fokin "reports to Lord Barker and presumably Mr. Deripaska." (*Id.*). The FARA form required the defendant to indicate whether the agreement or understanding between him and Fokin (1) was pursuant to a "formal written contract"; (2) "resulted from an exchange of correspondence" but was not memorialized in writing; or (3) was "the result of neither a formal written contract nor an exchange of correspondence." (*Id.* ¶ 40). Notwithstanding the existence of the Contract and extensive correspondence among the defendant, McGonigal, and Fokin regarding the work being performed under the Contract, the defendant checked the third box, *i.e.*, falsely stating that his agreement with Fokin was "the result of neither a formal written contract nor an exchange of correspondence between the parties." (*Id.*). Had he checked either the first or third boxes, the defendant would have been required to submit a copy of the Contract and all pertinent correspondence. (*Id.*).

In his Registration Statement, the defendant also provided the following description of his activities for Fokin: (1) "Mr. Fokin has contacted me seeking professional assistance in the US, which have resulted in the retention of the [Law Firm] and later and separately the business intelligence consultants Spectrum Risk Solutions. I acted in hope that my assistance would result in a facilitation fee from the US entities retained, and I have received such fees"; (2) "From time to time, beginning at approximately [May 1, 2019], Mr. Fokin has communicated with me on behalf of himself and/or his company seeking professional assistance, and I have attempted to facilitate those requests with the help of Mr. Charles F. McGonigal, a security professional, on an ad hoc basis"; and (3) "At Mr. Fokin[']s request, I facilitated with the help of Mr. McGo[]nigal the retention of [the Law Firm]. At Mr. Fokin's request, I contacted Mr. McGonigal, which resulted in some kind of relationship being reached with Spectrum Risk Solutions which I believe is still in progress." (*Id.* ¶ 41). The defendant executed the FARA Registration Statement under penalty of perjury. (*Id.* ¶ 42).

On January 12, 2023, a grand jury sitting in this District returned a five-count indictment (the "Indictment") charging the defendant with (1) conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705, 31 C.F.R. § 589.201, and related Executive Orders ("Count One"); (2) violation of IEEPA, in violation of 50 U.S.C. § 1705, 18 U.S.C. § 2, 31 C.F.R. § 589.201, and related Executive Orders ("Count Two"); (3) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) ("Count Three"); (4) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 ("Count Four"); and (5) false statements, in violation of 18 U.S.C. § 1001 ("Count Five"). (ECF No. 2).

## II.  Guilty Plea and Applicable Guidelines Range

Trial was scheduled to commence on June 16, 2025. On June 12, 2025, the defendant pleaded guilty to Count Five of the Indictment pursuant to a plea agreement with the Government

(the "Plea Agreement").  (PSR ¶ 1).[2]  Pursuant to the Plea Agreement, the parties stipulated that, based on an offense level of two and a Criminal History Category of I, the defendant's applicable Guidelines range was zero to six months' imprisonment.  The Guidelines also recommend a term of supervised release of one to three years and a fine of $200 to $9,500.  (PSR ¶¶ 118, 123).  The Probation Office agreed with the Guidelines calculation in the Plea Agreement and has recommended a non-incarceratory sentence of two years' supervised release and a $5,000 fine.  (PSR at 42).

At his guilty plea hearing, the defendant confirmed that he knew he "had an obligation to be truthful" when speaking with the FBI.[3]  (June 12, 2025 Plea Tr. at 39, ECF No. 283).  The defendant admitted that, on November 21, 2021, in response to questions from the FBI, he "was intentionally deceptive." (*Id.*).  In particular, "when asked whether Mr. McGonigal knew Mr. Fokin," the defendant responded that "Mr. McGonigal probably does know Fokin." (*Id.* at 31).  As the defendant admitted, he in fact knew that "Mr. McGonigal knew Evgeny Fokin and the two were working together." (*Id.*).

Thereafter, the Court asked the defendant whether he was truthful or lying when he told the FBI that he had "no business" with Fokin.  (*Id.* at 40).  The defendant responded:

> Well, your Honor, at the time – and I still continue to think it – that I never had business with Fokin.  He was a friend and I was helping a friend.  So, we didn't discuss any money, any compensation on his behalf or the company that he represents behalf, so I was basically doing a friendly service. . . .  And my understanding was that we can describe my relationship with McGonigal as business, and that's different from my relationship with Fokin.

(*Id.* at 40).  When asked to elaborate, the defendant stated:

> I did not negotiate the contract.  I helped McGonigal and Fokin communicate.  And when I put that signature on the contract, McGonigal explained to me while he was away on a business trip that he said he was so busy with meetings.  I asked him why cannot the person who is actually on the contract sign off on the contract, and he said he's traveling somewhere in the deep waters of the Balkans so he's not reachable.  And it was a matter of time, time was of the essence, and McGonigal told me, "Sign the contract and we'll be done."

(*Id.* at 41).

After further inquiry from the Court, the defendant stated that "the money that was received by me [from the Friend] was not from Mr. Fokin, never discussed with Mr. Fokin; it was from Mr. McGonigal, upon his insistence, by the way.  And he also paid the same amount to [the Friend], who also figures in this situation." (*Id.* at 44).  The defendant stated that the $8,000 that he received

---

[2] Prior to trial and the defendant's guilty plea, the Government elected not to proceed against the defendant on Counts One through Four of the Indictment.
[3] The defendant also confirmed to the Probation Office that "he knew he was obligated to be truthful with the FBI." (PSR ¶ 48).

was a "finder's fee" from McGonigal "for a contract that [McGonigal] entered with the company that represented EN+ . . ." (*Id.* at 45).

## III. Discussion

### A. Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).[4] Following that calculation, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), when imposing a sentence. They are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Court Should Sentence the Defendant to Six Months' Imprisonment

A sentence of imprisonment of six months would be sufficient, but not greater than necessary, to serve the purposes of sentencing in this case.

#### 1. The Seriousness of the Offense and Need for Just Punishment

The seriousness of the defendant's conduct and the need for just punishment support imposition of a sentence of six months' imprisonment.

Lying to law enforcement is a serious offense that can undermine the integrity of the criminal justice system. As the defendant admitted to the Court during his plea allocution, the defendant knew that he had an obligation to be truthful when speaking to law enforcement, particularly the FBI. The reason for this obligation is straightforward: For the FBI to do its job effectively and efficiently, particularly when conducting criminal investigations, the FBI must

---

[4] Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

receive truthful information in response to its questions. Lies in response to the FBI's questions may cause the FBI to waste valuable time and resources on investigative leads that are, in fact, dead ends; deflect the FBI's attention from guilty subjects; or, worse yet, focus its attention on innocent subjects. *See generally, e.g.*, *United States v. Rodgers*, 466 U.S. 475, 481-82 (1984) ("The knowing filing of a false crime report, leading to an investigation and possible prosecution, can also have grave consequences for the individuals accused of crime. There is, therefore, a valid legislative interest in protecting the integrity of such official inquiries, an interest clearly embraced in, and furthered by, the broad language of § 1001."); *see also United States v. Aiello*, 118 F.4th 291, 305 (2d Cir. 2024) ("[The defendant's] false statements were . . . capable of influencing a decision-making body—the Department of Justice, via its prosecutors and special agents in a proffer session—as it determined who to investigate for wire fraud and wire fraud conspiracy."), *cert. denied sub nom. Ciminelli v. United States*, 145 S. Ct. 2814 (2025); *United States v. Adekanbi*, 675 F.3d 178, 183 (2d Cir. 2012) ("[T]here is little doubt that providing a false identity can result in a significant hindrance to law enforcement's investigation or prosecution of crimes: Giving a false identity can impede the government's ability to develop information about the subject crime, and to inform itself about the defendant and any relevant criminal history").

During the November 21, 2021 voluntary meeting with the FBI, the defendant, fully aware of the need to be truthful, lied repeatedly. When asked whether he had "ever engaged in a business relationship" with Fokin, the defendant falsely stated, "No no business." (PSR ¶ 35). The defendant knew this was a lie: Over the past several months preceding the interview, he, McGonigal, and Fokin negotiated the Contract and discussed performance under the Contract. (*Id.* ¶ 23). In fact, the communications between the defendant and Fokin in the summer and fall of 2021 primarily concerned the Contract, rather than any personal relationship between them. (*Id.*). The defendant was even paid $8,000 for his work under the Contract that he negotiated with Fokin. (*Id.* ¶¶ 28-29). The defendant also lied when he was asked by the FBI how recently he had been in contact with Fokin, responding that they speak "once in a while." (PSR ¶ 35). In truth, the defendant regularly spoke with Fokin regarding the Contract in the summer and fall of 2021, including that very morning. (*See, e.g.*, *id.* ¶ 33).

The defendant continued to lie when he was asked by the FBI about the relationship between McGonigal and Fokin. When asked whether McGonigal knew Fokin, the defendant stated that McGonigal "probably" does (*id.* ¶ 35), even though they had all regularly communicated about the Contract and had met in person just 12 days earlier to discuss performance under the Contract (*id.* ¶ 32). Similarly, when asked what was McGonigal's "interest in Fokin," the defendant lied and said that McGonigal wanted to be "nominally" in touch with Fokin because McGonigal was "somehow interested in uh things Russian" and he wanted to "stay[] on top of uh things for business connections and all." (*Id.*). At no point during this exchange did the defendant tell the FBI that he, McGonigal, and Fokin had been working together on the Contract.

The defendant's lies to the FBI were serious and significant. The FBI was actively investigating the conduct of the defendant, McGonigal, and Fokin, a known longtime associate of sanctioned Russian oligarch Deripaska. The defendant's lies to the FBI, if believed, could have caused the FBI to halt its investigation of both the defendant and McGonigal since, according to the defendant, neither the defendant nor McGonigal were engaging in any type of business with Fokin. Even if the defendant did not know about the existence or scope of the FBI's investigation at the time of the interview, his deliberate lies in response to basic questions about the relationship among himself, McGonigal, and Fokin show that the defendant knew that he was being asked

about important topics and that lying about those topics, rather than telling the truth, was worth the risk of being caught in a lie.

Moreover, the defendant's lies did not stop with his interview with the FBI. After the interview, the defendant lied on his FARA filing, which he signed under penalty of perjury. While the defendant acknowledged in the FARA filing that he had been working as an agent for Fokin, and thereby acknowledged—contrary to what he had told the FBI—that he had a business relationship with Fokin, the defendant lied when he said that he had no formal contract with Fokin, and that his agreement to work with Fokin was not the result of an "exchange of correspondence" between the defendant and Fokin. (*Id.*). As the defendant well knew, he and Fokin had exchanged numerous messages about the Contract. (*Id.* ¶ 23). The defendant also lied when he stated that his work with McGonigal and Fokin "resulted in *some kind of relationship* being reached with Spectrum Risk Solutions" (emphasis added) (*id.* ¶¶ 39-40), when the defendant was fully aware that their work resulted in the Contract, to which the defendant had even signed someone else's name (*id.* ¶ 26).

Finally, the defendant continued his deception even during his plea allocution to the false statements charge before this Court. Although the defendant now does not appear to object to the statement in the PSR that he made a material false statement when he told the FBI that he had never engaged in a business relationship with Fokin (*see* PSR ¶ 36), the defendant attempted to dispute this fact at his plea hearing, falsely telling this Court under oath that he "never had business with Fokin" and that he was merely "helping a friend." (June 12, 2025 Plea Tr. at 41). The defendant also tried to distance himself from the Contract, telling this Court that he "did not negotiate the contract," merely "helped McGonigal and Fokin communicate," and signed the Contract only at McGonigal's explicit direction. (*Id.* at 41). The defendant's false minimization of his role is contrary to the numerous communications exchanged among the defendant, McGonigal, and Fokin. For example, McGonigal kept the defendant updated about the work of the subcontractors whom McGonigal had hired to perform work under the Contract, including by sending the defendant a proposal for the subcontractors' work. (PSR ¶ 24). The defendant also confirmed to McGonigal that he read the Contract, agreed with it, and was glad they had used the Friend's name on the Contract. (*Id.* ¶ 25). And despite the defendant's claims to the contrary, there is no evidence in the defendant's communications with McGonigal to support the defendant's self-serving claims that McGonigal told him to place the Friend's signature on the Contract.

The defendant's pattern of lies to the FBI, on his FARA registration form, and to this Court is serious and warrants just punishment. From his prior meetings with the FBI and his years of working as a court interpreter for the federal courts, the defendant knew better. He knew the importance of providing truthful and accurate answers to questions by law enforcement, the Department of Justice, and the Court. His former job also required and depended on his candor: If the defendant misinterpreted a statement by a witness or a court, or mistranslated a document, that could significantly alter the outcome of an investigation or a case, and it also could cost him his job. During his interview with the FBI, the defendant could have elected not to answer questions. Instead, he affirmatively answered questions and repeatedly lied. Accordingly, just punishment requires an incarceratory sentence.[5]

---

[5] [redacted]

### 2. The Need for General Deterrence and To Promote Respect for the Law

A custodial sentence of six months' imprisonment is also required to promote respect for the law and to deter others who may seek to lie to law enforcement. As discussed in the prior section, witness interviews are often a critical part of law enforcement investigations. Some investigations, especially those involving conduct that occurred many years ago or those involving only one eyewitness to an event, depend primarily, if not exclusively, on witness interviews. When witnesses lie to law enforcement, law enforcement may waste time and resources on frivolous investigative steps. In the worst-case scenarios, lies to law enforcement may lead to charges against innocent individuals or to halted investigations of guilty individuals. As a result, it is imperative that members of the public know not only that they have to be truthful when talking to law enforcement, but also that there will be serious consequences for lying to law enforcement. In this case in particular, where the defendant lied repeatedly and deliberately, a sentence that includes incarceration is necessary to promote respect for the law and deter others from lying to law enforcement. *See United States v. Delgado*, 798 F. App'x 105, 107 (9th Cir. 2020) (affirming as substantively reasonable a 24-month sentence in a Section 1001 case "in light of the 18 U.S.C. § 3553 factors and the totality of the circumstances, including the seriousness of [the] offense and the need for deterrence").

### C. The Court Should Impose a Fine of At Least $5,000

Section 5E1.2(a) of the Guidelines "requires a district court to impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." *United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998). The defendant bears the burden of demonstrating an inability to pay a fine. *See United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).

Under the Guidelines, "[i]n determining the amount of the fine, the court shall consider: (1) the need for the combined sentence to reflect the seriousness of the offense . . . , to promote respect for the law, to provide just punishment and to afford adequate deterrence; (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources; (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments; (4) any restitution or reparation that the defendant has made or is obligated to make; (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct; (6) whether the defendant previously has been fined for a similar offense; (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and (8) any other pertinent equitable considerations." U.S.S.G. § 5E1.2(d).[6]

---

[6] Section 3572(a) of Title 18 also specifies factors a court must consider when imposing a fine. Most of those factors overlap with U.S.S.G. § 5E1.2(d), and the others are not relevant here.

Hon. Jed S. Rakoff                                                                                                         Page 11
October 10, 2025

      The Court should impose a fine of at least $5,000 in this case to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence. The pertinent Section 3553(a) factors are discussed in addressing the appropriate term of incarceration. With respect to the unique considerations here: First, as demonstrated by the defendant's total net worth, and as the Probation Office correctly states, the defendant has the financial resources to pay a fine. (PSR ¶¶ 106, 112). Second, it does not appear that the defendant has any dependents. Third, because of the nature of the offense, the defendant will not be required to pay restitution. (*Id.* ¶ 125). Finally, if this Court imposes the six-month term of imprisonment that the Section 3553(a) factors urge, a $5,000 fine will still fall well short of the cost of imprisoning the defendant for his crimes. (*Id.* ¶ 124). As a result, as the Probation Office recommends (*id.* at 42), the Court should impose a fine of at least $5,000.

## IV.    Conclusion

      For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of six months' imprisonment and a fine of at least $5,000.[7]

                                                   Respectfully submitted,

                                                   JAY CLAYTON
                                                   United States Attorney for the
                                                   Southern District of New York

                                     By:  _____/s/_____
                                           Rebecca T. Dell
                                           Amanda C. Weingarten
                                           Olga I. Zverovich
                                           Assistant United States Attorneys
                                           (212) 637-2198 / 2257 / 2514

cc:  Defense Counsel (via ECF)

---

[7] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).